**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-115-CJN** |
| **LARRY GIBERSON** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Larry Giberson to 11 months' incarceration, 3 years' supervised release, $2,000 in restitution, and the mandatory $100 special assessment. The government's recommended sentence is at the midpoint of the 8- to 14-month guideline range, as calculated by the government and the United States Probation Office in its Presentence Investigation Report.

### I.      INTRODUCTION

The defendant, Larry Giberson, participated in the January 6, 2021 attack on the United States Capitol—a violent attack which interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

On January 6, 2021, Giberson, who at that time was a sophomore at Princeton University, joined the rioters who stormed the West Terrace of the Capitol. As the police line established on the West Terrace collapsed, officers retreated into the Lower West Terrace tunnel ("the tunnel"), which led to an entryway into the Capitol building. Rioters then followed the police officers into the tunnel. At approximately 3:08 p.m., Giberson entered the tunnel and moved directly towards the front pack of rioters, who were assaulting police officers using chemical spray and various objects. Around this time, MPD Officer D.H. was crushed between rioters and doors leading to the Capitol crypt.

At 3:14 p.m., Giberson retreated from the front line and positioned himself at the entryway of the tunnel. Giberson ushered additional rioters into the tunnel and towards the police line before returning inside the tunnel, where he participated in coordinated pushing and pulling against the police. Giberson eventually left the tunnel but remained on the Lower West Terrace, at one point chanting "drag them out!" as rioters continued to assault officers.

The government's recommendation of an 11-month sentence reflects the gravity of Giberson's conduct and serves the sentencing purposes laid out in 18 U.S.C. 3553(a), while also giving due consideration to Giberson's age and lack of criminal history.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 21, for a short summary of the January 6, 2021, attack on the United States Capitol by

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.      Giberson's Role in the January 6, 2021 Attack on the Capitol**

Giberson, a Princeton University student and New Jersey native, decided to attend the Stop the Steal rally after seeing the former President's social media post calling for a protest in Washington, D.C., on January 6, 2021. According to Giberson, as a political science major "specializing in American ideas and institutions" with an interest in Constitutional law and interpretation, he had concerns about the 2020 election.[2] Giberson told agents in his pre-arrest debrief that he planned to be at the Capitol to support the parties that were making decisions regarding the certification of the electoral college, and that he was there to encourage what he believed to be the "correct" certification.[3]

On the morning of January 6th, Giberson and his mother drove from New Jersey to Washington, D.C., to attend the Stop the Steal rally at the Ellipse and then go to the Capitol building. After arriving and watching the former President's speech, Giberson stated that he heard people with megaphones on the Ellipse saying they were going to the Capitol to make their voices heard.[4] According to Giberson, at the time he understood that going to the Capitol and entering

---

[2] Following an investigation, the FBI contacted Giberson in September 2022 and attempted to speak with him. Giberson declined to speak with law enforcement without an attorney. A few months later, Giberson and his attorney met with the FBI for a voluntarily interview. The interview is attached as Government's Exhibit 1.

[3] Government's Exhibit 1 at 22:46-26:34.

[4] *Id*. at 27:00-28:07.

the building was part of a planned political event.[5]  Giberson and his mother went from the Ellipse to the Capitol along the National Mall.[6]

By the time they arrived at the Capitol, Giberson could see a line of officers along the West Front, positioned around the media tower,[7] while rioters with megaphones urged others to "move forward" and to "fill in the gap[]."[8] While Giberson told the FBI that he had no reason to believe that he was not allowed to be at the Capitol,[9] he admitted that certain rioters were being "instigators"—an impression that was consistently reinforced throughout the day.[10] Giberson also admitted to seeing people in camouflage vests and "geared up," which he said was "weird" and "kind of scary" to see.[11] Giberson further noted that, "when tear gas, or pepper spray, or flash bangs were being disbursed, I took that as, you know, these people at the front are really causing problems, and [the police were] trying to get them to back up."[12]

At approximately 2:28 p.m., the police line along the West Front broke, and officers retreated up to the Inauguration Stage. Seeing the police retreat and "ceding ground," Giberson and his mother entered the West Front of the Capitol grounds and walked up a temporary staircase leading to the Inauguration Stage.[13] Giberson and his mother then separated,[14] and Giberson, wearing a blue hat, black and grey gaiter, and a Trump flag around his neck (as pictured below),

---

[5] *Id*.
[6] *Id*.
[7] *Id*. at 52:40-53:20.
[8] *Id*. at 51:50-52:00.
[9] *Id*. at 52:20-53:30.
[10] *Id*. at 53:50-54:20.
[11] *Id*. at 54:30-54:56.
[12] *Id.* at 55:52-56:01.
[13] *Id*. at 58:55-1:00:25.
[14] *Id*. at 1:07:45-1:08:01.

made his way towards the tunnel:



Figure 1

Despite the chaotic scene surrounding him, Giberson claimed to the FBI that at this point, he *still* was not aware that he was not allowed to enter the Capitol building.[15]

As Giberson moved towards the tunnel, rioters outside of the tunnel were taking stolen police shields and passing them to other rioters positioned further inside the tunnel at the front of the police line.[16] At 3:08 p.m., Giberson, having pulled his gaiter over his face, entered the tunnel and made his way towards the front of the police line:

---

[15] *Id*. at 1:02:25-1:03:35.
[16] Government's Exhibit 2 from 17:08 – 18:20 (3:06:08 p.m. – 3:07:20).



Figure 2, Government's Exhibit 2 at 19:27 (3:08:27 p.m.)

Once inside the tunnel, Giberson moved through the crowd of rioters and towards the front of the police line. At this time, rioters were assaulting the line of police officers who were attempting to block an entrance to the Capitol building by pushing them, spraying them with chemical irritants, and throwing a myriad of items at them. Giberson admitted that there was a lot of "chemical irritant" in the air at this time, so he pulled his mask up over his eyes and mouth. Again, despite the obvious signs of violence, Giberson claimed to the FBI that he, a lone individual, moved forward because, "I felt like I was obligated, in some sense, maybe, to, you know, be a more calming presence, or to help calm the crowd down."[17] Giberson also told the FBI that he didn't learn until he got further inside the tunnel that there were police officers inside of the tunnel, and that there were people "engaging in a more substantive way with the officers there."[18] During the melee in the tunnel, MPD Officer D.H. was crushed in between the rioters and a set of metal doors.[19]

---

[17] *Id*. at 108:10-1:08:35.
[18] *Id.* at 1:10:00-1:10:38.
[19] *See* Government's Exhibit 3 at 21:10-21:30.

6

As he reached the front of the line of rioters in the tunnel, Giberson and other rioters attempted to create a wall of stolen police shields against the line of police officers:



Figure 3, Government's Exhibit 3 at 21:30[20]

While at the front of the crowd of rioters in the tunnel, Giberson turned to the rioters behind him and appeared to yell, "another shield! Another shield!"[21]  Immediately thereafter, Giberson and his fellow rioters attempted to pull a shield away from the front line of police officers:



Figure 4, Government's Exhibit 3 at 21:58

---

[20] Giberson's actions on the front line of the rioters inside the tunnel can be seen on Government's Exhibit 3 from 21:29-22:00.
[21] Government's Exhibit 3 at 21:57.

7

Giberson denied grabbing a shield during his FBI interview.[22]

At 3:13:43 p.m., Giberson was still standing on the front line of rioters and attempting to cover his face:



Figure 5, Government's Exhibit 2 at 24:43 (3:13:43 p.m.)

Giberson remained standing near the front for nearly two more minutes before retreating to the mouth of the tunnel. At 3:15 p.m., as the crowed began to surge forward, Giberson began ushering other rioters into the tunnel and towards the front of the police line:[23]

---

[22] *Id*. at 1:33:30-1:39:00.
[23] Government's Exhibit 2 from 26:31-27:12 (3:15:31-3:16:12 p.m.).



Figure 6, Government's Exhibit 2 at 26:46 (3:15:46 p.m.)



Figure 7

During this time, Giberson pushed at least 10 other rioters into the tunnel. After urging others

forward, Giberson then returned inside the tunnel, where he participated in coordinated pushing

against the police:[24]

---

[24] Government's Exhibit 2 from 27:32-28:38 (3:16:32-3:17:39 p.m.).



Figure 8, Government's Exhibit 2 at (3:16:41 p.m.)

Giberson remained with the crowd for approximately 90 more seconds as the rioters tried

to force their way past the police. He then left the tunnel at 3:18: p.m.:



Figure 9, Government's Exhibit 2 at 29:18 (3:18:18 p.m.)

Contrary to the video evidence, Giberson falsely claimed to the FBI that he did not try to

take a riot shield from police officers,[25] and that "from what I saw, even then, was not, so, you

---

[25] Government's Exhibit 1 at 1:14:15-1:15:25.

know, outwardly aggressive or nakedly aggressive. Up until that point what I had seen, mostly, was just pushing, not to downplay pushing."[26] Giberson said he just saw exhausted, exasperated persons "on both sides."[27]  He claimed that he didn't know why he stayed in the tunnel in the midst of a melee for as long as he did, and that, even while he was in the tunnel, it "truly" didn't cross his mind that he was not allowed into the building.[28]

Giberson's witnessed the dragging and assault of MPD Officer M.F., but his statement surrounding this event is wildly inconsistent. At one point, Giberson described seeing Officer M.F. being carried away "peacefully," and that for all he knew, Officer M.F. had been physically unharmed, though he realized later that this was not the case and he had indeed been hurt.[29]  But earlier in his interview, Giberson admitted that he was only four to six feet away when Officer M.F. was dragged into the crowd, and that he "saw the fear in Officer [M.F.'s] eyes. That man believed he was going to die."[30]  Despite later claiming that he saw Officer M.F. carried away "peacefully," Giberson said this event was "burned into his mind from that day," and "that's when the gravity of the situation started to hit me."[31]

After participating in a collective assault against law enforcement officers, observing the viciousness of the fighting inside the tunnel, and witnessing the assault of Officer M.F., Giberson did not leave the Capitol grounds. Instead, he remained outside the tunnel for at least 40 more

---

[26] *Id*. at 1:20:36-1:21:05.
[27] *Id*. at 1:21:15:1:21:20.
[28] *Id*. at 1:23:20-1:24:05.
[29] *Id*. at 2:24:50-2:25:10.
[30] *Id*. 2:01:40-2:02:16.
[31] *Id*. at 2:01:34-2:02:25.

minutes. As a particularly violent individual was using a pole to stab at the line of police, Giberson

attempted to start a chant, yelling "drag them out!" at least three times:



Figure 10, Government's Exhibit 4 at 0:04

CCTV footage also captured the violent individual with the pole assaulting the police officers

while Giberson chanted "drag them out:"[32]



Figure 11, Government's Exhibit 5 at 32:40 (4:02:40 p.m.)

---

[32] Giberson did not participate in this assault; the government includes this information both to note the time and for context as to what was taking place at the mouth of the tunnel as Giberson chanted.

12

Regarding his chant, Giberson told the following story to the agents who interviewed him:

> The best way that I could think to diffuse the situation was, "drag them out" meaning, drag out the instigators, drag out the cops that were being aggressive, drag out the people up in the front, the protestors who were really going at it. Get these people out of here. Because, like, here we are, all of us, enjoying, like, you know, a peaceful protest, we're here to make our voices heard, and our cause known, and, you know, these people up at the front, I don't know who it is, but they keep causing problems, and they keep tainting, you know, what is supposed to be this nice, this important moment for, for, this movement, and, so that's what I'm referring to, and that's what I mean, is to get them out, get out the instigators, get out the cops.[33]

At a different moment, as people in front of him broke windows and yelled, Giberson

pumped his fist:



Figure 12, Government's Exhibit 6 at 0:19

---

[33] *Id.* at 2:23:45-2:24:50.

13

Giberson said that his biggest regret regarding his actions on January 6, 2021 was that he "just started moving with the crowd,"[34] but also that he felt he was "unfairly targeted" by the police because of the other instigators in the crowd.[35] Regarding his participating in the "heave ho" against the police, Giberson did admit that he had a "lapse of judgment."[36]

## III.    THE CHARGES AND PLEA AGREEMENT

On April 4, 2023, a federal grand jury returned a six-count superseding indictment, of which Giberson pled guilty to Count 1, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), pursuant to a written plea agreement.

## IV.    STATUTORY PENALTIES

Giberson now faces sentencing under 18 U.S.C. § 231(a)(3). As noted by the plea agreement and the Presentence Report (PSR) issued by the U.S. Probation Office, Giberson faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The plea agreement and PSR set the base offense level is 10, pursuant to U.S.S.G. §2A2.4(a).  The plea agreement further noted that the government intends to seek a three-level enhancement pursuant to U.S.S.G. §2A2.4(b)(1)(A) because the offense involved physical contact to an officer, but that Giberson reserves the right to oppose this adjustment.

---

[34] *Id*. at 1:55:56-1:56:02.
[35] *Id*. at 1:56:10-1:56:16.
[36] 1:56:19-1:57:22.

The PSR includes the §2A2.4(b)(1)(A) three-level enhancement because Giberson's offense involved physical contact with a police officer. PSR ¶ 29. Giberson pushed with a group of other rioters in a collective "heave-ho" against a line of law enforcement officers in the tunnel that were attempting to restrain the crowd. Giberson's participation in the collective push was both intentional and deliberate, and he admitted later that he had a "lapse of judgment."[37] Giberson also admitted to participating in the coordinated pushing against the police line in his Statement of Offense.[38] Therefore, three-level adjustment is appropriate. The Guidelines analysis is thus:

<u>Count One 18 U.S.C. § 231(a)(3)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact or Dangerous Weapon Used | +3 |
| U.S.S.G. § 3E1.1(a) | Acceptance of Responsibility | -2 |
| | **Total** | **11** |

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter but was not considered at the time the parties entered into the plea agreement.[39]

Section 4C1.1 does not apply in this case because Giberson engaged in, facilitated, and encouraged violent conduct on January 6th. Specifically, upon entering the tunnel, Giberson moved to the front of rioters, engaged in assaulting the line of police officers defending an entrance to the

---

[37] *Id.*
[38] Statement of Offense, Dkt. 21, at ¶ 10.
[39] *See* Plea Agreement, Dkt. 20, at 2-3.

Capitol building, and joined in the collective "heave-ho" against those officers. Giberson also joined with other rioters grabbing a police officer's riot shield and yelled for "another shield" to be passed to the rioters. In addition to entering the tunnel and twice joining in the collective assault against law enforcement officers, Giberson encouraged other rioters to assist in the assault by both chanting that the rioters should "drag" the police "out" and by pushing more rioters into the tunnel. Accordingly, Giberson does not satisfy § 4C1.1(a)(3), which limits the amendment to defendants who "did not use violence or credible threats of violence in connection with the offense." The government is aware of at least two cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence: *United States v. Gundersen*, 21-cr-137 (RC), and *United States v. Baquero*, 21-cr-702 (JEB).

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Furthermore, due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature

of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[40]

The PSR set Giberson's criminal history as category I, which is not disputed. PSR ¶ 39. Accordingly, based on the government's and probation's calculation of Giberson's total offense level, after acceptance of responsibility, at 11, Giberson's Guidelines imprisonment range is 8 to 14 months' imprisonment.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) above, Giberson's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Giberson was present on restricted Capitol grounds for at least an hour, after admittedly seeing police officers using tear gas and flash bangs to try to disburse the crowd,

---

[40] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

all indicia that he was trespassing and participating in an unlawful riot. Despite this, Giberson moved into the tunnel and twice pushed his way to the front of the mob attempting to overtake the line of police attempting to guard an entrance to the Capitol building. The first time, Giberson was at the very front of a line of rioters engaged with police and pulled on a shield that rioters and officers were struggling over. Giberson then retreated to the mouth of the tunnel, where he encouraged others to join the fight against police guarding an entrance to the Capitol Building, before moving back into the tunnel a second time to participate in a coordinated assault against law enforcement. Later, as others engaged in violence against police officers, and after Giberson had witnessed Officer M.F. dragged from the tunnel, seeing the fear in Officer M.F.'s eyes,[41] Giberson chanted "drag them out"—meaning the rioters should drag the police officers out of the tunnel by force—and pumped his fist as other rioters vandalized the Capitol building. The nature and circumstances of Giberson's offense were of the utmost seriousness, and fully support the government's recommended sentence of 11 months' incarceration.

### B.  The History and Characteristics of the Defendant

Giberson has no prior arrests or convictions. He is a young man, but he is evidently capable of appreciating the implications of the January 6 attack on the Capitol and of his participation in that attack, having recently graduated college and earned a bachelor's degree in Political Science.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Giberson's criminal conduct on January 6 was the epitome of disrespect for the law.

---

[41] Government's Exhibit 1 at 2:01:40-2:02:16.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[42] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. While it is true that Giberson accepted responsibility for his criminal conduct by pleading guilty (and doing so relatively quickly after being indicted), it is troubling that several of Giberson's statements to the investigators are inconsistent with the video evidence documenting Giberson's conduct at the Capitol on January 6. Giberson told the FBI that, even after seeing officers retreat on the West Front and the chaos around him on the Lower West Terrace, he *still* believed that he was allowed to be on Capitol grounds and, indeed, that he could lawfully *enter* the Capitol building. That claim strains credulity. Giberson's explanation to the FBI for his "drag them out" chant is also nonsensical, and his assertion that there were agitators "on both sides" is contrary to the evidence. The fact that, in an interview conducted nearly two years after the Capitol riot, Giberson still believes the crowd on the Lower West Terrace on January 6 was "enjoying a peaceful protest" despite seeing an officer dragged from the tunnel who "believed he was going to die" shows that he either still fails to

---

[42] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

19

appreciate the gravity of his conduct or chooses to deny it. A sufficient sentence of incarceration is necessary to deter future participation in riotous conduct, and Giberson's conduct towards law enforcement can never be justified nor repeated.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United*

*States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[43]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[44]

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Giberson's case is perhaps most similar to *United States v. Bernard Sirr* and *United States v. Luke Lints*, 21-cr-259, who were charged together. Both Sirr and Lints pled to a single violation of 18 U.S.C. § 231, had no criminal history, and did not contest the applicability of the three-level physical contact adjustment, which they both earned for entering the tunnel and engaging in a coordinated push against the line of police. Sirr, Lints and Giberson engaged in similar conduct

---

[43] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[44] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

inside the tunnel, and were all directly next each other during Giberson's first push to the front line:



Figure 13, Government's Exhibit 3 at 21:46, with Giberson circled in yellow,
Sirr, wearing a tan hat, in red, and Lints, wearing a black and grey flannel shirt, in blue

Lints and Giberson together struggled with an officer over the police shield:



Figure 14, Government's Exhibit 3 at 21:59, with Giberson circled in yellow and Lints in blue

Although both Sirr and Lints had an advisory guideline range of 8-14 months' imprisonment, Judge McFadden sentenced Sirr to just two months' incarceration and an additional

6 months' home confinement, and Lints to four months' incarceration and four months' home confinement. Sirr, an honorably discharged military veteran, sat down for a pre-plea proffer with the government, and showed genuine remorse for his conduct. Sirr also had dozens of letters of support, and assisted the government as best he could. Lints, meanwhile, gave an allocution at sentencing that made it obvious he failed to grasp the significance of his conduct, and called into question his acceptance of responsibility. Although Sirr and Lints were both allowed to serve portions of their sentences on home confinement, and are comparable cases, the government believes a sentence of confinement for Giberson is appropriate. At best, Giberson's provided inconsistent statements during his interview. In addition to his participation in a collective assault against police officers, he encouraged others to do so. And, at a particularly violent moment near the mouth of the tunnel, as a rioter was using a pole to stab at the police line, Giberson called for more violence. He later provided an explanation for this conduct that is equal parts illogical and offensive, and perpetuates the false narrative of the police as aggressors on January 6. Combined, this behavior differentiates Giberson from Sirr and Lints.

There are other similar cases where a middle-of-the-guideline range was determined appropriate. In *United States v. Roger Kent Baugh*, 22-cr-208, where Baugh had the same advisory guideline range as Giberson, Judge Bates sentenced the defendant to 12 months' and one day incarceration and 24 months of supervised release for a single violation of 18 U.S.C. § 231. Like Giberson, Baugh did not enter the Capitol, but was involved in the assault on the Lower West Terrace tunnel. However, he was never on the front line of that fight, and instead remained behind and helped other rioters engage in a "heave ho" against the police line. Baugh was also properly given a three-level adjustment for physically contacting the police (even though he did not

personally put hands on an officer). And in *United States v. Ronnie Presley*, 21-cr-257, Judge Moss sentenced the defendant to 12 months' incarceration and 26 months of supervised release for a single violation of 18 U.S.C. § 231. Like Giberson, Presley received a three-level adjustment for physical contact, but due to his criminal history, Presley's advisory guideline range of 10-16 months was slightly higher than Giberson's. Like Giberson, Presley encouraged others to storm the Capitol, and at one point Presley pulled on a police riot shield. However, unlike Giberson, Presley successfully entered the building shortly after the initial breach of the Senate Wing Doors. Presley also refused police orders to leave and interfered with police efforts to push people out of the Capitol.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[45] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

---

[45] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Giberson must pay $2,000 in restitution, which reflects in part the role Giberson played in the riot on January 6.[46] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of June 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Giberson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 97.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 11 months' incarceration, 3 years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

---

[46] Unlike under the Sentencing Guidelines for which, the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:      Stephen J. Rancourt
         Assistant United States Attorney
         Texas Bar No, 24079181
         601 D Street, N.W.
         Washington, D.C. 20530
         (806) 472-7398
         stephen.rancourt@usdoj.gov