IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No.  1:23cr115-CJN** |
| | : | |
| **LARRY GIBERSON** | : | |
| | : | |
| **Defendant.** | : | |

**SENTENCING MEMORANDUM**

**I.      Introduction**

Mr. Giberson has pled guilty to one count of Civil Disorder 18 U.S.C. §231(a)(3) and is before the Court for sentencing.

Mr. Giberson was 20 years old on January 6th and has accepted responsibility for involvement in the confrontation between protestors and police that took place in the Lower West Entrance tunnel on January 6.  Mr. Giberson did not enter the capitol building, destroy property, or assault law enforcement.  He began cooperating with law enforcement shortly after being contacted.

As explained below Mr. Giberson overcame an extraordinarily difficult childhood to achieve remarkable academic success and become the first member of his family to attend college.  He earned a degree from Princeton while also working part time and attending to significant family responsibilities.  Many individuals have written to the Court about the good character and potential of this extraordinary young man.

Mr. Giberson regrets his actions on January 6th and has already suffered enormously from those mistakes.  We submit that Mr. Giberson's youth, good character, and other mitigating factors make a non-incarceration sentence appropriate in this case.

## II.     Law of Sentencing

The law requires this Court to impose a sentence sufficient but no greater than necessary to achieve the goals of sentencing in 18 U.S.C. § 3553.  The sentencing guidelines must be considered but are not binding on the Court.  *United States v. Booker*, 542 U.S. 220 (2005).

## III.     Sentencing Guidelines

Mr. Giberson agrees with the PSR writer that the base offense level is 10, that he should receive the two level reduction for acceptance of responsibility and that his criminal history is zero points (level I).  This would result in guidelines of 8/I with a range of 0-6 months.  However, the presentence report also assesses a 3-level enhancement under USSG § 2A2.4(b)(1)(A) for physical contact with law enforcement, which the parties agreed in the plea agreement was disputed.  The enhancement raises his guidelines to 11/I for a range of 8-14 months.  Mr. Giberson contends this enhancement was wrongly applied.

§2A2.4 states that if "the offense involved physical contact…increase by **3** levels."  Neither the notes to this section nor any other section of the guidelines provide a definition of "physical contact."  Where, as here, a guideline term is left undefined the ambiguity should be resolved in favor of the accused.  *United States v. Parkins*, 935 F.3d 63, 66 (2d Cir. 2019)(rule of lenity applies to sentencing guidelines).  It is the government's burden to establish applicability of the enhancements.  *United States v. Victor*, 719 F.3d 1288, 1290 (11th Cir. 2013)(government bears the burden of establishing the applicability of a sentencing enhancement)..

In many cases, enhancements are applicable in the case of jointly undertaken criminal activity if they are reasonably foreseeable even where the defendant did not commit them.  § 1.B1.3.  However, other courts and the government have urged this Court to impose a definition

of physical contact according to the law of assault.  *See*, *e.g.*, *United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000).  This changes the analysis.  Relying on the law of assault necessarily imports an intent requirement into the guideline.  *See*, *e.g.*, *Buchanan, v. United States*, 32 A.3d 990 (D.C. 2011)(assault requires intention coupled with present ability of using actual violence against the person).

In attempting to meet this burden, the probation officer relies on the fact that Mr. Giberson was "pressed directly against the arm of a police officer as the officer uses his elbow and arm to push back against the defendant."  PSR at 19.  The PSR does not identify evidence of Mr. Giberson intentionally causing injury to any officer, as opposed to merely being caught in the press of the crowd.

The government for its part, relies on Mr. Giberson's admission that was a part of one of the "heave-ho" routines that took place in the tunnel.  However, the government does not elaborate on which officer(s) Mr. Giberson intended to assault or how his intent is to be inferred. This is not sufficient to carry the government's burden.

## IV.   Sentencing Factors

### a.   History and Personal Characteristics

Mr. Giberson was born in 2001 in Vorhees New Jersey.  He experienced significant trauma during his childhood after his parents divorced in 2009.  PSR ¶ 45.  The divorce was not amicable and Mr. Giberson's parents' relationship was turbulent for many years.  In one incident, 12-year-old Mr. Giberson hid under a bed while his father broke into his mother's residence to steal belongings he thought he was entitled to.  *Id*.  By 2013 Mr. Giberson and his mother were "nearly destitute."  *Id*.

By all accounts, Mr. Giberson seems to have responded to his parents divorce by attaining a remarkable maturity. One letter after another describes him with terms like "old soul." *See, e.g.* Ex. 1 at 11 ("Even early on when he was a young boy he was polished, intelligent, and well spoken."). Mr. Giberson channeled his maturity and natural intelligence into extraordinary academic success. He graduated high school number 3 in his class while mastering French, singing in the choir, and pursuing other extracurricular activites. He went on to become the first member of his family to attend college, graduating from Princeton in 2023 with an A average.

Mr. Giberson's academic success is that much more impressive considered in light the work schedule he maintained. From his freshman year on, Mr. Giberson worked part time during the school year and full time in summers in the restaurant industry. Several coworkers have written to the Court about this aspect of his life:

> [Larry] is a terrific co-worker. Larry and I work the same position as a server in a restaurant and oftentimes we work the same shifts. I always say that me and larry make a great team at work.
>
> ***
>
> In the spring of 2019, Larry started working with us and became a valuable employee, offering support in all aspects of running of our business. He proved very dependable and hardworking, putting in many hours whilst still keeping up with his academic work."

Ex. 1 at 6, 15

Perhaps most important to this Court's assessment of Mr. Giberson's character are the numerous small acts of kindness he routinely performs for friends and family. *See, e.g.* Ex. 1 at 1 ("He and his family opened their home to me"); *Id*. at 2 ("During the week following my surgery…Larry immediately dropped everything"); *Id*. at 4 ("At every family function he always finds a moment to pick me out of the crowd"); *Id*. at 5 ("our neighbors across the street had a

horrible house fire, and Larry and his mother rushed home from what they were doing to help");
*Id*. at 6 ("Larry is someone you can call at 3 am"); *Id*. at 11 ("he recounted to me the story of
how one of his employees quietly confided in him…that they were nonbinary"); *Id*. at 17 ("when
we were having car troubles, he was very gracious to drive us up to Newark Airport"); *Id*. at 19
("we were able to travel together to present our brother Mason with his 4-year sobriety chip").

### b. Facts and Circumstances of the Offense

Mr. Giberson was not motivated to attend Jan 6 through membership in radical groups or
adoption of online conspiracy theories.  In short, Mr. Giberson studied the issues surrounding the
2020 eleciton and concluded that state actors had interfered with the electoral process in
unconstitutional ways.  Mr. Giberson was not alone in this conclusion.  *See*, Ex 2 at 37
(Deposition of Chief Counsel to the Vice President)("the basic conclusion that I came to was that
there was good, perhaps even conclusive evidence of what I would call irregularities; that being
instances where secretaries of state had bent, perhaps broken the rules for how elections were
supposed to be conducted.").  He believed the U.S. Congress had authority to address these
issues during the certification.

Mr. Giberson traveled from New Jersey with his mother to attend the January 6 rally.
Much of the conduct underlying the statement of facts was captured on publicly available video.
A camera[1] above the Lower West Terrace tunnel shows Mr. Giberson's approach as depicted in
the following image:

---

[1] https://www.youtube.com/watch?v=_a3RGlu5yLs (beginning at 1:08:27).



Figure 1

As Mr. Giberson proceeds farther into the tunnel, he can be observed covering his face in response to chemical irritants in the tunnel air. After a couple minutes in the tunnel, the first of the "heave-ho" crowd motions begins around 3:12 p.m. As can be observed from the video, Mr. Giberson does not instigate the pushing but rather is himself pushed by two individuals (one wearing a red MAGA hat and the other a black beanie).[2] The beginning of the pushing and the two indivudals who first pushed Mr. Giberson are show below:

---

[2] *Id*. at 1:11:24.



Figure 2



Figure 3

Eventually Mr. Giberson makes his way to front of the line near police.  He continues to appear disoriented and does not himself take any aggressive actions towards police.[3]  His demeanor and overall behavior while at the front of line is depicted in the following screenshots and associated videos[4] [5]:

---

[3] Note that neither the Statement of Offense nor the Statement of Facts maintains or alleges any connection between Giberson's actions while at the front lines and Officer D.H. being crushed between rioters and the doors, merely noting his presence in the general vicinity.
[4] https://jan6attack.com/videos/c/c1vJVaLcIdbk/c1vJVaLcIdbk.mp4 (starting at 19 seconds)(Figure 4).
[5] https://jan6attack.com/videos/n/naDQiKfDfv7G/naDQiKfDfv7G.mp4 (between 21:30 and 22:05)(Figure 5).



Figure 5



Figure 4



Figure 6

After a short time at the front of the crowd, Mr. Giberson voluntarily retreated back to the entrance of the tunnel.

To be clear – Mr. Giberson is not claiming that his actions were involuntary. Although initially carried away by the crowd, Giberson admits that he later waved more protesters in the tunnel, and while there near the mouth participated in a second heave-ho effort. But while Mr. Giberson's acts were certainly wrongful, he was not one of the many individuals that day who had an intention of harming the police.

In fact, Mr. Giberson's attitude towards law enforcement by his conduct upon exiting the tunnel. After exiting, Mr. Giberson remained in the vicinity of the Lower West Entrance for about an hour. During this time, he witnessed the widely reported assault on Metropolitan Police Officer Brian Fanone. Video shows Mr. Giberson and other protesters screaming for several

minutes for Officer Fanone to remain unharmed.[6]  Giberson can be seen waving his arms back and forth in a cross motion as if to say 'no', hand outstretched in a 'stop' gesture, and up and down slowly in a 'calm down' gesture, as seen in Figure 8.[7]  In the latter video at 2:08 he tears of his face mask and shouts "Do not hurt him" as seen in Figure 9.



Figure 8



Figure 9

[6] https://www.youtube.com/watch?v=iNFcdpZdkh0 (between 55:39 and 56:31).
[7] https://web.archive.org/web/20210112004306/https://www.youtube.com/watch?v=9rOKpUkiOW4,

Finally, Mr. Giberson unlike some defendants Mr. Giberson did not boast about his activities on January 6 on social media or attempt to obstruct justice.

The foregoing analysis is not meant to excuse Mr. Giberson's conduct but rather to place in the proper perspective.  Mr. Giberson regrets his choices that day and is prepared to accept the consequences.

### c.   Mr. Giberson's Cooperation and Acceptance of Responsibility

The presentence report correctly reduces Mr. Giberson's guidelines for acceptance of responsibility.  However, Mr. Giberson's willingness to accept consequences goes beyond merely pleading guilty and agreeing to a statement of facts.

Giberson was not contacted by federal agents regarding his involvement in the events of January 6th, 2021, until over a year and a half later, on September 26th, 2022. In that time, Giberson demonstrated no further criminal acts, much less any acts of political extremism, and continued to devote himself to his studies, his family, and his community. When Mr. Giberson was first contacted by law enforcement at his home in New Jersey, he immediately retained counsel to help cooperation with the investigation.  He readily agreed to a recorded interview with law enforcement without the benefit of the usual immunity agreement.  He surrendered to Court and accepted a plea agreement without the necessity of setting the case for trial.  He has been 100% successful on pretrial release.

Although the prosecution is not sponsoring Mr. Giberson for a 5K, the government has announced an intention to continue apprehending and prosecuting January 6th participants for some time to come.  If the government should ever call upon Mr. Giberson for assistance it is likely that he will not be in a position at that point to benefit from a 5K.  This Court should

therefore give special consideration to Mr. Giberson's acceptance of responsibility and willingness to cooperate with law enforcement at this juncture.

### d.  Avoid Unwarranted Disparities

Section 3553(a) requires the Court to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).  The following cases all weigh in favor of a downward variance under this factor:

### i.  United States v. Hazelton

The most comparable case to Mr. Giberson's may be *United States v. Hazelton*.  The 51 year old Hazelton arrived in DC with the "Sons of Liberty" – as sizable group many of whom arrived in military style gear.  1:21-cr-30, ECF 56 at 4 (photo).  According to case documents, Ms. Hazelton was also present at the Lower West Terrace tunnel entrance and encouraged rioters to enter the tunnel.  1:21-cr-30-JBD, ECF 56 at 5.  She eventually moved to the front of the mob of rioters.  *Id*. at 6.  She retreated from the front of the crowd to entrance but would return to the front of the crowd at least three more times.  *Id*.  After January 6, Ms. Hazelton made unrepentant statements on social media and destroyed evidence.  *Id*. at 11-12.  Ms. Hazelton received 10 days imprisonment.

Larry Giberson, by contrast, was not a member of any political group, only approached the line of officers a single time, and was in tunnel for a shorter amount of time.  He did not brag about his presence on January 6th on social media or try to obstruct justice.  Mr. Giberson was far younger that Ms. Hazelton who committed her offense despite the wisdom of years.  When all facts are taken into account, Mr. Giberson's conduct is significantly less aggravated.

### ii.  United States v. Tyler Bensch

*United Stats v. Tyler Bensch*, 1:23-cr-180, is another case to arise from the Lower West Entrance tunnel.  Mr. Bensch traveled to DC with a milita group and wore tactical gear.  ECF 86 at 2.  According to his Statement of Offense, Bensch "moved into the mouth of the Tunnel, and he was present when one of the heave-ho pushes against the officers occurred."  ECF 86-1 at 4. Bensch also aided and abetted other members of his group in stealing a riot shield, and discharged one of his chemical irritants in the face of an individual within the crowd. *Id*. Ultimately, he pleaded guilty to one count of § 1752(a)(2) and one count of §§ 641, and 2, receiving a sentence from Judge McFadden of sixty days house arrest and two years of probation instead of the nine months in federal prison sought by the government. According to news reports, the judge said at sentencing: "I am giving you this break because of your age. This doesn't need to define you or your life."[8]

Although Mr. Bensch had many aggravating factors no applicable to Mr. Giberson, this Court saw fit to show leniency due to his immaturity and remorse.  Such leniency is that much more justified here.

### iii.  Other § 231 Cases

As described above, Mr. Giberson's offense conduct consisted in joining the crowd of protesters pushing against police in the Lower West Entrance tunnel.  While not seeking to minimize this conduct, it bears emphasis that it is less aggravated than most or perhaps even all § 231 cases to date as shown in the following chart:

---

[8] https://www.nbcnews.com/politics/justice-department/trump-appointed-judge-gives-break-jan-6-rioter-sentencing-rcna93170cf

| § 231(a)(3) Jan. 6 Defendant | Case No. | Violent Criminal Conduct |
|---|---|---|
| Adams | 21-cr-84 | Pushed police officers against a wall |
| Alan | 21-cr-190 | Threw punches at law enforcement |
| Antonio | 21-cr-497 | Threw objects at police |
| Ballard | 21-mj-529 | Threw tabletop at police |
| Bingham | 21-mj-430 | Threw punch at officer |
| Brock | 21-mj-527 | Striking police with rod |
| Brockhoff | 21-mj-444 | Shooting fire extinguisher at police |
| Brown | 21-mj-565 | Spraying pepper spray in officers' faces |
| Brown | 21-mj-498 | Pushing and punching police |
| Buteau | 21-mj-487 | Throwing hard objects at police |
| Byerly | 21-mj-500 | Tasing police |
| Caldwell | 21-cr-181 | Spraying pepper spray at police |
| Cua | 2021 U.S. Dist. LEXIS 44293 | Shoving officer |
| Coffee | 21-cr-327 | Hitting officer with crutch |
| Copeland | 21-mj-403 | Shoving and grabbing officer |
| Council | 21-mj-08 | Shoving officers |
| Dasilva | 21-mj-520 | Grabbing, pushing and pulling police |
| Davis | 21-mj-536 | Shoving police |
| DeGrave | 2021 U.S. Dist. LEXIS 92102 | "Coming to blows" with police |

| § 231(a)(3) Jan. 6 Defendant | Case No. | Violent Criminal Conduct |
|---|---|---|
| Egtvedt | 21-cr-177 | Throwing punches at police |
| Fairlamb | 21-cr-120 | Shoving and punching police |
| Fitzsimons | 21-cr-158 | Punching officers |
| Foy | 2021 U.S. Dist. LEXIS 123953 | Swinging hockey stick and throwing objects at police |
| Galetto | 21-mj-386 | Knocking officer to the ground |
| Hayah | 21-mj-577 | Shoving officers |
| Jenkins | 21-cr-245 | Throwing pole at officers |
| Johnson | 21-cr-332 | Knocking over officer who falls unconscious |
| Judd | 21-cr-40 | Throwing object on fire at police |
| Klein | 21-cr-236 | Striking officers with shield |
| Lang | 21-cr-53 | Thrusting a bat and shield at officers |
| Languerand | 21-cr-353 | Throwing garbage cans at officers |
| Lazar | 21-mj-533 | Spraying chemicals at police |
| Mackrell | 21-cr-276 | Striking multiple officers |
| McCaughey III | 21-cr-40 | Striking multiple officers |
| McGrew | 21-cr-398 | Striking officer |
| McHugh | 21-cr-453 | Macing officers |
| McKellop | 21-cr-268 | Macing officers |

| § 231(a)(3) Jan. 6 Defendant | Case No. | Violent Criminal Conduct |
|---|---|---|
| Mellis | 21-cr-206 | Striking officers with a stick |
| Middleton | 21-cr-367 | Poking officers in the face |
| Miller | 21-cr-75 | Spraying officers with pepper spray |
| Morss | 21-cr-40 | Striking officer with shield |
| Mullins | 21-cr-35 | Assaulting officer |
| Nichols | 21-cr-117 | Spraying pepper spray at officers |
| Owens | 21-cr-286 | Striking officer in the head with skateboard |
| Padilla | 21-cr-214 | Ramming cop with metal sign |
| Palmer | 21-cr-328 | Spraying fire extinguisher in face of officer |
| Pezzola | 21-cr-52 | Smashing large window of Congress, a crime of violence |
| Quaglin | 21-cr-40 | Striking multiple officers |
| Randolph | 21-cr-332 | Assaulting officer |
| Sabol | 21-cr-35 | Striking officer |
| Sandlin | 21-cr-88 | Attempting to rip helmet off officer |
| Sandford | 21-cr-86 | Throws fire extinguisher at officers |
| Sargent | 21-cr-258 | Throwing punches at officers |
| Schwartz | 21-cr-178 | Bear spraying officers |
| Shively | 21-cr-151 | Assaulting officers |

| § 231(a)(3) Jan. 6 Defendant | Case No. | Violent Criminal Conduct |
|---|---|---|
| Sibick | 21-cr-291 | Attempting to take officer's gun, while threatening to kill him |
| Stager | 21-cr-35 | Smashing officer with flag pole |
| Stevens | 21-cr-40 | Striking officer with shield |
| Warnagris | 21-cr-382 | Shoving officer |
| Webster | 21-cr-208 | Striking officer with flag pole |
| Woods | 21-cr-476 | Tripping officer and pushing her to ground |

The above chart makes clear that Mr. Giberson's is one of the least aggravated civil disorder cases to come out of January 6th.

### iv.  Misdemeanor Cases

§ 3553(a)(6) requires this Court to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Notably, the type of charge the defendants were convicted of is not included in the analysis.  This Court must therefore look not only to other § 231 cases but also to misdemeanors to complete the disparities analysis.

Many of the protesters the government offered misdemeanor plea bargains to engaged in conduct arguably more aggravated than Mr. Giberson's.  *See, e.g. United States v. Marquez*, 21-cr-136 (18 months misdemeanor probation for defendant who entered "hideaway" office of Senator Merkley saying "we only broke a couple windows."); *United States v. Ericson*, 21-cr-506 (24 months misdemeanor probation for defendant who stole property from Speaker's office);

17

*United States. V. Wilson*, 21-cr-578 (24 months misdemeanor probation for defendant who entered Speaker's office); *United States v. Gonzalez*, 21-cr-115 (24 months misdemeanor probation for defendant who smoked weed in the captiol); *United States v. Tutrow*, 21-cr-310 (36 months misdemeanor probation for defendant who entered the capitol with a knife).  These cases weigh in favor of a lower sentence for Mr. Giberson.

### v.  Cases with Older Defendants; Mr. Giberson's Relative Youth

§ 3553(a)(6)'s reference to "similar conduct" naturally encompasses relevant offender characteristics.  The January 6th protests were notable in that many of participants were middle aged or older.  According to media reports, January 6th protesters were "mostly in their 40s and 50s."[9]  Stephanie Hazelton, discussed above, was 51.  ECF 57 at 2.  A Seton Hall University report from earlier this year analyzing the demographic makeup of the then-716 people prosecuted by the Department of Justice for their role in the Capitol Riot found that only 4.3% of offenders were under the age of 21 at the time of their offenses.[10]

Mr. Giberson was 20 years old at the time of his offense and his youth was manifestly the main reason for his decisions.  Mr. Giberson is by all accounts passionate about politics and government.  He was too young to vote in 2016 so 2020 was the first election in which Mr. Giberson could consider himself a true participant in the democratic process.  By that point, Mr. Giberson had spent a year studying politics at Princeton and was therefore in position to understand the constitutional debates occurring in that turbulent time.  Mr. Giberson's mother's

---

[9] https://www.wbur.org/hereandnow/2022/01/03/jan-6-rioters-white-older
[10] https://www.forbes.com/sites/michaeltnietzel/2023/07/28/a-new-seton-hall-university-report-profiles-the-people-prosecuted-for-january-6-insurrection/?sh=2ed61bf4722b

significant other, with whom Mr. Giberson is close, has written insightfully to the Court of the

effect these events had on him:

> In my opinion, the 2020 election period was very exciting for Larry because he
> understood the process and how things worked.  This time was exciting for him,
> maybe similar to watching your favorite baseball team on a World Series run.
> You get caught up in the hype and excitement and you want to be at that winning
> game.  I feel Larry wanted to be a part of something that he was passionate about,
> I know he had no intent to be caught up with the wrong crowd.  In fact, I think
> that is the first time he has ever been part of the wrong crowd situation and I'm
> confident it is his last.

Ex. 1. at 12.

Mr. Giberson's youth is extremely significant at sentencing for several reasons.  First, it

greatly reduces the chances of recidivism as Mr. Giberson's maturity grows with each passing

year.  Although he will no doubt retain his interest in politics and current events, the Court can

be assured he will not repeat the mistakes of 2021.  Secondly, Mr. Giberson's age differentiates

him from older January 6th defendants who should have known better than to be carried away

into criminality.

### vi.  Other Protest Activity in 2020/21

As the Court will recall, substantial protest activity occurred in the United States throughout

2020 involving participants from across the political spectrum.  Many observers have noted that

the January 6th defendants seem to have been prosecuted more harshly than protestors motivated

by "liberal" causes more closely associated with the current Presidential administration such as

police reform.  The most comparable cases are the prosecutions (or lack thereof) stemming from

riots at the Hatfield Federal Courthouse in Portland Oregon in 2020.  Portland's federal courthouse

was the focus of intense protest activity for more than 90 consecutive nights[11] following the death

---

[11] https://www.justice.gov/usao-or/pr/74-people-facing-federal-charges-crimes-committed-during-portland-demonstrations

19

of George Floyd during a police encounter in Minnesota.  In one court filing, the government

described the protests as follows:

> [The protests] [w]ere followed by nightly criminal activity in the form of
> vandalism, destruction of property, looting, arson, and assault. One violent event
> impacting federal property occurred on May 28, 2020, when the Portland Field
> Office for the Immigration and Customs Enforcement (ICE) was targeted by a
> Molotov cocktail. The Mark O Hatfield Courthouse has experienced significant
> damage to the façade, glass, and building fixtures during the weeks following this
> incident. Additionally, mounted building security cameras and access control
> devices have been vandalized or stolen. The most recent repair estimate for the
> damage at the Mark O. Hatfield Courthouse is in excess of $50,000. Other federal
> properties in the area routinely being vandalized include the historic Pioneer
> Federal Courthouse, the Gus Solomon Courthouse, and the Edith Green Wendall
> Wyatt Federal Office Building. FPS law enforcement officers, U.S. Marshal
> Service Deputies and other federal law enforcement officers working in the
> protection of the Mark O. Hatfield Courthouse have been subjected to assault,
> threats, aerial fireworks including mortars, high intensity lasers targeting officer's
> eyes, thrown rocks, bottles and balloons filled with paint, and vulgar language
> from demonstrators while performing their duties.

*United States v. Bouchard*, 3:20-mj-165 (D.Ore. July 24, 2020), ECF 1-1 at 4-5.  The protests

involved thousands gathering on a nightly basis.  *United States v. Judd*, 579 F.Supp.3d 1, 8, *10

(D.D.C. December 28, 2021).  Despite these enormous numbers, federal prosecutors limited

themselves to charges against a few dozen persons, mostly involving property destruction or

assaulting law enforcement.[12]  Many of these cases were later dismissed or resolved with

extremely favorable plea bargains.[13]  A handful of Portland protesters were charged with lesser

offenses.  *See, e.g. United States v. Ian Wolf*, 3:20-cr-286, ECF 1 (D. Ore.)(Information charging

Creating a Hazard on Federal Property under 41 C.F.R. § 102.74.380(d) and Failing to Obey a

Lawful Order under 41 C.F.R. § 102.74.385).  The overwhelming majority of the persons

---

[12] *Id*.
[13] https://www.kgw.com/article/news/investigations/portland-protest-cases-dismissed-feds/283-002f01d2-3217-4b12-8725-3fda2cad119f;

involved in the Portland protests were not charged with any offenses.  This Court described the

federal response to the Portland protests in *Judd* as follows:

> Therein lies a troubling theme that emerges from a wholesale analysis of the
> Government's decisions in Portland.  The Government dismissed 27 cases
> brought against Portland defendants, including five felony cases.  *See generally*
> Appendix to Def's Mot.  Dismissal of one felony case is unusual.  Dismissal of
> five is downright rare and potentially suspicious.  Rarely has the Government
> shown so little interest in vigorously prosecuting those who attack federal
> officers.

*Judd*, 579 F.Supp.3d at 7.  The "appendix" referred to in this passage is attached as Exhibit 3.  It

is a charge of the various Portland cases and their dispositions.

The extraordinarily lenient treatment afforded to the Portland rioters supports a

downward variance for Mr. Giberson to avoid an unwarranted disparity.  This is particularly

necessary because the disparity could reasonably be interpreted to have been created by political

bias in the Department of Justice, which is especially odious.

### e.  Collateral Consequences of this Case

Mr. Giberson has already faced significant collateral consequences from this prosecution,

even before sentencing.  The substantial media coverage of his case combined with his relatively

unusual last name means that this case will dominate his google results for years to come.  A

recent article[14] in the Daily Princetonian entitled "Giberson '23 graduates, criminal case for

alleged Jan. 6 involvement continues" discussed Mr. Giberson's peers' reactions to his case:

> Giberson's case has been a topic of discussion since his arrest by the FBI in
> March.  During Class Day remarks, one of the student speakers Gavin LaPlace
> '23, alluded to the controversy.  "Some of us actually made national news,"
> LaPlace joked, "I guess you can say we're taking the country by storm!"

***

---

[14] https://www.dailyprincetonian.com/article/2023/06/princeton-larry-giberson-graduates-jan-6-capitol-riot-proceedings

> Mary Elizabeth Marquardt '23 tweeted, "[Y]ou're telling me the insurrectionist graduated with a certificate in VALUES AND PUBLIC LIFE?!"

A search of social media for Mr. Giberson's name includes hundreds of mentions of which the following are a sampling:

> Larry Giberson '23 brings disgrace to Princeton in his attempt to overturn a fair and legal election of the next US President.

> ...seems Larry Fife Giberson (what a name) didn't learn a damn thing, and should refund his certificate in values and public life.

In August of this year, the Daily Princetonian featured an editorial from student arguing that Mr. Giberson's diploma should be withheld by the university.[15]

All of this negative commentary will have continuing negative effects on Mr. Giberson's professional and social prospects.  Moreover, as more than one character reference has written to the court, Mr. Giberson has long contemplated attending law school – a natural step for someone with his educational background.  As a convicted felon there may be significant question of whether he will be allowed to pass the character and fitness requirements for many state bars.

To be sure – those who commit felony offenses should naturally expect professional and social consequences.  However, the unusual extent of those collateral consequences for such young man is beyond what you see in the ordinary felony cases and therefore weights in favor of a lesser sentence.

   **f.   General Deterrence**

As has been widely reported, over 1000 people have been prosecuted for their roles on January 6th.  Their sentences have ranged from probation to years in prison.  Their cases have been widely reported in the media, as have judges' comments about the seriousness of the cases.

---

[15] https://www.dailyprincetonian.com/article/2023/08/princeton-opinion-larry-giberson-graduation-diploma

Such a large lumber of related cases gives this Court more flexibility to show measured leniency in cases with significant mitigation without sacrificing much in the way of general deterrence.

### g.  Specific Deterrence

As explained above, Mr. Giberson was not the type of person one would ever expect to be in trouble with the law.  This case was the result of an extraordinary confluence of events unlikely to repeat itself.  It has been over two years since January 6th and Mr. Giberson has demonstrated in every way possible that his offense was aberration.  He acknowledges that President Biden was rightfully certified as the 46th President.  Incarceration is not necessary for specific deterrence.

### h.  Kinds of Sentences Available

If the Court agrees with Mr. Giberson's requested guidelines, it will place him in Zone A of the table.  For defendants in that zone, the Court "should consider imposing a sentence other than a sentence of imprisonment… [i]f the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table." U.S.S.G. § 5C1.1(4).  However, even if the Court affirms the presentence guidelines, the significant mitigating factors amply justify a non-incarceration sentence or home detention.

Mr. Giberson respectfully requests the Court to consider a period of home detention without imposing a term of supervised release or probation.  A period of home detention combined with the time Mr. Giberson has already served on pretrial release will by itself constitute a significant period of Court supervision.  Although probation has requested a term of

supervision to "monitor the defendant for any escalating political extremism or other anti-social behavior" there seems to be little risk of that here.[16]

## V.      Conclusion

For the foregoing reasons, Mr. Giberson requests the Court to impose a non-incarceration sentence.

Respectfully submitted,
By: /s/ Charles Burnham
Charles Burnham
D. Md. Bar 12511
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 265-2173 (fax)
charles@burnhamgorokhov.com

'

---

[16] There is also some precedent for a term of probation or supervised release not being imposed in a § 231(a)(3) January 6th case, in the case of *United States v. Robert Flynt Fairchild, Jr.*, 1:21-cr-551, who was sentenced to six months of incarceration and nothing more.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this filing has been served on opposing counsel by email.

By: */s/ Charles Burnham*
Charles Burnham
D. Md. Bar 12511
*Attorney for Defendant*
BURNHAM & GOROKHOV, PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
(202) 386-6920 (phone)
(202) 265-2173 (fax)
Charles@burnhamgorokhov.com