1

2

3

4       SELECT COMMITTEE TO INVESTIGATE THE

5       JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

6       U.S. HOUSE OF REPRESENTATIVES,

7       WASHINGTON, D.C.

8

9

10

11      DEPOSITION OF:     GREG JACOB

12

13

14

15                              Tuesday, February 1, 2022

16

17                              Washington, D.C.

18

19

20              The deposition in the above matter was held in room 5480, O'Neill House Office

21      Building, commencing at 10:05 a.m.

22              Present:     Representatives Aguilar, Schiff, Murphy, Raskin, Cheney, and Kinzinger.

1

2     <u>Appearances:</u>

3

4

5     For the SELECT COMMITTEE TO INVESTIGATE

6     THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

7

8     ████████████, STAFF ASSOCIATE

9     ████████████, DEPUTY STAFF DIRECTOR & CHIEF COUNSEL

10    ████████████, SENIOR LEGISLATIVE COUNSEL

11    ████████████, STAFF ASSOCIATE

12    ████████████, RESEARCHER

13    ████████████, SENIOR INVESTIGATIVE COUNSEL

14    ████████████, CHIEF INVESTIGATIVE COUNSEL

15    ████████████, INVESTIGATIVE COUNSEL

16    ████████████ DEPARTMENT OF HOMELAND SECURITY

17    ████████████ CHIEF CLERK

18    ████████████, PARLIAMENTARIAN

19    ████████████ STAFF ASSOCIATE

20    ████████████, SENIOR INVESTIGATIVE COUNSEL AND OF COUNSEL TO THE VICE CHAIR

21    ████████████RECORD, COUNSEL

1

2      For THE WITNESS:

3

4      A.B. CULVAHOUSE

5      AMANDA SANTELLA

6      O'Melveny & Myers

7      1625 Eye Street, NW

8      Washington, D.C.    20006

1

2          Mr. ███    Good morning, everyone.

3          This is a deposition of Greg Jacob conducted by the House Select -- I'll start over.

4          This is a deposition of Greg Jacob conducted by the House Select Committee to

5    Investigate the January 6th Attack on the United States Capitol, pursuant to House

6    Resolution 503.

7          Mr. Jacob, could you please state your full name and spell your last name for the

8    record.

9          The <u>Witness.</u>   Gregory Jacob, J-a-c-o-b.

10         Mr. ███   Okay.   So I am ████    I'm a senior investigative counsel for

11   the committee and also have the additional title of being of counsel to the vice chair,

12   Representative Liz Cheney.

13         Why don't we just go around and everybody introduce themselves on the staff

14   side, and then we'll introduce the members.

15         Mr. ███    Good morning, Mr. Jacob.   I'm ████, the chief investigative

16   counsel.

17         Mr. ████   Thank you for coming.   I'm ████    I'm a professional

18   staff member with the committee.

19         Ms. ███   Good morning.   I'm ████, investigative counsel with the

20   select committee.

21         Mr. ████, senior counsel to the vice chair, Liz Cheney.

22         Mr. ███   Good morning.   ████ a senior investigative counsel for the

23   committee.

24         Mr. ███ And it looks like we have on here on video the vice chair,

25   Representative Liz Cheney, Mr. Schiff, Ms. Murphy.   And anybody else?

1          Mr. ███████   I believe that's all.

2          Mr. ██████   It looks like that's it as far as the members right now, and if -- oh, if

3    counsel --

4          Ms. <u>Cheney.</u>   Good morning.

5          The <u>Witness.</u>   Good morning.

6          Ms. <u>Cheney.</u>   Thanks so much for being with us, Mr. Jacob.

7          The <u>Witness.</u>   Happy to be.

8          Mr.████   If counsel could introduce themselves, that would be great.

9          Mr. <u>Culvahouse.</u>   Sure.   I'm A.B. Culvahouse of O'Melveny & Myers representing

10   Mr. Jacob.

11         Ms. <u>Santella.</u>   I'm Amanda Santella, also of O'Melveny & Myers, representing

12   Mr. Jacob.

13         Mr. ██████   Thank you.

14         So this deposition is being conducted in executive session, which means that,

15   under the House rules, it cannot be -- the transcript cannot be released except upon a

16   ruling by the chair, but of course it is up to the chair to determine whether to release it

17   and, if so, the manner in which to release it.

18         The transcript is the official record, but we are also taking a video here, as well as

19   audio recording.

20         I'll just go over a few ground rules.   There is an official reporter transcribing the

21   record of this interview.   As I'm sure you know, please wait until each question is

22   completed before you begin your response, and we'll try and wait until your response is

23   completed before we ask our next question so it's easier for the transcript to just have

24   one person talking at a time.

25         As you know, the stenographer cannot record nonverbal responses, such as

1    shaking your head, so it's important that you answer each question with an audible,

2    verbal response.

3         We ask that you provide complete answers based on your best recollection.    Of

4    course, if a question is not clear, please ask us to repeat the question because it's

5    important that you fully understand the question.

6         If you need a break at any time to confer with your counsel, for any other reason,

7    we'd be happy to accommodate that.

8         If you do refuse to answer a question based on the invocation of a privilege, staff

9    can either proceed with the deposition and the objection will be noted for the record, or

10   we can seek a ruling from the chair.    We don't anticipate that we'll seek a ruling from

11   the chair during this deposition because we've had discussions with counsel about the

12   circumstances in which you anticipate raising objections.    But, if the chair eventually

13   does overrule any objection, you'll be required to answer the questions.

14        As I said, please don't hesitate to ask us to repeat a question if you either can't

15   hear it or don't understand it.

16        And, with that, do you have any questions before the witness is sworn in?

17        The <u>Witness.</u>    No.

18        Mr          Okay.    Could the court reporter please swear in the witness.

19        The <u>Reporter.</u>    If you would raise your hand and stand, please.

20        Do you solemnly declare and affirm under the penalty of perjury that the

21   testimony you are about to give in this matter will be the truth, the whole truth, and

22   nothing but the truth?

23        The <u>Witness.</u>    I do.

24        The <u>Reporter.</u>    Thank you.

25                          EXAMINATION

1        BY MR. ████

2        Q    So, Mr. Jacob, I understand you got your undergraduate degree from

3    Amherst and your law degree from the University of Chicago.    Is that correct?

4        A    Yes.

5        Q    Could you just very briefly walk through the various jobs you had since law

6    school leading up to your work for Vice President Pence.

7        A    Yes.    After law school, I clerked for Judge Jacques Wiener on the Fifth

8    Circuit Court of Appeals.

9            I then joined O'Melveny & Myers as an associate for about 10 months.

10           I then went into the Bush administration as an attorney adviser in the Office of

11   Legal Counsel, where I served for about 2.5 years.

12           I then joined the Bush reelection campaign as the legal policy person -- call it legal

13   potpourri.    Any subject touching on the law, I was responsible for, as a policy position

14   rather than a legal position.

15           After the campaign, I joined the Labor Department as deputy solicitor of Labor.

16           I then, in late 2006, went to the White House as special assistant to the President

17   for domestic policy with the justice and immigration portfolio, largely working on the

18   comprehensive immigration reform bill that was before the Senate in 2007.

19           In 2007, I was nominated to be solicitor of labor and confirmed at the end of that

20   year and served in that position through the end of the administration.

21           After the Bush administration, I joined Winston & Strawn as a partner for about

22   2.5 years, and then came back to O'Melveny and served as a partner there until March

23   of 2020, when I joined with the Vice President's Office as counsel to the Vice President.

24       Q    And, in addition to being counsel to the Vice President, do you have a title,

25   like deputy assistant to the President?

1      A     Yes.    Deputy assistant to the President.

2      Q     Okay.    And to whom did you report?

3      A     So to Marc Short and to the Vice President.

4      Q     And when did you leave that position?

5      A     I was there to turn the -- turn the lights out at the end of the administration,

6    so January -- I -- my position technically expired noon on June 20th, 2021?

7      Q     Okay.    And then you returned to O'Melveny?

8      A     Yes.

9      Q     And that's where you're working today?

10      A     Yes.

11      Q     Okay.    So, at some point during your time working for Vice President Pence,

12    did you begin doing any kind of research regarding the 12th Amendment and the

13    Electoral Count Act?

14      A     Yes.

15      Q     How did that come about?

16      A     So, towards the beginning to middle of October, the Vice President was out

17    on the campaign trail every day.    I was only occasionally with him.    There weren't very

18    many policy issues percolating in the White House at that point in time, and so I started

19    just looking ahead to things that -- questions that I might be asked at some point in the

20    future, and one of those things was, mechanically, what's going to happen on

21    January 6th?

22      There was nobody in the office who had been around for a January 6th electoral

23    count before, and so I knew that those questions would come to my office.

24      I did check in with our -- at the outset -- with our Senate side office lead,

25    Hannah Lankford, and asked her to get me what are the rules for the joint session, and

1    otherwise just asked my staff to start identifying what are the rules, what are the

2    statutes, what are the constitutional provisions that are going to apply?

3         So that was, again, probably somewhere around the end of the first week of

4    October that we started looking at that.

5         Q    And was this on your own initiative, or did somebody ask you to look into

6    this?

7         A    On my own initiative.

8         Q    And is this because the Vice President, by law, presides over the joint session

9    of Congress on January 6th?

10        A    Yes.    I mean, I -- so one of the things I had learned during my time in the

11   Vice President's Office is that, when I got asked a question, people usually expected me to

12   give an answer in about 5 minutes' time.    And so, being -- figuring out the things that I'm

13   likely to be asked about at some point and being ahead of speed on them was the best

14   way that I could serve the Vice President with those things.

15        So, yes, I knew that -- that that was an event that he would need to participate in,

16   and I wanted to figure out how it would work for him.

17        Q    And you mentioned rules regarding the joint session.    Are there such rules?

18        A    No.

19        Q    Okay.    So what sources of material did you look at as part of your research?

20        A    So this was something I asked my staff to look into at that point in time, so

21   they quickly discerned, I think, that there is a constitutional provision originally in Article II

22   and then carried forward into the 12th Amendment.    When the 12th Amendment was

23   enacted, I think it was carried through sort of word for word.    And then there was an

24   Electoral Count Act enacted in 1887.

25        And there had been some rules and informal rules that I think that the Senate had

1   occasionally operated under prior to the Electoral Count Act, but that there had never

2   been any firm set of rules for how those procedures worked.

3          They also looked at a lot of Law Review articles because, given that there

4   was -- that there were no rules for the joint session and there was no statute until 1887,

5   there were a lot of instances of Electoral Count Acts and issues that had come up prior to

6   1887, and they looked at a lot of Law Review articles to understand those.

7          Q      So did you or anybody on your staff memorialize your research in a memo or

8   anything like that?

9          A      So there is a memo that my staff created around the end of October.    And,

10  by that point, I was actually in ██████████████████████████

11  ████████████████ around October 19th or 20th, ██████████████████

12  ██████████████████████████████, before I got back into the office

13  sometime around the end of the first week of November.

14         So -- but there is a memo that they created around that point in time.

15         Q      I don't believe that the committee has received that memo from the

16  Archives, so this is not intended as a memory test.    If I had the document, I would show

17  it to you.    But can you just very briefly summarize what your or what your staff's findings

18  were?

19         A      So I can't speak in too much detail because the former President has put that

20  memo on a list that he has invoked executive privilege on, and it's my understanding that

21  the current White House is still examining the set of documents that he has invoked

22  executive privilege on.

23         I can just say, at a high level, without speaking to contents and conclusions, that

24  they examined and summarized historical examples, Law Review articles, and then what

25  the Electoral Count Act says.

1        Q    Did that memo address whether the Vice President had any authority to

2  reject electors submitted by a State?

3        A    Obliquely, I don't think it directly addressed that, but I think it is one of the

4  things -- essentially around 2002, I think, because of the experience of the 2000 election

5  and some of the disputes over Florida, there were several Law Review articles beginning

6  in 2002 about the Electoral Count Act.   And some of those Law Review articles

7  addressed that subject.   So, in summarizing what they were finding, I think that's one of

8  the things that the memo addresses.

9        Q    But, at that point, had anybody suggested to you that Vice President Pence

10  should reject any electors?

11       A    No.   Nobody had talked to me about -- this was an entirely independent

12  project of mine just to try and get ahead of issues that, at some point, I was going to be

13  asked how does -- what -- how does January 6th work?   And I just wanted to understand

14  that mechanic.

15       The Electoral Count Act was complicated.   It depends on a whole bunch of

16  different things, how the procedures go, and I wanted to understand that.

17        Q    Okay.   And, in advance of the election, so in advance of November 3rd,

18  2020, did you discuss your research and your findings with anybody other than your staff?

19       A    No.

20       Q    Okay.   Did you ever discuss it with Marc Short?

21       A    So I did on -- it could have been the morning of election day --

22       Q    Okay.

23       A    -- or the day before election day.

24       Q    Okay.   So the exact date doesn't matter, but can you tell us in general what

25  you discussed with Mr. Short.

1      A      So there -- Marc had indicated to me that there was a possibility that there

2 would be a declaration of victory within the White House that some might push for -- and

3 this is prior to the election results being known -- and that he was trying to figure out a

4 way of avoiding the Vice President sort of being thrust into a position of needing to opine

5 on that when he might not have sufficient information to do so.

6      Obviously, if all of the evidence is that you have won the election, there is no

7 problem with opining to that effect.    But, in the face of uncertainty about it, he wanted

8 to make sure that the Vice President was only able -- was only speaking to things that

9 were known.

10      And so one of the things that I mentioned to him at that point was that, well, the

11 Vice President is going to -- again, I was ████████████████████ so Marc

12 was -- Marc and I would speak every day.    ████████████████ as well at that point.

13 ████████████████████████████████████████████

14      So I told him, well, the fact that the Vice President presides over the joint session

15 might be, in and of itself, a good reason to not be opining on where you think things have

16 come out, where there is not certainty about where a State has come out if you're going

17 to be the one sitting up there presiding over the counting of the electoral votes at the

18 end.

19      And so I had advised him at that point in time that that would be a good rationale

20 essentially to keep the Vice President out of any premature declarations of victory.

21      Q      And was it your impression that Mr. Short wanted to keep the Vice President

22 out of having to declare whether or not he thought he and President Trump had been

23 reelected?

24      A      Well, again, at that point, the election results had not been tabulated yet,

25 and so we didn't know what the outcomes would actually look like.    But I think that he

1  did want to ensure that, whatever advisers might want the Vice President to say, that the

2  Vice President would not be out front declaring things based on insufficient evidence.

3      Q      So you referred, I think, to advisers might have wanted the President to

4  make some kind of statement about victory.    Do you know who those advisers were?

5      A      No.

6      Q      And so did you discuss the findings of your research with the Vice President?

7      A      The first time I had any discussion with the President about the Electoral

8  Count Act or January 6th --

9      Mr. Culvahouse.    The Vice President?

10      The Witness.    The Vice -- did I say the President?

11      Mr. Culvahouse.    Yes.

12      Mr. ███████    I asked about the Vice President, yeah.

13      The Witness.    With the Vice President was in -- around December 7th or 8th.

14              BY MR ███████

15      Q      Okay.    We're going to try and go somewhat chronologically, but just so I

16  know to come back to that, can you tell us what the context was in which you had that

17  conversation around the 7th -- December 7th or 8th?

18      A      So I recall being called over to his West Wing office, and he -- this is right

19  around the time that the Lincoln Project started running an ad saying that, you know:

20  Not only have you won -- not only have you lost, Donald Trump, but the Vice President is

21  going to be the one who declares that you have lost.

22          And the Vice President said in conjunction with that that he is hearing from people

23  that he's got some role to play on January 6th about announcing the outcome of the

24  election.    What is the -- how does this work?

25          And he mentioned that he had been elected in 2000 to Congress, and the first

1    thing that he actually did as a Congressman was sit in and watch the electoral count

2    for -- in 2001, January 6th of 2001.    So he had been there, and he observed that, and so

3    he had some sense of the way that day worked.    He had a recollection of there being

4    objections to Florida and Al Gore gaveling them down.    But he wanted to know how

5    does this all actually work?

6         So I told him that I had a fairly good sense of how things worked and that my staff

7    had actually pulled together some research, but that there aren't actually rules for the

8    joint session.    There is this thing called the Electoral Count Act and told him that

9    I -- my -- the -- to the best of my recollection, we talked about this maybe on

10   December 7th, and told him that, overnight, I could pull together a memo for him that

11   would lay out how the proceedings would work.

12        And so, again, there has been an invocation of executive privilege on the memo,

13   but there is a memo from me to him on December 8th that lays out both the history, the

14   fact that the constitutional clause in question is itself somewhat muddy, but then you

15   have 130 years of consistent practice under the Electoral Count Act.

16        Q    And did you discuss with the Vice President at that time, either in your

17   December 7th conversation with him or in the memo, whether the Vice President had the

18   authority to reject electors?

19        A    So I don't recall specifically addressing rejecting electors.    The memo did

20   address the question of what the Vice President's role is in resolving objections that are

21   raised.    And, essentially looking back at -- you have 100 years or almost 100 years of

22   history leading up to the Electoral Count Act where, from time to time, disputes had

23   arisen, and they had been handled in ad-hoc different ways with sometimes the Vice

24   President or the President of the Senate -- the Vice Presidency was vacant for a lot of

25   those first 100 years, and so frequently it was the President pro tem of the Senate who

1    had -- was sitting in the chair.

2           One good example of that is 1857 when, in Wisconsin, there had been a blizzard.

3    So the Constitution specifies all the electoral votes are supposed to be cast on the same

4    day, on a day to be set by Federal law, and that day had been set by Federal law.

5           Well, then a big blizzard happened in Wisconsin, and the electors couldn't meet in

6    Wisconsin on that day.    So they cast their vote -- I believe it was the next day.    And

7    somebody raised an objection to that.    It wasn't an outcome- determinative situation,

8    and so it wasn't highly politically pressured.    But there was a big discussion in Congress

9    at that point in time.    What's the role of the President of the Senate in resolving that

10   objection?

11          And nobody was really satisfied with how it worked out.    The people essentially

12   withdrew their objection and moved along.    So there were a number of historical

13   examples like that.    And I said, if that's all you had, there would be some ambiguity.

14          But then you have the Electoral Count Act that comes in in 1887, and from that

15   point forward, everybody has resorted to the Electoral Count Act and followed its

16   procedures every time an objection has been raised.

17          At first, I thought that there was a possibility of one exception to that, which was

18   the 1960 Nixon situation, because you had two slates in Hawaii back to 18 -- 1876 was the

19   first time that you had really had two slates presented.    That created the constitutional

20   crisis that resulted in the Electoral Count Act.

21          But, in 1960, you had had a Republican slate certified by the outgoing Governor of

22   Hawaii.    You then had a judicially ordered recount.    And then, after -- I believe it was

23   after December 14th, so after what we think of as the safe harbor date and when the first

24   votes are supposed to be counted, you had a Democrat slate certified by the new

25   incoming Democrat Governor pursuant to the terms of the recount.

1       And Nixon, when he got to Hawaii and the vote count, sort of magnanimously said

2  that he had personally looked into the circumstances of what had happened in Hawaii,

3  that he was satisfied that the Democrat slate for Kennedy was the correct one, and that

4  he asked the Chamber, are there any objections to us counting that?

5       So, if you --

6       Q     And were there any objections?

7       A     And there were none.

8       Q     Okay.

9       A     And that was critically important to my mind to then putting that in the

10  category of not an exception to the electoral count because, if you have alternate slates,

11  it's supposed to trigger an automatic debate, where you split into House and Senate, and

12  there is a -- because here you did have -- it's alternate slates, both certified by a State

13  authority, an outgoing Governor, incoming Governor, similar to 1876 where that had

14  happened in at least one of the three States where you had alternate slates.    So -- but

15  they did do the breaking apart.

16       But I ultimately satisfied myself that the Nixon example, because he had asked for

17  objections and nobody objected to it, was actually consistent with what the electoral

18  count -- the Electoral Count Act says that the Vice President or the President of the

19  Senate shall call for objections.

20       There being no objections stated to his proposed resolution, it was consistent with

21  the Electoral Count Act, and, thus, what you have is 130 years of, every single time that

22  there has been any objection to electors, it has been resolved in accordance with the

23  Electoral Count Act procedures.

24       Mr. ████     And I'll just note that Congressman Kinzinger has joined us.

25              BY MR ████

1   Q   Was anybody else at that December 7th meeting that you had with the Vice

2   President?

3   A   I'm sure Marc Short was present.   I don't remember whether there might

4   have been others present.

5   Q   Okay.

6   A   And December 7th is to the best of my recollection as to the date, and that's

7   based on knowing that the December 8th memo, which I think I recall saying I would pull

8   together for him overnight, is dated December 8th.

9   Q   Okay.   So I want to go back in time to around the time of the November 3rd

10   election.

11   Did you at some point become aware of a call from Corey Lewandowski to

12   Marc Short about whether the Vice President would observe ballot counting?

13   A   No.

14   Q   Okay.   Did you have any conversations with anyone on the Trump-Pence

15   campaign staff regarding the outcome of the election, such as the likelihood of recounts

16   or lawsuits that could change the outcome of the election?

17   A   Yes.

18   Q   Okay.   And with whom did you have those conversations?

19   A   Matt Morgan, who was the general counsel of the campaign and my

20   predecessor as counsel to the Vice President.

21   Q   Okay.   And what did he say to you?

22   A   There were probably two or three different phone calls that I had had with

23   him over time, and that was just to get a download so that I would be aware if the Vice

24   President asked what the status of any litigation that was brought.   I recall Matt's early

25   report was that they had thought that they would end up coming out on top in both

1   Arizona and in Georgia once all of the vote counting was done and you got through the

2   absentees, that that looked to be the case, and that -- and that they were on top of

3   whatever procedures needed to be followed to file contests if they determined that was

4   appropriate, but that they still needed to have things sort of sort out on the ground as to

5   the facts before they made any final decisions about what they were going to do.

6        Q     Did Mr. Morgan ever say -- aside from what you just told us, did Mr. Morgan

7   ever say whether he thought President Trump had won or lost the election?

8        A     I don't recall whether we specifically discussed that or not.

9        Q     Okay.    Did you have any conversations with Bill Stepien?

10       A     No.

11       Q     Did you have any conversations with Jason Miller?

12       A     Not -- not after the election, no.

13       Q     Okay.    Did you have any conversations with Mark Meadows about efforts

14   to overturn or change the results of the 2020 election?

15       A     No.    I'll say that there was one meeting with Mr. Meadows after the

16   Gohmert lawsuit was filed, but it was on the subject of the lawsuit.

17       Q     And who else was in that meeting?

18       A     Marc Short, Pat Cipollone, and Pat Philbin.

19       Q     Can you tell us just generally what was discussed?

20       A     So, again, they've invoked privilege on all of the documents relating to

21   involvement of White House Counsel's Office or Mr. Meadows in that lawsuit.    But the

22   general subject at the highest level was just we -- the normal practice is that the Justice

23   Department represents -- you know, we had done that -- so the -- let me take a step back.

24            I think it was December 23rd that we had been sued in the Wisconsin Voters

25   Alliance lawsuit, so that was the first lawsuit that came in.    And, there, the -- I spoke to

1      the -- that lawsuit had a number of defendants in it, including the Senate, the House, on

2      down the line.    And so I interacted with counsel for the Senate.    I don't recall what his

3      name was.

4              But the Senate was going to be represented by the Justice Department.    The

5      question was, did we want to be as well, and we determined, yes, we do.    And so that

6      had been lined up.

7              When we got to Gohmert --

8      Q      So that was decided in advance of this meeting that you're talking about --

9      A      That was for Wisconsin Voters Alliance.

10     Q      The Wisconsin.   Okay.

11     A      So that had been decided, I think, the same day that it got filed that, yes, we

12     will use Justice Department representation along with the Senate on that.

13             The Gohmert lawsuit, we were the only named defendant, and so I again

14     interacted with the Senate because we were sued in our capacity as President of the

15     Senate.    But it meant that I had to be a little more involved in ensuring that the Justice

16     Department was going to represent us, but the normal rules in the White House are that

17     you need to -- if you're going to have contact with the Justice Department, you need to

18     make sure you go through the White House Counsel's Office.    So I had to be in touch

19     with them about getting that set up.    And that then led to that one meeting.

20             So, at the highest level, the question really was just, okay, so we're going to be

21     represented -- it was we were going to be represented by the Justice Department.    That

22     was already determined by that point.    And the question was essentially, what

23     arguments are we going to make in our -- in our brief?

24     Q      And was there discussion in that meeting about whether an argument

25     should be made that the Vice President had no authority to reject electors?

1       A       I don't recall.   So, A, because of the invocation of the executive privilege by

2  the President, I can't really speak to the contents of the meeting, but I don't believe that

3  there was any discussion on the merits.

4            The lawsuit was so obviously unable to proceed for a whole host of reasons,

5  including, most saliently to my mind, the fact that they had sued the Vice President in

6  order to have him declared to be more powerful in derogation of authorities that the

7  Electoral Count Act places with the House and the Senate.     And so to sue us in order to

8  get that declaration is not a proper construct of the lawsuit.    The others seemed to me

9  to be the necessary defendants in that lawsuit.

10           So it was really a discussion of threshold arguments.    And, without -- without

11  going into the details of what was actually discussed in the meeting, one of the things

12  that I wanted to make really sure of was that we did not advance a political question

13  argument in that brief, and we did not, because a political question argument would

14  suggest that there is no role for the courts in resolving this.

15           And my concern was, if this issue actually did come to a head, if the courts don't

16  get involved, exactly how does it get resolved?    I mean, normally, the political question

17  doctrine, I got it as sort of a belt-and-suspenders construct of an argument, but there was

18  no resolution -- there was no mechanism here for the friction between the branches and

19  the players in an Electoral Count Act standoff over who had what authorities to be

20  resolved if the courts didn't decide the underlying question that would be there, which

21  was, what is the constitutionality of the Electoral Count Act?

22       Q       But the courts didn't decide that anyway because of the threshold issues

23  that kept them from getting to the merits, right?

24       A       Right, but one of the threshold issues -- if you just put on your belt and

25  suspenders and gave somebody that complaint, one of the first things that almost any

1   government lawyer would say would be, oh, it's a typical political question.    It's a fight

2   between Congress and the executive branch.    Why should the courts weigh in on that?

3         And so I wanted to make sure that there was not a political question argument

4   raised because, once we committed ourselves to that position, the government is saying

5   we don't think that the courts have a place in resolving this.

6         Q      Did anybody suggest that the Justice Department should not vigorously

7   defend that lawsuit?

8         A      No.

9         Q      Did anybody point out that there were potential sort of conflicts between

10  the government's position in that lawsuit as a defendant and the President's interest in

11  getting reelected?

12        A      I don't recall anybody ever raising that as an issue.

13        Q      Okay.    So, going back to whether you had questions with certain people

14  about the Presidential election, did you have any conversations with Jared Kushner about

15  the 2020 Presidential election?

16        A      I don't think I ever had a conversation with Jared Kushner about anything.

17        Q      Okay.    Did you ever have any conversations with Ivanka Trump about the

18  2020 election?

19        A      No.

20        Q      I think you said earlier something to the effect of some people in the staff

21  may have been encouraging the President to declare a victory on election night.    To your

22  knowledge, did anybody in the White House staff ever encourage the President to

23  concede the 2020 election?

24        A      So, again, taking a step back, my conversation with Marc was before the

25  election happened.    So it was a concern about, I think, general pressure, and I don't

1   think I had a strong understanding about whether he was talking about White House

2   staff, campaign staff.    I think it was just sort of a conglomeration of a concern that there

3   would be general pressure to do that.

4           As to the -- can you restate that question?

5           Q     Yeah.    Do you know if anybody in the White House staff ever advised the

6   President that he should concede the 2020 election?

7           A     I don't know.

8           Q     Okay.    And then, similarly, do you know whether the President -- to your

9   knowledge, did the President ever admit to any staff members that he had, in fact, lost

10  the 2020 election?

11          A     So I received instructions from the former President not to testify as to any

12  Presidential communications, which, if he had personally given such an instruction or not,

13  would fall within that.    So I don't think I can answer the question for that reason.

14          Mr █████    I'll pause now to see if first any members have any questions?    No?

15  Okay.

16          Mr.█████    Just quickly.

17          Mr █████  Staff?

18          Mr.█████    Yep.    Just quickly, Mr. Jacob.

19               BY MR.█████

20          Q     You've a couple of times talked about "we" of the VP's staff.    How many

21  lawyers worked for you when you were the Vice President's chief counsel?

22          A     So I had -- Matt Sheehan was my deputy counsel --

23          Q     Uh-huh.

24          A     -- to the Vice President.    I had a detailee from the Justice Department,

25  Lindsay Pickell.    And then I had an administrative guy who had not passed the bar yet

1    but who helped do research on some things, Devin Petricca.    And I had an intern,

2    Ugonna Eze.    That's my entire staff.

3        Q    I see.    And were they all officed over in the executive -- in the Eisenhower

4    Building?

5        A    Yeah, all of them were --

6        Q    Okay.

7        A    -- within my legal counsel suite.

8        Q    And you mentioned also that there was a Senate side or another group of

9    OVP staff that functioned as his aides on the Senate side?    Is that right?

10        A    So it's a little complicated within the Vice --

11        Q    Yes.

12        A    -- President's Office.    But -- so there is an actual Senate office.

13        Q    Okay.

14        A    Hannah Lankford ran that Senate office, usually I think just by herself.    It's

15    possible she had one other person --

16        Q    Yeah.

17        A    -- who was up there with her.

18        Q    You're anticipating my question in terms of what they do.    How many

19    people are in that Senate office, and what are their general functions?

20        A    So I think, in terms of actually staffing that office --

21        Q    Uh-huh.

22        A    -- Hannah Lankford was the only one -- there could have been one other.    I

23    don't recall.    But -- and her job was just to -- if the Vice President did go up to the

24    Senate, she would make sure to coordinate things up there.    She was the point of

25    contact on Senate side -- like Senate business that the Vice President was involved in.

1       Q     Uh-huh.

2       A     But the Vice President's Office is also -- because he has constitutional

3  functions that are primarily actually in the legislative branch as President of the Senate,

4  his executive branch functions are thin except for delegated authority that comes from

5  whatever the President decides to give him.

6         The entire office's budget is split so that quite a few of the staff -- like, for

7  example, I think our legislative affairs director might have been paid on the Senate side

8  out of the Senate appropriation as opposed to -- which doesn't mean that you were

9  staffed up at the Senate office.   It just meant that your functions tended to be more

10  supportive of that --

11       Q     I see.   So is it all one staff, Hannah Lankford in the focus on Senate, your

12  team and others at the Executive Office Building all working together as part of the Vice

13  President's staff?

14       A     Yes.   So we would have a weekly staff meeting, and Hannah Lankford

15  would come down to the -- to the Vice President's ceremonial office for that.   We were

16  all one staff, split appropriations, and then Hannah particularly minded the shop up on

17  Capitol Hill.

18       Q     Understood.   And do all those people report up to the Vice President

19  through Marc Short, his Chief of Staff?

20       A     Yes.

21       Q     Okay.   Fair to say that -- it sounds from your testimony that Marc Short was

22  more focused on political issues, the Vice President's and otherwise, much more so than

23  you.   Is that fair to say?

24       A     More than me, yes.

25       Q     Yeah.   You, I get the sense, were not really focused on political issues.

1    You're a lawyer working hard to ensure the Vice President had good legal advice about

2    the issues that arose over the course of his time as Vice President?

3        A    That was my primary responsibility, yes.

4        Q    So I want to go back quickly, then, to the conversation you had with

5    Mr. Short before the election about concerns that the President might declare victory,

6    the President -- there might be something that required your involvement or legal advice.

7    Anything you can recall about what Mr. Short told you, tell us more, the context of that

8    conversation and things that he said.

9        A    So I think I've given you most of my memory of it.

10       Q    Uh-huh.

11       A    I don't think that he necessarily -- so he was expressing a concern and asking

12   me, is there anything you can think of that can be -- that could help in this situation?

13   And, initially, my thought was that this doesn't really sound like a legal issue, so, no, I

14   don't think that there is anything I can do to help.

15       But then it occurred to me, well, actually, it might be unseemly for the person who

16   is going to preside over the vote count to be out if there was some dispute over which

17   side a State should be, getting out in front of declaring what you thought that should be,

18   so that a position of neutrality would be helpful.

19       So I recall -- I mean, he -- he called me.    He expressed the concern.    It was just

20   one of the number of things we probably talked about in a phone call.    And then it

21   occurred to me, I think later that day, well, could this be helpful?    And then I wrote a

22   short memorandum to Marc, not to the Vice President.

23       Q    Yeah.    Helpful to what end?    What was your understanding from the

24   conversation Mr. Short's goal?    What was it that he was trying to achieve on which you

25   could be helpful?

1          A       So giving the Vice President essentially a reason that he would not be

2   weighing in on a disputed State, that his lawyer had advised him that a posture of

3   neutrality was appropriate for him.

4          Q       It sounds like the goal was to keep the Vice President out of those

5   discussions or that controversy.    Is that fair to say?

6          A       Well, there wasn't a controversy yet.

7          Q       Okay.

8          A       This was before there was any outcome, and it was a prophylactic measure

9   to, in the event that there was a situation where the evidence was uncertain and there

10   were people who were calling the vice -- for the Vice President to make some kind of

11   statement where we didn't have confidence in the underlying evidence behind it --

12          Q       Uh-huh.

13          A       -- that the Vice President would be able to invoke advice of counsel to say,

14   among other things:    I just can't do this.

15          Q       Yeah.    Did Mr. Short say anything about the basis for his expectation that

16   there might be a controversy, or that there could be something in which people would

17   turn to the Vice President?

18          A       So he didn't name names as to where he was concerned that there could be

19   pressure to do that, but I think his observations of the campaign and the folks who were

20   involved, that there can be pressure from any one of a number of different sources that

21   could come in.

22          Q       Did he say anything, Mr. Jacob, during that conversation that suggested that

23   that controversy could be pushing the President or the Vice President to do things that

24   were in contrast to the count -- the reported results, the official outcome of the election?

25          A       Not to -- I mean, I don't know what you mean by "do anything."    So

1     the -- the whole idea of the electoral count and those kinds of actions weren't on

2     anybody's radar screen.    I don't think that Marc had given a single thought to the fact

3     that January 6th was even an event that was going to happen.    I raised it as a possibility

4     that we could use sort of defensively, that counsel had advised him, because of his role,

5     that it would be inappropriate for the Vice President to weigh in on those disputes.

6           Q    Yeah.

7           A    So, if, by action, you mean getting to a podium and saying something, I think

8     that that was the concern, would be that there would be a request of some kind that we

9     wouldn't feel like we had all the underlying evidence that we needed to feel comfortable

10    with whatever it was that he might be being asked to say.

11          Q    Uh-huh.

12          A    But it was a hypothetical at that point because we didn't know what the

13    outcome of the election would be.

14          Q    How long before the election did this conversation take place, best as you

15    can recall?

16          A    It was, I believe, that -- I believe he called me the day before and that I either

17    called him back that afternoon --

18          Q    Uh-huh.

19          A    -- or possibly the morning of the election with my idea that the Vice

20    President's role in the electoral count might be a very good reason to say he shouldn't.

21          Q    So big picture is, before the election, he expressed concern that there could

22    be controversy, that there could be a dispute about the results, and the goal is to keep

23    the Vice President out of that.    Is that right?

24          A    So, if the Vice President was asked to say something for which we had

25    affirmative evidentiary basis, I don't think that there would be a problem with the Vice

1    President weighing in on that.

2         Q    Uh-huh.

3         A    So it wasn't -- it wasn't a general sense that there are no circumstances

4    under which the Vice President should ever weigh in.    But, if there was an actual dispute

5    with underlying evidence that was uncertain, that was the circumstance in which, if we as

6    a staff didn't feel comfortable with the underlying basis for whatever it is that he might

7    be being asked to say was rock solid, then we could invoke advice of counsel that he

8    needed to stay out of it.

9         Q    Your advice was, given that he presides over the count, he should avoid it.

10   Wouldn't that also apply regardless of the evidence?    Given his institutional role, he

11   shouldn't comment upon anything having to do with the evidence or things that

12   happened with respect to individual States?

13        A    I mean, I -- you look back at Al Gore and his pronouncements in 2000, right?

14   He's the sitting Vice President, candidate for President, and he said a lot of things about

15   thinking that he had won the State of Florida, and he didn't, no matter what way you

16   went back.    So I can't say that, when you are dual-hatted, you both have a position as

17   Vice President and have a position as one of the candidates --

18        Q    Uh-huh.

19        A    -- that it's inappropriate for you to weigh in on what you honestly believe the

20   outcome of the election to have been, what you honestly think are problems with the

21   way that things materialized.    Again, I think there is lots of historical examples of that.

22        But certainly one always needs to be cognizant of the fact that, when you are

23   in -- when you have the Office of Vice President of the United States, if you're speaking as

24   Vice President of the United States, or you're speaking as President of the Senate, there

25   are certain expectations about the integrity with which you approach --

1    Q    Yeah.

2    A    -- remarks that were made.

3    Q    Understand.    Anything else about the conversation with Mr. Short that you

4    can recall?

5    A    No.

6    Q    Okay.

7    Mr. ██████    Thank you.

8    Ms. ██████    Just two quick follow-ups for you, Mr. Jacob.

9        BY MS. ██████

10   Q    I believe I heard you refer to another memo in that -- following on this

11   conversation with Mr. Short.    Is that right?    Did you prepare a memo right around the

12   time of the election about these issues?

13   A    I mean, this was about a page and a half, I think.    It was a quick -- I think I

14   did it in about an hour, sending something off quickly to Marc.    And, at this point in

15   time, again, ██████████████████████████████    I had seen some

16   things that my staff had put together for me, but I had not had the chance -- I mean, by

17   this point, ██████████████████, I think.    I hadn't had the chance to really dig into

18   them and understand them.

19       And so, again, they -- I don't think that this memo even was in the pool for

20   whatever reason.    I don't know if maybe it was just on the computer and not in the

21   email.    So there hasn't -- nobody has had a chance to weigh in, neither the incumbent,

22   nor the former President, as to whether they would invoke privilege on it.

23       But what I can say is it essentially said:    There are scholarship disputes about the

24   Electoral Count Act.    Set those aside.    We know that he's going to be the face of this

25   vote count.    And, given that that's the case, he should remain neutral on anything that is

1    in dispute and uncertain.

2         Q     Okay.    Thank you.    You're anticipating my question about the status of

3    production on that document.

4         The only other followup I had for you was:    Earlier, you -- in response to

5    questions from ███████ you were describing an early conversation that you had with

6    Matt Morgan, then the general counsel of the Trump campaign.    And I believe you

7    describe him as sharing with you early conclusions about the possibility of success and

8    challenging the election outcome in Arizona and Georgia.

9         Did you have subsequent conversations with Matt Morgan about the likelihood of

10   success in those States or others?

11        A     So the early conversations that I remember weren't about needing to

12   challenge an outcome.    They thought, in the first couple of days at least, after -- I don't

13   remember it was the day after the election or the day after that.    Probably not the day

14   after the election.    In fact, this could even have been a few days after because I

15   remember being in my office talking to Matt on speakerphone, and I wasn't in the office

16   on the day or the day after the election because I was still completing ███████

17        But, at the time, they thought, when all was said and done, that it was going to be

18   a squeaker in both Georgia and Arizona, but they thought that they were ultimately going

19   to come out ahead.    And I -- my recollection was that they did not think that they were

20   going to come out ahead in Michigan, Pennsylvania, Wisconsin, that the numbers did not

21   look like that, and that the questions were whether issues like the late-arriving ballots in

22   Pennsylvania would be within the margin of victory for purposes of challenges in those

23   States.

24        And I just don't recall where -- I think, by the time you got to that weekend, the

25   margin in Pennsylvania was significantly in excess of the late-arriving absentee ballots,

1   which hadn't been counted in the total anyway, I think because of Justice Alito's

2   segregation order.

3          So I don't remember all the details, but that's -- the early reports were some

4   nervous confidence that Arizona and Georgia would ultimately come out in the win

5   column without resort to litigation, just the initial tabulation of the ballots.    And I think

6   he described the general process that, if they did need to litigate anything, this is the

7   way -- that it varied by State the way that the timing and the kinds of things you needed

8   to do to bring an election challenge because you had to wait, as I recall, until the results

9   were certified.    You couldn't bring a challenge until then.

10         So it's not just, oh, the news has declared it; therefore, you sue.    You actually

11   have to have some certified results.    So certifications weren't going to happen until a

12   while out.

13         And that's -- that's what I recall from Matt.

14     Q     Thank you.    And any other conversations with Mr. Morgan or other lawyers

15   for the campaign about the outcome of any litigation or challenges in the States?

16     A     Not about litigation.    I had -- I had later had conversations with Matt about

17   what -- what evidence they had compiled in support of the lawsuits that had been filed.

18     Ms. ████    Okay.    Do you --

19     Mr. ████   Just one or two.

20          BY MR. ████

21     Q     As you were developing your views on the Electoral Count Act and 12th

22   Amendment -- operation of the 12th Amendment, did you consult with OLC or DOJ at all,

23   or --

24     A     No.

25     Q     Okay.    And is there a reason why you didn't consult with them?

1          A      So a couple of different reasons.    One, as I'm developing my early views,

2     I'm not generally allowed to contact OLC unless I've gone through counsel's office.    So it

3     was not -- it was not something that we normally did at all.    There might have been two

4     or three times during my entire time in the Vice President's Office that we asked OLC to

5     weigh in on something.

6               So this was also -- I didn't anticipate when we started looking at this topic what a

7     morass it was going to be in terms of the number of Law Review articles, the fact that the

8     rules weren't going to be as clear as -- the fact that there weren't going to be actually

9     rules for the joint session, the fact that the -- there were all these historical examples that

10    you needed to look at to understand things.

11              So things were at a very preliminary state even through the election at this point

12    in time.    It wasn't really until the conversation that I mentioned with the Vice President

13    on the 7th -- and, again, I -- to the best of my recollection, on the 7th.    And I -- again, my

14    recollection, as I said, I have a bunch of stuff on this, but I don't -- and so I can give you

15    some details, but I really want to pull together my own thinking on this and take a closer

16    look at the things that have been given to me before I put in front of you something as

17    this is the way the world works.

18              And so I think I worked late to get that memo together.

19         Q      Do you know -- did you ever learn whether other people from the White

20    House consulted with OLC about issues involving the 12th Amendment or the Electoral

21    Count Act?

22         A      I don't know.

23              BY MR. ███████:

24         Q      What about later, when obviously this question about the Vice President's

25    role at the joint session of Congress became a very big issue, even contentious between

1    the President and Vice President?    Did you at that point ever consider consulting with

2    the Office of Legal Counsel?

3          A      So I think by the time that -- it wasn't really until a January 3rd, 4th

4    timeframe that I became cognizant of sort of an internal tension among personnel within

5    the White House.    I had seen some things floating around at a -- somebody in my small

6    group at church brought to my attention the Operation Pence Card memo when that

7    came out.

8          And I -- you know, it's a forgery of a White House counsel type memo.    But, at

9    that point, it just felt like blogosphere type issues.    It was not an inside-the-building

10   issue.

11         By the time we got to January 2nd, 3rd, 4th, I had read every page of all the

12   congressional counts that had happened going back to the beginning.    I had read all the

13   Law Review articles.    I had read the statute.    I served at OLC.    I didn't need

14   Steve Engel's opinion to know what I thought the right answer was at that point.    And

15   we had decided on January 2nd that we were going to do a statement to the Nation as it

16   were of exactly how we had concluded what the Vice President's role was and was not

17   and what could and could not happen on January 6th.

18         So, again, by the time you got to a point where I became aware at least of

19   tensions internally, it was a resolved issue.    You know, you ask OLC a question, and it

20   takes them a month looking at a bunch of things.    I had already done it.

1

2    [11:03 a.m.]

3              ████████        May I follow up very quickly, Mr. Jacob?

4              One of the memos you mentioned was kind of an anticipatory memo in October

5    or the November timeframe.

6              Do you know if that was ever shared with the President or his staff; in other

7    words, outside of the Office of Vice President.

8              The <u>Witness.</u>   I am virtually certain that no one other than me ever saw that

9    memo.

10             ████████.   Okay.    How about the December 8th memo that you talked

11   about?    Do you know if that was ever shared with the President or his staff?

12             The <u>Witness.</u>   I don't know.

13             ████████.   Thank you.

14             BY MR. ████████

15       Q    So, Mr. Jacob, I think you were saying earlier something to the effect of Marc

16   Short didn't want the Vice President to make any statements about the 2020 election

17   when the facts were in dispute.

18             How did that sort of then play out as far as what the Vice President did or did not

19   say after the election?

20       A    So that's a pretty broad question that I'm not sure I can answer writ large.

21   But, generally speaking, I felt like the advice that I had given Marc -- again, it was a memo

22   to him -- but the advice that I had given to Marc was generally followed insofar as the

23   Vice President might talk about the fact that we were -- you know, in his campaign

24   role -- would talk about the fact that we were fighting, and we were going to, you know,

25   follow the legal course of action that might exist.

1   But I didn't feel like he made declarations that were inappropriate or unsupported

2 by evidence about any of those States.

3   Q Do you know whether he was ever asked by anyone to make statements?

4   A I don't know.

5   Q Okay. I don't believe the Vice President ever used the term "Stop the

6 Steal."

7   Do you know why that is?

8   A I don't know.

9   Q Do you know whether the Vice President believed that the 2020 election was

10 stolen?

11   A I can't speak to the Vice President's beliefs, but he's never expressed to me

12 that he thought that it was stolen.

13   Q So on December 1st of 2020, Attorney General Barr made a statement to the

14 AP where he said, "The U.S. Justice Department has uncovered no evidence of

15 widespread voter fraud that could change the outcome of the 2020 election."

16   Do you know what the reaction within the White House generally was to that

17 statement?

18   A No.

19   Q Do you know what the President's reaction was to that statement?

20   A No.

21   Q Did you discuss that statement with Vice President Pence?

22   A It's possible. I don't recall specifically discussing it.

23   Q Do you recall generally discussing it?

24   A No. There was a -- when the Vice President was on vacation -- so he left

25 around the time the Wisconsin Voters Alliance lawsuit got filed and then was then out

1    west somewhere, maybe Vale skiing with his family.

2           And so it was during that period of time that he asked me to -- he essentially said,

3    "I keep reading media reports.    I see the stuff on the blogs.    People keep telling me

4    things.    I don't feel like I have at all a good sense of what has been established by hard

5    facts."

6           And so it's possible that General Barr's statement would have been one of the

7    things that would have been -- come up in our discussions at that point in time about the

8    lack of evidence of widespread voter fraud.

9           So I don't remember specifically discussing that, but we did have a discussion

10   about what is the evidence.

11          Q    And what did you say to him about what the evidence was?

12          A    So the general conclusion, which -- so I mentioned that I reached out to Matt

13   Morgan later, and this was that point in time, because when he had said that to me, I was

14   aware -- I think there was something like 90 lawsuits filed all over the place.

15          And I paid some attention to news reports about them, but you would get dueling

16   reports about what the underlying evidence was, what this affidavit said, whether this

17   witness was stoned when they were testifying.

18          I mean, there were all kinds of different things that I and my small staff did not

19   have the capacity to try to wrap our arms around all of those things happening in all the

20   different States.

21          So I went to Matt first to say, "What do you have that you guys have pulled

22   together?"    And so he sent me some things.

23          I gave it to my staff and said, "This is a baseline of what you can work from, but

24   make sure that we -- I'm not going to put anything in front of the Vice President that I

25   don't have confidence in."

1    So I wanted them to really run the stuff to ground.    So around the December

2    31st-January 1st timeframe they were spending a lot of time.    I think that may have

3    been a weekend.    Certainly it was New Year's Day, but I think they were in the office

4    with me, and they were digging in on those things.

5    So the basic conclusion that I came to was that there was good, perhaps even

6    conclusive evidence of what I would call irregularities; that being instances where

7    secretaries of state had bent, perhaps broken the rules for how elections were supposed

8    to be conducted.

9    The examples that most stood out in my mind were in Pennsylvania, the

10    late-arriving absentee ballots which the Pennsylvania State Supreme Court essentially

11    said, "Yeah, the statute says you can't count them, but we say you can, so you're going to

12    count them for so long."    And Justice Alito, of course, had segregated those ballots

13    because of serious legal questions about whether that was permissible under Article II,

14    section 1.

15    And in Wisconsin guidance had been put out by the secret ray of state that if

16    you -- regardless of whether you actually were indefinitely confined, you could check a

17    box on an absentee ballot because Wisconsin did not have no excuse absentee voting.

18    You didn't have to submit any ID if you did it.

19    But because of COVID you could say that you were indefinitely confined.    And

20    the Wisconsin Supreme Court later, after the election, determined that that was not a

21    permissible exercise of authority by that secretary of state.

22    So my basic conclusion was, yes, irregularities have happened.    Those are worth

23    examining and potentially fixing going forward.    But that when it came to voter fraud,

24    that instances of alleged voter fraud were either small in number or difficult or impossible

25    to verify.

1   Q So would you say that your conclusion was consistent with Attorney General

2 Barr's conclusion?

3   A Yes.

4   Q And did you memorialize this in a memo?

5   A I did not. I didn't have time to. There is a memo that my staff put

6 together.

7   I had a chance to review it twice and gave a number of comments and asked for a

8 number of changes to it based on things that I had read.

9   So there is a memo from them that privilege has been invoked on.

10   Q And did that memo go to the Vice President?

11   A Yes.

12   Q Do you know if it went to anybody else?

13   A I'm sure it went to Marc Short. I don't know if it went to anybody else.

14   Q So, to your knowledge, it didn't go to anybody outside of the Vice President's

15 office?

16   A I just don't know.

17   Mr. ██████ I'm going to pause here.

18   Any members have any questions?

19   Ms. <u>Cheney.</u> ██████ I have a question.

20   Mr. ██████. Yes.

21   Ms. <u>Cheney.</u> Mr. Jacob, did the memo that we were just discussing go to the

22 White House Counsel's Office?

23   The <u>Witness.</u> I did not send it to them. I don't know if anybody else gave it to

24 them.

25   Ms. <u>Cheney.</u> Thank you.

1          Mr. ████    Anybody else?

2                  BY MR. ████

3          Q      So as we talked about earlier, the Vice President did make some statements

4    regarding the election.    And we're short on time, so I'm not going to play all the videos.

5    But there was one on December 10th at a Georgia rally where he said, "We're going to

6    keep fighting until every legal vote is counted.    We're going to keep fighting until every

7    illegal vote is thrown out."

8          And then he discussed the Texas v. Pennsylvania lawsuit.    And at the end he said,

9    "And all I can say is God bless Texas."

10          Do you know whether the Vice President was suggesting that he agreed with the

11    position that Texas was taking in the Texas v. Pennsylvania lawsuit?

12          A      So the Vice President and I never had a chance to discuss the Texas lawsuit.

13    Certainly I don't think that the position in that lawsuit, at a meta level, that Federal courts

14    can be used for one State to challenge the outcome of the election in another State.

15          I would need to have a longer conversation with the Vice President on that.    I

16    think that -- I don't think that the Vice President necessarily agrees with that proposition.

17          Q      With your proposition or the proposition that Texas was taking?

18          A      So, to the extent that Texas was taking the position that Federal

19    courts -- that States have standing to go to Federal court to challenge the outcome of

20    elections in other States, I have no reason to believe that the Vice President agrees with

21    that proposition.

22          Q      Do you have any reason to believe that he disagrees with that proposition?

23          A      So that would get into a private citizen conversation that I had with the Vice

24    President about that more recently that would be protected by attorney-client privilege.

25          Q      So just so I understand, the former Vice President is your client?

1       A       Yes.    He's a pro bono client.

2       Q       Okay.    So I know that Vice President Pence is a former governor and,

3       obviously, had relationships with a lot of governors around the country, particularly

4       Republican ones.

5              Do you have any knowledge of conversations that he had with governors in the

6       disputed States about the outcome of the 2020 election?

7       A       No, I don't think so.

8       Q       Okay.    So did the Vice President, to your knowledge, have any

9       conversations with Members of Congress about whether they were going to object to

10      electors from the disputed States?

11      A       I did not participate in any conversations between the Vice President and

12      Members of Congress about that.    So I don't know whether any conversations of that

13      kind happened.

14      Q       Okay.    Were you told of any conversations the Vice President had with

15      Members of Congress?

16      A       Not that I remember.

17      Q       Okay.    Do you have any knowledge about Senator McConnell's reported

18      efforts to discourage Senators from objecting to electors from disputed States?

19      A       I had heard internally -- I don't recall, it might have been from our legislative

20      affairs director -- that Senator McConnell was actively discouraging objections.    But I

21      don't have any firsthand knowledge of that.

22      Q       Okay.    If you look at exhibit 14 in the binder that's in front of you.

23             And just based on the way they were produced, as well as the description of the

24      attachment in the attachment line, it appears that exhibit 14 goes with exhibit 15,

25      meaning that exhibit 15 may have been an attachment to the email that's in exhibit 14.

1   And 16 may have been as well.

2          So looking first at exhibit 14.    On December 31st, 2020, it looks like you sent an

3   email from your ███████ account to your OVP account, and then you forward it to several

4   people who look like they were all in the VP's Office.    I won't bother with the names

5   because this will be in the record.

6          And the attachment says, "The Immaculate Deception," which is why I think it

7   probably -- and then also "Fraud examples" -- which is probably why I think 15 and 16 go

8   with it.    And the text in the email message says just says, "Less verified."

9          So then exhibit 15 is "The Immaculate Deception:    Six Key Dimensions of Election

10   Irregularities," and at the bottom it says, The Navarro Report.    And then exhibit 16, looks

11   like it just has examples from specific States?

12          Do you recall what you meant when you said, "Less verified"?

13   A      Yes.

14   Q      What did that mean?

15   A      So, as I mentioned before, when the Vice President asked me to give him

16   sort of my hard facts analysis about the various allegations that had been made

17   concerning the election, I went to Matt Morgan as someone who would be able to give

18   me information that I could start from or give my staff to start from.

19          So I believe that there are two emails that I -- so Matt Morgan, because he's on

20   the campaign, would send things to my personal account, because campaign activity isn't

21   supposed to happen on the official system, and then let me make the judgment as

22   counsel to the Vice President that whatever he had sent me was going to be used for

23   official side work.    And so then I sent it in to the official side account.

24          So he would have sent me -- and I think he sent me two emails, one of which was

25   analysis prepared by some set of lawyers, I think working for him on the campaign, that

1    he said he could sort of vouch for the information in there, not every detail, but most of

2    it.   And so I sent that in to my staff.

3         And then he also had given me these two documents.    And I think that he had

4    said that these have some citations that might be useful but that he couldn't vouch for

5    their contents in the same way.

6         So when I sent them in -- I had given my staff the direction that no matter what

7    the source was, if I was going to put something in front of the Vice President, I needed to

8    know that they had run it down to the underlying factual basis.    I was not going to use a

9    media source or anything like that.    I needed to know exactly what the basis was.    But I

10   wanted them to know that this set in particular, great to start with the citations there,

11   but let's not trust the conclusions in this.

12        Q    Did Mr. Morgan disavow the Navarro report in any way?

13        A    I don't think he affirmatively disavowed it.    I think he just said he was not

14   vouching for the accuracy of the contents.

15        Q    Okay.    And when you wrote, "Less verified," were you disavowing the

16   Navarro report in any way?

17        A    I very much doubt that I read this all the way through.    I think I probably

18   took a quick look at it, saw that there were a bunch of citations in the back, including to

19   court dockets, and thought, okay, it could be potentially useful.

20        So I have since read it.    But at the time I don't think that I had even read it to

21   have a strong opinion of it one way or another.

22        Q    Was your decision not to read the Navarro report based at all on your

23   impression of Mr. Navarro's credibility?

24        A    So if it had been presented to me as a really credible source by Matt

25   Morgan, I might have -- I was getting 5 hours of sleep a night at this point, if I was lucky,

1       so --

2           Q      Sounds pretty good to me right now.

3           [Laughter.]

4           A      So I had to be careful what I actually spent my time on.

5           So if it -- if this was presented to me as a really credible bible of everything I could

6    want to know, I might have read it, because I was interested and I knew that it would

7    actually come up in conversation with the Vice President what the underlying stuff that I

8    was giving him was.

9           But none of my interactions with Mr. Navarro at the White House would have led

10   me to think that this was something I needed to pay a lot of time or attention to.

11          Q      Did your interactions with Mr. Navarro give you reason to be skeptical of his

12   report?

13          A      Yes.

14          Q      Why?

15          A      I found that Mr. Navarro had a -- he and I had different views about the role

16   of legal process within the White House.

17          Q      What does that mean?

18          A      I was always committed to doing things by the book, and he often -- our

19   previous interactions -- and I think he's said something in some role he was doing an

20   article about how I'm a bad person and he had previous run-ins with me on coronavirus

21   stuff.

22          So it's coronavirus -- our previous actions had been coronavirus related.    I

23   suppose in fairness to him there was a lot of urgency at that point in time, and lawyers

24   are not always held in the highest regard when they are standing in the way of urgency

25   and saying, "These are the steps that we need to go through before we can get to the

1    kind of outcome that you're looking for."

2          So I can't go into the details of those things because, obviously, those are within

3    the executive branch and both the incumbent and the former would need to weigh in on

4    executive privilege details.

5          But at a high level, he viewed me as one of those legal obstructionists and I

6    viewed him as insufficiently careful about the required process.

7    Q      Did Vice President Pence ever tell you how he viewed Peter Navarro?

8    A      No.

9          Ms. ████    Mr. Jacob, do you know what's the status of production of the other

10   email that you referred to receiving from Mr. Morgan about election fraud evidence?

11         The <u>Witness.</u>    If you don't have it, it's because the former President invoked

12   privilege on it and the incumbent hasn't made a decision, so the Archives hasn't moved.

13   It was definitely in the set that I reviewed.

14         Ms ████    Thank you.

15              BY MR. ████

16   Q      So I believe it was December 8th that the Lincoln Project ran its ad that you

17   referenced earlier.    It was around that time at least.

18         So you already told us about the conversation you had with the Vice President.

19   But can you just tell us sort of generally did this, in addition to the fact that it prompted

20   the Vice President to want to talk to you about his role, did you get the impression that

21   the Lincoln Project ad increased the level of concern or attention about what the Vice

22   President was going to do on January 6th?

23   A      So, again, I didn't have a strong sense of an issue within the building until

24   early January.

25   Q      Okay.    And then in connection with that Lincoln Project ad, did you have

1    any conversations with anybody other than the Vice President and your own staff about

2    what the Vice President's role was going to be?    So I'm talking about around the time of

3    December 8th when that ad came out.

4         A    No.    It would have been getting the information that my staff had compiled

5    back in October, taking a deep dive into it with fresh eyes myself, and then summarizing

6    that for the Vice President, and then having conversations with him.

7         Q    Okay.    If you can look at exhibit 5.    This is an email sent on December 8th,

8    4:35 p.m., from Ugonna Eze -- is it "Ease"?    Is that how you pronounce it?

9         A    I think it's "Ezzay."

10        Q    "Ezzay," okay.    And I think you said he was an intern in the Office of Vice

11   President?    Is that correct?

12        A    Yes, and a University of Chicago grad.

13        Q    Law school?

14        A    Yes.

15        Q    Okay.    So sent to you, copying several people in the Office of Vice

16   President.

17             It says, "Please find below the latest legal news.

18             "Today, number one, today is 'Safe Harbor' day for the Electoral Count Act.    All

19   court and State legislative challenges must be resolved by today, else the electors will be

20   solidified.

21             "House Republicans, including Representative Jim Jordan, Representative Matt

22   Gaetz, and Representative Andy Biggs, chairman of the Freedom Caucus, are reportedly

23   urging the President to bring a floor fight when Congress meets to certify the results on

24   January 6th?"

25             So at that point did you have any understanding as to whether or not Members of

1   Congress were going to fight to prevent the certification of electors from any disputed

2   States?

3          A      So I was aware from media reports and from Ugonna's summary here that

4   there were -- I think Mo Brooks was another Congressman who had raised issues around

5   this time -- that there were those who were suggesting that objections of some kind

6   should be raised.

7          Q      Okay.    And did you have any knowledge at that point about whether any

8   Senators were considering objecting as well?

9          A      I think at that point in time none had announced that they were.

10         Q      And did you know anything about any discussions between anybody at the

11  White House and any Senators about whether they were going to object?

12         A      Again, I recall hearing internally from someone, could have been from Chris

13  Hodgson, that McConnell was discouraging objections on the Senate side, but I'm not

14  certain.    But I think that those reports were all after the actual vote count -- or the

15  actual electoral college vote on the 14th.

16         Mr. ███    Okay.    And I would just note that Mr. Aguilar has joined us.

17         And I'll pause here to see.    Do any members have any questions?

18         Ms. Cheney.    ███  I have just a question just to clarify.

19         Greg, I'm just trying to make sure that I have clear the assertions of executive

20  privilege.

21         And so with respect to the memo that you mentioned that your staff had drafted

22  that went to the Vice President, what is the exact assertion of executive privilege with

23  respect to that memo?

24         The Witness.    So are you asking me what the basis of the assertion of the

25  privilege is?

1          Ms. <u>Cheney.</u>    Yes, of that memo.

2          The <u>Witness.</u>    Yeah.    So I don't know the entire basis of the assertion of the

3    privilege.    The President's team -- the former President's team put together a list of, I

4    don't know, 80, 90 documents after they went through the set that had been gathered by

5    the Archives, and that one was on the list and -- as well as all of the interactions between

6    my staff that went into the creation of that memo.

7          So it's on their privilege invocation list.    And it's my understanding that the

8    incumbent hasn't weighed in yet with a final say on that set of documents that the former

9    President's team invoked on.

10          Mr. <u>Culvahouse.</u>    Congresswoman Cheney, it's A.B. Culvahouse.

11          Just to clarify because it wasn't -- I mean it's -- Mr. Jacob is the Office of Vice

12    President's designated agent, I guess it is, for Presidential Records Act purposes.    So he

13    would review in that context anything that the Archives would purport to produce to this

14    committee or any other entity trying to get information from the OVP records.

15          So he would have seen the entire collection -- I believe that's right, Greg --

16          The <u>Witness.</u>    Yes.

17          Mr. <u>Culvahouse.</u>    -- in that context, and would, therefore, have a general

18    familiarity with what has been withheld with respect to an assertion of privilege and the

19    status.

20          But that's the context in which his familiarity has been gained.

21          Ms. <u>Cheney.</u>    Okay.    So I appreciate that.    Thank you very much.

22          So the memo that we're discussing here specifically -- and correct me if I

23    misunderstood this -- but my understanding was that it was prepared for the Vice

24    President in his capacity as President of the Senate, because that's the capacity in which

25    he would be conducting himself on January 6th.

1        The <u>Witness.</u>    So this one was a little more complicated than that.    My

2    December 8th memo to him was certainly about his role as President of the Senate.    My

3    January 5th memo to him, which I believe you have, is certainly about his role as

4    President of the Senate.

5        This memo, which is not from me to him, but rather is legal staff, because I just

6    didn't have enough time to have the input into it to put my name on it, went up either

7    January 1st or January 2nd.    And it's not about his role as President of the Senate.    It is

8    just about these -- you've asked what are the things that we can verify about the various

9    complaints and assertions that have been raised about the election, and it summarizes

10   those.

11       So it's not obvious what role that would play on January 6th.    It's not -- it's just

12   general information that he wanted.

13       I do think that he was concerned that -- he wanted to be able to understand and

14   follow the debate that was taking place in front of him.    By that point it was known that

15   there were going to be objections and so there was going to be a debate of some kind.

16   And so he wanted to know what did his staff think about these things.

17       But that memo, unlike the other ones, is not as clearly in the box of President of

18   the Senate.

19       But the former President's team, and I don't know what their practice has been

20   with respect to other sets of documents, but they don't give explanations in the letter

21   that I've seen as to why they're invoking privilege on the various documents.    It's just a

22   long list of Bates numbers that they've decided to invoke privilege on.

23       Ms. <u>Cheney.</u>    And, again, just for my understanding, so as you are, in your role in

24   that process, are they seeking your advice or the Vice President's advice or signoff when

25   they're making decisions about what they're going to withhold?

1        The <u>Witness.</u>    So under the Presidential Records Act, when Vice Presidential

2    records are requested, they go both to me for review and to the former President's team

3    for review.

4        Under the Presidential Records Act, it is the former President that has the capacity

5    to invoke or not invoke privilege on all of those documents.    There is not a role for the

6    former Vice President to invoke privilege.

7        I did answer a number of questions that they had about the documents that were

8    in the set and -- but we did not ask them to invoke privilege on that document.    They

9    made the decision to do that.    And it's not because I necessarily agree or disagree with

10    their various privilege calls.    They determined to do that.

11        Ms. <u>Cheney.</u>    And what questions did they ask you?

12        The <u>Witness.</u>    A lot of the questions that they asked me, without going into too

13    many details, just essentially had to do with who might have seen this memo, is it

14    possible that anybody could have -- that any of this information, any given document

15    might ultimately have been shared with the President in some form.

16        And, you know, our conversations were under a common interest privilege, me

17    representing the former Vice President and them representing the former President, So I

18    can't get into the contents of those conversations.

19        But those were the kinds of questions they asked, and they would have to speak

20    to the ultimate connections that they think any one of those documents had to a credible

21    claim of executive privilege.

22        Ms. <u>Cheney.</u>    Okay.    Thank you.    I appreciate that.

23            BY MR. █████

24    Q        And who were the lawyers representing former President Trump?

25    A        Justin Clark and Alex Cannon.

1    Q    So back on this tab 5, the email sent to you under one, where -- and I'll

2    read -- it says, "Today is the 'Safe Harbor' day for the Electoral Count Act.    All court and

3    State legislative challenges must be resolved by today, else the electors will be solidified."

4    So was it your view that by December 14th, when the electors met and voted, that

5    the election was over?

6    A    So largely, yes.    I mean, the results had been certified in the various States

7    even prior to that.    It's kind of difficult to pin down exactly a "when the election is over"

8    point.    But at that point in time it became clear -- when I met with the Vice President on

9    December 8th it was my view that the electoral count on January 6th would almost

10   certainly proceed according to regular order because there did not -- it did not appear to

11   be the case that there were going to be any State authorities that certified alternate

12   slates of electors.

13   And when he we got to December 14th and no State authorities had, in fact,

14   certified alternate slates of electors, that let us know what procedures we were going to

15   be under.

16   So, in that sense, I think that the results were known before the electoral college

17   folks actually got together and voted, but it certainly was an inflexion point along that

18   continuum of resolution.

19   Q    And were you aware that Trump electors in some of the disputed States

20   were meeting and then ultimately sending in certificates of their electoral votes?

21   Mr. Culvahouse.    As of what date █████████?

22   Mr. ██████    Well, I guess around December 14th.

23   BY MR. ██████

24   Q    On or around December 14th, were you aware that the Trump electors were

25   meeting in various disputed States?

1       A     So I -- I'm not sure.    I became aware of the fact that alternate electors had

2 met and sent in votes at some point between this and over the course of the next couple

3 of weeks.    I think that there were media stories about it.    I don't specifically recall a

4 story on the 14th about that, but it's possible that there was one.

5       Q     Okay.    But do you -- is your recollection that when you learned about these

6 alternate electors that you learned that through the media?

7       A     Yes.

8       Q     And what was your reaction as to whether these alternate slates of electors

9 had any impact on what either the Vice President or Congress would do on January 6th?

10       A     So when I saw media reports, there was no indication that any of the groups

11 that met had an imprimatur of State authority, which under my read of the Electoral

12 Count Act, which while not a model of clarity on this point, I thought was the best reading

13 of it, that you had to have an imprimatur of State authority in order to have the alternate

14 elector sections operate.

15       So it was my view that the media reports that I was seeing and the kinds of slates

16 that were being sent in -- which I don't think I actually saw the underlying slates at this

17 point in time.    It probably wasn't until early January that I actually saw any of them.

18 But I didn't think that they would qualify so that we would be under normal -- sort of

19 under the normal order procedures.

20       Q     Okay.    So if you can turn your attention to exhibit 78.    This is an email

21 from Douglas Carlson, and the signature block indicates he was director of

22 correspondence in the Office of Vice President, sent to several people in OVP, but not

23 you.

24       And Mr. Carlson wrote, "All, States are beginning to certify their election votes

25 which they then mail to the Vice President in his capacity as President of the Senate."

1    Were you sort of involved at all in this process of receiving the electoral votes

2    from State authorities?

3    A    So I wasn't directly involved.    I believe that the Senate parliamentarian had

4    reached out to Hannah Lankford to let her know to be on the lookout for them, and I

5    think had also told Hannah that sometimes historically the States had not always sent

6    them to the Senate address, that sometimes they would come to the White House

7    address.

8    And so I think, although I was not on this particular email, I think that there are

9    other emails from Doug that I was on that may have had the same content, and was just

10   trying to make sure that if one of the certificates came to the White House address that

11   we would get it into the proper hands up in the Senate office.

12   Q    Okay.    And then if you look at exhibit 25, email chain.    I'm not going to go

13   through each of the emails in the chain, but if you'll look at sort of the middle of the first

14   page, an email from Christopher Hodgson sent to you and Hannah Lankford on

15   January 3rd, 2021.    "Subject:    Electoral Votes."    It says, "Confirming that we received

16   the following alternate elector certificates," and then the State abbreviations for Nevada,

17   New Mexico, Arizona, Georgia, and Pennsylvania.

18   So, again, I know this is somewhat duplicative of what I asked you earlier, but

19   what was your reaction as far as the implication of any -- of receiving alternate elector

20   certificates from those States?

21   A    So on January 2nd I had advised the Vice President that, to the best of my

22   knowledge, none of the slates that had been sent in would qualify as an alternate slate

23   within the meaning of the Electoral Count Act, and that, therefore, we would not be

24   under the alternative slates procedures on January 6th.

25   And this exercise that you see occurring here on January 2nd and 3rd to gather

1    the information we had was in advance of our meeting with the Senate parliamentarian

2    the afternoon or early evening of January 3rd.

3            After he swore in the new incoming Senators, we met with the parliamentarian,

4    and he wanted to confirm with the parliamentarian that she was of the same view that I

5    was, that we were not going to be under the alternate slate procedures.

6            So that's the exercise that's going on here.    We're gathering all the information

7    about what do we have about alternate slates for purposes of that conversation with the

8    parliamentarian.

9            Q        And the advice you gave to the Vice President on January 2nd, was that

10    written or oral?

11            A        Oral.

12            Q        And what was the parliamentarian's view?

13            A        The parliamentarian agreed.    The parliamentarian told us that this was not

14    a new phenomenon, that, in fact, in just about every election cycle, they got what she

15    called private citizen submissions.    I think she mentioned some lady in Tennessee who

16    has sent in an alternate slate virtually every year.    No offense, A.B., or the people of

17    Tennessee.    They're fine people.

18            [Laughter.]

19            But they had always just taken them and sort of set them aside.    And, in fact, I

20    was a little -- a little put out to learn that the parliamentarian had historically just sort of

21    made the decision to set them aside without even bringing them to the attention of the

22    Vice President's Office because it did seem to me there was a constitutional function of

23    the Vice President to determine what are the certificates that are being counted, not the

24    parliamentarian.

25            But, nonetheless, she was in agreement that those were merely private

1   citizen -- what she called private citizen submissions that would not invoke the alternate

2   electors procedures.

3          Q      Okay.    If you look at exhibit 83, you can see in the middle of the page

4   there's an email from Elizabeth MacDonough.

5          First of all, who's Elizabeth MacDonough?

6          A      She is the Senate parliamentarian.

7          Q      Okay.    And she wrote to Hannah Lankford, copying a couple other people,

8   but not you, "Hi, Hannah.    Attached are copies of the submissions we have from private

9   citizens and our spreadsheet about the deficiencies of those submissions."

10         And then it looks like Ms. Lankford sent this to Christopher Hodgson.

11         We can get you, if it would be helpful, that spreadsheet.    It's not attached here,

12  but I think we can get it for you.

13         But do you know whether you ever saw that spreadsheet referenced there?

14         A      I probably did, but I don't recall it specifically.

15         Q      Okay.    And based on review of the spreadsheet with deficiencies -- oh, we

16  have it pulled up on the screen here -- did you have a conclusion as to whether these

17  alternate slates of electors were, in fact, deficient?

18         A      Yes.    And I was -- I don't recall whether each of these specific listed

19  deficiencies was something that I examined in detail.    I'm sure I, either in my oral

20  conversation with Elizabeth or in looking at this spreadsheet, confirmed my conclusion

21  that none of these had the requisite State authority.

22         Q      Okay.    So some of them, you can see there, you know, in parentheses, they

23  will say, like, sovereign citizen.    I don't think we need to go over those.    But some of

24  them say Arizona Republican Party.    I'm not certain, but those may be ones where they

25  are, in fact, the Trump electors from those States.

1        But why were those ones that, in fact, had Trump electors, in your opinion,

2   deficient?

3        A     Well, they still didn't have a State authority that had signed off on them.

4   So when you look back in Hawaii in 1960, you had incoming governor, outgoing governor.

5   When you look back to what happened in 1876, you had governor and attorney general

6   or incoming and outgoing governor.

7        In theory, you could have a State legislature or you could have a State judicial

8   declaration of some kind, depending on the internal law of the State, and none of these

9   had that requisite indicia of State authority.

10       Q     Okay.     If you could look at exhibit 13.

11       This is from Christopher Hodgson.     At the top it says, "Appointment."     It looks

12   like it's a certain Outlook calendar invitation perhaps, referring to a meeting starting on

13   December 30th at 8 p.m. and scheduled to end at 9 p.m. the same day.

14       "Required," Marc Short, Greg Jacob, Christopher Hodgson, and Claire Keeler, all

15   from the Office of Vice President.     "External meeting participants," and it lists two

16   people from Mo Brooks' staff and the Republican staff director for the House Judiciary

17   Committee.

18       Do you remember if you attended that meeting?

19       A     So I am pretty sure that this meeting didn't happen at 8 p.m. at night.

20       Q     Okay.

21       A     I think it happened in the late afternoon.     But, yes, I did attend the meeting

22   with -- I don't know who these individuals are, but I know that there were at least some

23   Brooks staffers present.

24       Q     Okay.     And what was the point of the meeting?

25       A     This meeting was just to compare notes on mechanics on January 6th, what

1    had -- what was their understanding of how -- once they got up and raised an objection,

2    was it supposed to be one sentence?    Were they supposed to have a paragraph where

3    they actually read out the different things that they were objecting to?

4          They were getting advice, I think from the House parliamentarian, no, it should

5    just be a sentence, which is consistent with historical practice and the rule in the Electoral

6    Count Act that there not be debate during the joint session.

7          So it was just comparing notes on our understanding of the mechanics of how

8    January 6th was supposed to work.

9       Q    So by that point, December 30th, my understanding is Congressman Brooks

10    had already publicly announced he was going to be objecting.    Did his staff say anything

11    to you about what they thought the Vice President's role should be as opposed to the

12    Members of Congress' role at the joint session of Congress?

13       A    To the best of my recollection, everybody in this meeting proceeded with

14    the assumption that the Vice President's role would purely be ministerial.

15       Q    Okay.    At some point that same day, I'm not sure exactly what time,

16    Senator Hawley announced that he was going to object to at least the electors from

17    Pennsylvania.

18          I think you've already answered this in answer to my questions about

19    communications in general with Members of Congress, but are you aware of any

20    communications between the White House -- anybody at the White House and Senator

21    Hawley about whether he was going to object in advance of his announcement?

22       A    No.

23       Q    Do you know if the Vice President had any conversations with Senator

24    Hawley about that before his announcement?

25       A    I don't know.

1  Q  Do you know if he had any conversations with Senator Hawley after Senator

2 Hawley made the announcement?

3  A  I'm not aware.

4  Q  So what was the reaction in the Vice President's Office when Senator Hawley

5 made that announcement?

6  A  I think it just let us know that January 6th was going to be a longer day.

7 There were different ways that this could proceed. As I mentioned before, the Vice

8 President had been there for the vote count in 2001 and had seen Al Gore gavel down

9 objections.

10  And so the question was, were we going to be going through a sequence of

11 gaveling down objections or were we going to be breaking apart from time to time into

12 separate houses, a la the 2004 -- January 1st -- January 6th of 2005 debate over Ohio

13 where they split apart and did things that way.

14  So it essentially told us we're going to have a longer day. We didn't know at that

15 point how many States were going to be objected to, but I think that -- I recall one of the

16 things that Marc and Chris Hodgson told me early on that because of the House COVID

17 rules it was actually going to take a lot longer than the 2 hours of debate time allotted in

18 the Electoral Count Act to resolve any State where there was an objection because you

19 could only have so many House Members on the floor at a time to actually vote after a

20 debate.

21  So if we were going to have many States objected to, it probably wasn't even

22 going to end by midnight on January 6th.

23  Q  Now, Bob Woodward and Robert Costa in their book "Peril" reported -- and

24 I'm not sure if this is their exact language -- but they reported that Senator Hawley's

25 announcement was a flashpoint for the Pence team actualizing the political risk for Pence

1    to certify the election.

2          Do you agree with that description?

3          A     No.    There was -- again, there were a number of -- it's politically

4    unpalatable to be up there gaveling down objections by members of your own party.

5    It's politically difficult if you're having to sit in the chair for a debate that's taking place in

6    front of you where you know the outcome is going to be that it's going to be voted down.

7          So there were a number of different scenarios that were in play, but I don't recall

8    it being a flashpoint where we were particularly concerned about it.    I think it just let us

9    know which set of procedures were likely going to -- we were going to be under that day.

10         Q     Did Vice President Pence express anything to you one way or the other as to

11   whether he wanted Senators to object to disputed electors?

12         A     No.    I mean, he neither -- he certainly didn't say that he hoped that they

13   would object.    I think that he, again, didn't like having to be up there gaveling people

14   down.    He also didn't like that there were no particularly palatable alternatives, I guess

15   is the best way to put it.

16         Q     Did he ever say whether he agreed with Senator Hawley's objection?

17         A     No.

18         Q     Same thing for when Senator Cruz and then I think ten others joined with

19   Senator Cruz, same question with regard to them?

20         A     No, I don't recall him ever commenting on their underlying objections.

21         Q     And what was the reaction of the Vice President's Office when Senator Cruz

22   and I think ten other Senators announced that they were going to vote to reject the

23   electors from disputed States as not regularly given and lawfully certified unless and until

24   an emergency 10-day audit was completed?

25         A     That it was going to be a very long day.

1          Q       Did that raise any questions in the Vice President's Office as to whether the

2     Vice President himself could order such a 10-day audit?

3          A       No.    I don't think that such a 10-day audit can be done at all under the

4     terms of the Electoral Count Act.    Congress would have had to pass an alternate statute

5     because there are very specific adjournment and recess rules that essentially don't allow

6     you to go more than a 5-day period, and then they have to stay continuously in session.

7                I mean, the people who wrote the Electoral Count Act thought about the

8     possibility of somebody trying to drag out which -- I mean, recall the election of 1876,

9     they didn't come to a resolution until, like, the day before the new President was

10    supposed to be inaugurated.    So they were right up to the deadline, and that's an

11    example they had been looking back at 10 years before.

12               So they did their best to prevent any stalling by saying that, yeah, you can recess

13    for 1 day, recess for a day, recess for a day.    You get to the fifth day, you all are staying

14    there until you have determined who the winner is.    So that doesn't allow for the

15    possibility of a 10-day audit.

16               Mr███████       Okay.    I'll pause to see if any members have questions at this point.

17    No?    Okay.

18               Any staff?

19               Mr.████████████, very quickly.

20               Mr. Jacob, I believe Mr.██████asked you if you recall -- or when you recall hearing

21    that the alternate electors in the various States had met.    I just want to put a little bit

22    finer point on that.

23               Do you recall any conversations or indications that alternate electors might be

24    needed before December 14th?

25               The <u>Witness.</u>    I don't recall any, no.

1          Mr. ███████.    No discussions with campaign officials or anybody else in the White

2    House writ large about this idea of alternate electors?

3          The <u>Witness.</u>    I don't recall any, no.    I know that after the fact I was told, I think

4    by Matt Morgan, that there was concern that their lawsuits could be mooted in the event

5    they didn't have alternate electors in place.    Because if a court were to ultimately rule in

6    favor of any of the lawsuits, if you didn't have an alternate slate of electors, then the

7    whole thing would essentially be mooted.

8          And, of course, under the Electoral Count Act, when you looked at the political

9    dynamics, there was no way for alternate electors in and of themselves, under the terms

10    of the Electoral Count Act, to result in an outcome that would have elected Donald Trump

11    President again.

12          Because if you actually did have a State that had a State authority appended to it,

13    so you split apart -- let's say, Pennsylvania -- you split apart House and Senate, of course,

14    the House is going to go with the Democrat candidate, the Senate unclear.

15          But even, let's say, they went with Donald Trump, the tie-breaker under the

16    Electoral Count Act is the executive of the State, which for Pennsylvania, Wisconsin, and

17    Michigan were all Democrats.

18          So even -- I'm sure we'll be talking about Mr. Eastman later -- but even Mr.

19    Eastman when he mentioned the alternate electors later on, they weren't part of a way

20    to use the Electoral Count Act to get to victory.    They knew that that was not possible.

21    You had to go outside the Electoral Count Act in order for that to work.

1

2      [12:01 p.m.]

3                    BY MR. █████

4      Q      So you anticipated my question, which is that assumes -- what you just said

5      more or less assumes compliance with the Electoral Count Act itself.

6      A      It does.

7      Q      And you mentioned that, in your conversation with Mr. Morgan, I think you

8      said something, if they didn't have alternate electors in place, it might result in the

9      mootness concerns for some of the litigation that was going on.

10     Can you describe or explain what you mean by "they"?

11     A      So I don't recall the timing of this conversation with Matt.    This may have

12     been around January 2nd, and Matt was just explaining, because you saw that email

13     where we're hurriedly gathering the information that we had about the alternate

14     certificates.    Matt had been meeting with me and Marc Short and the Vice President on

15     January 2nd.    I can't remember if anybody else was there as well.

16     But he had mentioned -- I think in the context of my saying I don't think there is an

17     imprimatur State authority here, I think that he had said:    Well, yeah, the reason that

18     they did that was not to be mooted so that -- that makes sense.    So --

19     Q      "They" being the campaign or whatever is left over from the campaign?

20     A      Whatever is being left over from the campaign, but, again, I -- I did not have

21     the sense that Matt himself had been involved in that, just that he knew what the

22     rationale was for why they had been -- why they had gathered people together.

23     I think that -- I recall him saying something -- I never went to go back and check

24     the names of all the people who were on the certificates, but I think he had said that, in

25     some States, they hadn't even been able to get the electors who had been the originally

1    designated Trump slate, like if he won, these would be the electors for the State.    They

2    had to find substitutes, and I think, even in some States, they didn't even have a full

3    number of electors.

4            I don't -- I don't recall all the details of it, but that conversation probably was the

5    January 2nd conversation.    It's possible it came up in another conversation, but that's

6    my best guess based on what I remember.

7            Q     Was it your impression that Mr. Morgan was coordinating this effort --

8            A     No.

9            Q     -- with respect to the alternate electors?

10           A     No.

11           Q     Do you know who was, or did he say who was?

12           A     I don't think that he mentioned who was coordinating it.    He might have,

13   but I don't remember.

14           Q     Did he say anybody else was involved in the effort to coordinate it?

15           A     I don't think he mentioned any specific names, no.    It wasn't really relevant

16   to what we were talking about.    I think that he was just mentioning sort of what he

17   knew about what I was going to find when we pulled these slates to take a look at them

18   for purposes of the conversation with the Parliamentarian.

19           Mr. ███        Thank you, Mr. Jacob.

20           Mr. ███        So we've been going for a couple hours now.    Would you like to

21   take a break?

22           The Witness.    Sure.

23           Mr ███    All right.    Should we -- we could say 5 minutes, but it would end up

24   being 10, so let's just say 10 minutes.    Okay.    So we'll go off the record now.

25           [Recess.]

1          Mr ███████   Okay.   And we're back on the record.

2                 BY MR. ███████:

3          Q     So, Mr. Jacob, as I understand, January 3rd, I believe you said, was the

4    swearing in of new Members of Congress, and then a meeting with the Parliamentarian.

5          Can you tell us about that meeting with the Parliamentarian?

6          A     Yes.   We met in the Vice President's personal office off of the Senate floor.

7    The Parliamentarian came along with her assistant, whose name I don't recall.   And, as

8    of that point, I had gotten -- a couple days before, I think December 31st, Chris Hodgson,

9    our legislative affairs director, had received a number of historical transcripts from them,

10   but we still didn't have their proposed transcripts for our January 6th.

11         So, partly, we wanted to get details from them about the status of those

12   transcripts.   The Vice President wanted to confirm with her the advice that he had

13   received from me because I don't have floor privileges for January 6th, so it was going to

14   be Elizabeth who was going to be up there with him.   And it wasn't going to be the first

15   time that he relied on Elizabeth for advice on a number of things that might come to his

16   attention.

17         But we just wanted to make sure that we were aligned on a number of different

18   points and discuss the mechanics of how the day would work, when did the certificates

19   get brought in, how did -- how does the role of the tellers function?

20         So it was -- it was both a mechanical conversation about how things would

21   operate, it was a status check on the status of their scripts, and it was the Vice President

22   wanting to confirm that everybody was on the same page about the things that had to

23   happen and the order of events, particularly, as I mentioned before, to confirm that we

24   were -- to the extent that there were objections, that we were going to be under the

25   regular -- not the regularly given procedures of the Electoral Count Act, rather than the

1    alternate slate procedures of the Electoral Count Act.

2          Q     And the book "Peril," which you mentioned earlier, reported that

3    Ms. MacDonough counseled Vice President Pence that he was a vote counter.

4          Is that an accurate description of Ms. MacDonough's advice?

5          A     I don't recall her ever saying that.

6          Q     All right.    Did she say something to that effect?

7          A     We were all in agreement that his role was ministerial.    It's more

8    complicated than that because you have tellers from the House and the Senate involved

9    in the counting process.    So I -- I don't know what that phrase would even necessarily

10   mean in this context.

11         As you probably know, some of the constitutional ambiguity is what it means to

12   count the votes.    So, to be a vote counter -- in any event, we all agreed that his role was

13   ministerial.

14         Q     And so, by that, does that mean everybody was in agreement that the Vice

15   President could not, on his own, reject any slates of electors that had been sent by a State

16   authority when, in this situation, there was not an alternate slate of electors also sent by

17   a State authority?

18         A     I don't think that question even came up, whether the Vice President could

19   reject.    It wasn't -- there was no question about that in our minds, but all of our

20   conversation was geared around the fact that it was going to be a ministerial process and

21   these -- this is the way that it would operate.

22         Q     But, by this point, Senator Cruz and others had already said that they were

23   going to object.    I think it was actually the day before.    They said they were going to

24   object unless and until an emergency 10-day audit was completed.    At that meeting with

25   Ms. MacDonough, was there any discussion of whether or not the Vice President on his

1   own could suspend the proceedings so that there could be a 10-day audit?

2          A      Not that I recall.

3          Q      So if you look at exhibit 79 in your book.   So we're stepping out of

4   chronological sequence here a little bit, but it's relevant to the issue of the Vice

5   President's role.   The first chronologically, so the bottom of the page, is from James Rice

6   on December 23rd, 2020.   In parentheses, it says "Grassley," so I assume that means he

7   worked for Senator Grassley.

8          He wrote to Paul Teller from the Vice President's Office:   Paul, is there any

9   reason to believe that your boss will not preside over the electoral college vote count,

10  leaving my boss in the spot as PPT, question mark, which I assume PPT is president

11  pro tem.

12         Mr. Rice wrote back, same day:   Hmm.   It's not a zero percent chance of that

13  happening, you know?

14         Was there, to your knowledge, any question as to whether or not the Vice

15  President would, in fact, preside over the January 6th joint session of Congress?

16         A      So I don't think that, by this point in time, there was a question.   You can

17  see Paul responded pretty quickly, which does not -- I mean, if you actually follow the

18  time stamps, he managed to respond about 50 minutes before the question was asked,

19  which tells me there has to be something wrong with the time stamps.

20         Q      Or he's a very good staffer.

21         A      So this would not -- I don't even think -- I mean, this was the day of the

22  Wisconsin Voters Alliance lawsuit, and I don't know that the President -- Vice President

23  was even on campus by this point.   So this doesn't reflect a conversation with Paul, who

24  is our -- that Paul had with the Vice President or with me as an external affairs guy.

25         I will say that, early on in my conversations with the Vice President about this -- so

1   this would be in the December 7, 8, 9 timeframe -- the Vice President's first instinct when

2   questions came up about authorities that he might or might not have was that there was

3   just no way that the Framers of the Constitution would have entrusted that kind of

4   authority to one person.

5           And I recall him saying -- you know, the Vice President went to law school.    He

6   had even practiced briefly before launching into more political things.    I recall him telling

7   me that he had sat in as like a per diem judge in a few things and that there was no way

8   that you would ever allow a judge, who had an interest in the outcome of the election, as

9   he obviously did as Vice President, to sit in the chair there.

10          And so he asked:    Has any Vice President ever recused from the role of doing this

11  on the grounds that they are interested in the outcome of the election?

12          So we went back and looked at all of the historical examples and determined, one,

13  there had been many times that it was the President pro tem who sat in, but that was

14  because the Vice Presidency was vacant.    There was only one example of a sitting Vice

15  President who did not preside over the joint session, and that was Hubert Humphrey, and

16  so -- even though there were obviously many, many, many times that the Vice President

17  had presided, even though they were conflicted and interested in the outcome of the

18  election.

19          So my recollection, although we had that early project of looking at that and

20  reporting that to him, I think mostly, as he was trying to frame his thoughts about

21  whether it was even possible for him to sit in the chair under these circumstances once

22  he saw that only Hubert Humphrey had sat back and is it not exactly then viewed as a

23  profile of courage by Humphrey to -- I think he said something like:    Oh, there is a state

24  funeral I can go to in Europe, so I won't be able to make it.

25          But the Vice President determined that this is his -- his responsibility to fulfill this

1      task.

2              Q      Okay.     And then, if you look at exhibit 84, which should be the last one in

3      your binder, top of the email chain, most recent one is from Mike Emanuel of FOX News

4      to Devin O'Malley from the Office of the Vice President asking for comment on this news

5      headline, or whatever you would call it.     Says that Senator Grassley, the Senate

6      President pro tempore, says he and not Vice President Pence will preside over the

7      certification of electoral college votes since we don't expect him to be there.     And that's

8      January 5th.

9              So do you have any idea why there were reports -- well, why Senator Grassley

10     would announce that he was expecting to preside?

11             A      So my recollection of this example -- incident was, as soon as we got wind of

12     this, we very quickly interacted with Senator Grassley's staff to make sure that this got

13     corrected.     I think it was his chief of staff, and they very quickly fixed it.

14             I believe that their explanation was that they -- and, again, I don't recall exactly

15     what Senator Grassley's initial remarks were, but I believe that he was talking about after

16     the joint session broke apart into the constituent House and Senate parts to

17     debate -- debate any State to which there had been both a House Member and a Senate

18     Member who joined in an objection, that Senator Grassley did not expect the Vice

19     President to necessarily preside over that, which I believe that the example of Dick

20     Cheney in January 6th, 2005, that he might have gaveled in the debate on the Senate side

21     and then sort of took off, and the President pro tem presided over the rest of the debate

22     over the Barbara Boxer objection.

23             So, when we met on January 2nd, we had decided that the Vice President was

24     going to preside over all the Senate proceedings and not follow that Cheney model.     So,

25     by the time Senator Grassley made a statement, there was no question in our office as to

1    what the Vice President was going to do, and my impression was that Senator Grassley

2    had just sort of assumed that he was going to follow the model that Dick Cheney had of

3    not necessarily sit there for the whole thing and that he would then have a role presiding

4    over the Senate side.

5         But this -- I'm virtually certain all of this got quickly corrected by interaction of our

6    staff with Grassley's staff and then a statement going out.

7         Q    Okay.    So I understand that you reviewed the transcripts from several

8    previous joint sessions.    And, if you want, some of them are in here.    We can even

9    show you some videos.    But, just to save time to sort of get to the heart of it, which is,

10   did the Vice President or anyone on his staff decide to depart from or supplement the

11   typical script that had been used by previous Vice Presidents in some way?

12        A    Yes.

13        Q    In what way?

14        A    So, when we met on the 2nd and we -- the Vice President got my advice.

15   We were not going to be under the alternate slates procedures, but the Vice President

16   was concerned that people were aware that there were alternate slates that had been

17   submitted and that there had been a fair amount of news stories about it, and so he

18   wanted to make sure that we were being really transparent about -- it wasn't that we had

19   forgotten them.    It was that there was no imprimatur State authority, and, therefore,

20   they have no status at the electoral count.

21        And he was very clear on the 2nd that he thought, with as much ferment as there

22   was on these questions, that this was going to be an important moment of civic

23   education, that there is very little understanding among most of the public about

24   January 6th, the electoral vote count.

25        If you asked 100 Americans, probably 99 would have told you they didn't even

1  know what that meant.    They knew what the electoral college was, but what do you

2  mean they get together on January 6th for an electoral vote count?

3          And so he wanted a statement that was going to be civic education, that was

4  going to walk through precisely why he was doing what he was doing on the 6th, why he

5  had concluded that he didn't have the authorities that others had suggested that he

6  might.    And, on this question, he also wanted to be very clear and transparent about it.

7          And the previous transcripts, although I guess there had been private citizen

8  submissions that were never raised to public awareness or to the attention of the Vice

9  President's Office, now we can at that public awareness.

10          And so, the evening of the 3rd, I believe, I put together a transcript that would

11  have the Vice President effectively asking the tellers, so the tellers would present the

12  certificate of a State, and the Vice President would then ask the teller:    Have there been

13  any other certificates within imprimatur State authority presented?

14          And the teller would say:    No, there have not.

15          And so that would be your answer to the public.

16          The Parliamentarian, when she saw those edits, was pretty concerned that the

17  tellers weren't going to be very comfortable answering that question because they don't

18  know what these alternate certificates are, and they hadn't sat down and made any kind

19  of judgment about it.    So she suggested that it would be wiser to not involve the tellers

20  with that description.

21          So I then came up with an alternate formulation that had the Vice President saying

22  a long mouthful of words after each State saying that the Parliamentarian -- because

23  that's -- it reflects the reality.    The certificates come in to the Parliamentarian.    The

24  Parliamentarian sets aside private citizen submissions that don't have an imprimatur

25  State authority.

1        We had -- probably had seen the spreadsheet, but, at minimum, had taken a look

2    at the certificates and agreed we had no imprimatur State authority, so we're not under

3    those procedures.    And so, each time the Vice President read out, which the

4    Parliamentarian has advised me is the only one that has been received that has -- I forget

5    all of the words that we gave -- that has an imprimatur State authority, that purports to

6    be the return of the State and has the requisite imprimatur State authority.

7        The other change was that the Electoral Count Act specifies that the Vice

8    President shall call for objections, and that had not been in any of the transcripts for the

9    previous vote counts.    And, when we met on the 3rd, I raised that issue, like we're

10   relying on the word "shall" a lot for our conclusions about our authorities that we do and

11   don't have on that day.    So, when I have a statute that says "shall," I think the Vice

12   President needs to do this.

13        And she:    Well, I think that nobody has ever objected to the fact that we don't do

14   it.

15        I said:    I think today we need to do it by the book.

16        So we also added to the formulation that the Vice President called for objections.

17        And then there was some later edits to some of the -- not to the main transcript,

18   but there were also contingency scripts.    What happens if somebody raises this kind of

19   point of inquiry?    What if somebody raises this kind of point of order?    How do you

20   dispose of it?    And there was a lot of conversation between me and the Parliamentarian

21   about those on the 5th, and then we finally came to agreed formulations on those.

22        Q    You said something earlier that I actually want to follow up with, because I

23   know it seemed like a minor point, but it's actually going to become significant later when

24   we get into some of your email exchanges with Mr. Eastman that, you know, you pointed

25   out that an email I showed you earlier, it appeared that the recipient of the email actually

1   responded before the first one was sent.

2           Do you know why that is?    Is there -- is there some issue with the timing,

3   because Mr. Eastman -- we questioned whether it had something to do with, you know,

4   his email possibly being set to Pacific times or some other time zone, but it looks like this

5   is not just an issue with your emails with Mr. Eastman, but possibly with others.

6           Do you know what the cause of that is?

7           A    I don't.

8           Q    Okay.

9           A    It seems like there is like a 2-hour difference between them, and I -- I think

10  that -- well, we might be able to figure it out better with the Eastman emails, but it looks

11  to me more like his external email stamps may have been more accurate than our

12  internal ones, just like you saw with Paul's.

13          Q    Uh-huh.

14          A    His internal one suggests that it's being answered before it even comes in.

15  So I don't know what the -- I don't know what the internal issue is making those to be off

16  by a couple hours is, though.

17          Q    Okay.    But your estimate is it's about 2 hours that they're off?    Because it

18  does become important to us at some point for some of these emails to try and pin down

19  what time certain emails were sent because it, you know, tells us --

20          A    Yeah, so --

21          Q    -- what was going on, particularly on January 6th.

22          A    Yeah.    So my email to Eastman that ends with the phrase that got reported

23  in -- on by The Post, I am virtually certain would have been at about 2:14 based on the

24  events that I know were happening around the time.    In fact, I sent that immediately

25  before I got sent onto the Senate floor.    And so -- but I think that the time stamp on that

1    email says 12:14.

2          So I have been working on the assumption that Eastman's time stamps are

3    accurate and that my time stamps were off by 2 hours -- 2 hours before the time that

4    they were actually sent.    I can't prove that, but I do know that that email was sent like

5    2 minutes before I got herded onto the Senate floor.

6          Q      Okay.    And the reason I was asking that was exhibit 63, if you take a look at

7    that, this is on January 6th, and it says it was sent at 4:01 p.m. from you.    But now I

8    question whether that's accurate.

9          And it is to DL OVP Milaides.    So I'm assuming that that's the military aides to the

10   Vice President.    Is that correct?

11         A      Yes.

12         Q      Subject:    Please print for the VP attachment OVP legal scripts.

13         And then it looks like exhibit 64 is the script that you sent as the attachment.

14         Can you tell us how this document came about and why you were sending it on

15   the 6th as opposed to it having been provided to him in advance?

16         A      So I could be wrong, but I'm virtually certain that this was -- I'm pretty

17   certain I've seen an email from Chris Hodgson sending this to the Parliamentarian the

18   morning of the 6th.    And this would have been something I drafted the evening of the

19   5th and that I believe I would have sent for the mil aides to print the morning of the 6th.

20         This was certainly my work on the 5th.    Around 9:30 p.m. or so, I wrapped up my

21   work on the Vice President's statement and handed that off to him, and he finished it up

22   up at the residence.

23         I then turned to finishing up on the parliamentary script.    I think the main script

24   had already been worked out at this point.    Instead, it was these questions, motion to

25   adjourn, motion to recess.

1      There is a real problem under the Electoral Count Act and under the joint session

2   that I hope Congress will pay attention to when they do whatever they're going to do

3   with the Electoral Count Act, that the normal model that the Senate Parliamentarian is

4   used to working with is the chair rules, and the body can overrule.    So, if somebody

5   raises a point of order, raises a point of parliamentary inquiry, the Vice President, as

6   President of the Senate, or whoever happened to be sitting in the chair, would make an

7   initial ruling, usually based on the Parliamentarian's advice.    The body can overrule by a

8   majority.

9      And so the things that I got back kind of looked like that, but the problem is the

10   joint session has never, in all of history, voted as a body.    You have a conglomeration of

11   Senators and Members of the House.

12      So, if a question actually gets put to the President of the Senate presiding over the

13   joint session, and if they make a ruling -- and this is what came up with James Mason

14   sitting in the chair in 1857.    There was an objection of Wisconsin objectors.

15      He said:    I don't think that objection is valid.

16      Somebody jumped up and said:    Who do you heck are you?    You think you can

17   resolve this?

18      He said:    I'm sitting in the chair.    Overrule me if you disagree with me.

19      And they decided that they didn't disagree, so they let it pass.

20      But there isn't a good mechanism in place right now to deal with anything that

21   would be in order that goes to the chair because the joint session can't vote as a body.

22   It never has, and there is no rules for it to do so.

23      But then, if you break apart, what are the rules that you apply for determining

24   whether the chair is overruled or not?    Do both the House and the Senate have to agree

25   in order to overrule the chair?    Because that's a pretty high burden if both of them have

1   to agree.    But, yet, if only one agreed, is that sufficient to overrule?

2          There just were not good solutions to that, and so the Electoral Count Act has a

3   premise built into it that there isn't supposed to be debate during the joint session, and

4   so we tried to come up with formulas that were meeting the spirit of the Electoral Count

5   Act by simply not creating situations where the chair could rule on substantive issues in a

6   way that would have any kind of effect and we would always have to go back to the

7   Electoral Count Act.

8          So these were designed to essentially rule all these things out of order so that you

9   could never get to a question to the chair making a ruling on substance.

10          And I'm virtually certain this went up to the Vice President the morning of the 6th.

11   It doesn't make sense -- so the mil aides would print things at the residence for the Vice

12   President.    That's why you would send things to them.    Obviously the Vice President

13   was not at the residence at 4 p.m. on the 6th.    So that time stamp doesn't make any

14   sense.

15          The only way this -- the only way that time stamp and date could be at all accurate

16   would be if -- well, I -- I can't even speculate.    It's possible some question came up about

17   how we were going to handle something when we got back into session on the other side

18   of things, but why the mil aides -- the mil aides printed at the residence.    I don't think

19   that the mil aides are who you would send it to to print something at the Capitol.    And

20   obviously we'd been at the Capitol since just before 1 o'clock.

21          Q    Okay.

22          A    So I can't answer that time stamp question.

23          Q    Okay.

24          A    Yes, but I can tell you I did specifically discuss these with the Vice President

25   before we sent them to the Parliamentarian.

1    Q    And was this because you were anticipating that somebody -- a Member was

2    going to move to adjourn or move for a recess?

3    A    We didn't know, and so that was part of the substance of the conversation

4    with the Parliamentarian on the 3rd, that there were a lot of things that had just never

5    happened in joint sessions before that might come up in this joint session, and so that we

6    really -- and we didn't want to be resolving things off the cuff.    I particularly didn't want

7    to be resolving things off the cuff because, although the Parliamentarian and I were

8    aligned across the major issues on things like, whatever model they initially

9    proposed -- and I don't recall exactly, but for resolving like the chair ruling and how you

10   overruled, I thought that it was not a satisfactory resolution to it.    So there were things

11   that we were trying to work out in that regard.

12   Q    So I'm going to move on to Gohmert v. Pence, which we briefly discussed

13   earlier.    Did you have any conversations with anybody at the Justice Department about

14   the Gohmert v. Pence litigation?

15   A    I had several.

16   Q    Okay.    Do you remember who?

17   A    So -- and, again, the President's team has invoked privilege on the

18   discussions with the Justice Department on this, so they -- as I kind of read through the

19   production, I think they let through the briefs and the drafts of the brief.    But anything

20   where there was conversation with the Justice Department, they invoked privilege on

21   that, which makes some sense, I guess, because it's clearly an executive function for the

22   Justice Department to represent us.

23        That said, on a privilege log, you would list the participants.    So I had one

24   conversation with Jeff Rosen the day that the brief was filed.    Prior to that, John

25   Coughlin, Jeff Clark, and a couple of other people -- a woman -- I think it was the

1      Associate Attorney General perhaps who --

2          Q      Claire Murray?

3          A      Claire, yeah, who got on the phone for at least one conversation.      But there

4      were probably -- I think it might have been a couple of additional people, but all those

5      people were involved in at least one phone call.

6          Q      Did you have any disagreements with anybody at the Justice Department

7      about what position they should take on behalf of the Vice President?

8          A      So, again, I can't -- I can't talk about the conversations that I had with them.

9      Those are the things that they've invoked privilege on.      I can say I think everybody was

10     satisfied with the brief that got filed.

11         Q      So let's step outside the context specifically of Gohmert v. Pence.      Did you

12     have any conversations with Jeff Clark on anything related to the 2020 election besides

13     the two cases involving the Vice President, the Wisconsin case and the Gohmert case?

14         A      Yes.

15         Q      Okay.      When were those conversations?

16         A      The evening of January 2nd, Jeff Clark called.

17         Q      And what did he say?

18         A      So, again, for the Justice Department conversation, I don't think I can talk

19     about the contents.      But, at that point, the lawsuit had been dismissed, and I think there

20     was -- there might still have been a live question about a potential briefing schedule in

21     the Fifth Circuit.

22         Q      Okay.

23         A      But that was not the entire substance of the conversation.

24         Q      Okay.      So, as I understand it, you're saying that the former President is

25     invoking executive privilege over your communications with DOJ regarding the lawsuit.

1       Have they also invoked any privilege regarding your conversations with Jeff Clark

2    about other things related to the 2020 election?

3       A    So, having had -- what they have done is they've instructed me to invoke the

4    executive privilege as broadly as the law allows.    I'm taking what I have seen of their

5    invocation of privilege on the Gohmert records, which is any substantive discussion with

6    them, they've invoked privilege on.

7       They haven't invoked privilege on the fact that there were communications.    If a

8    final brief got sent back or forth, they haven't invoked it there.    But, every single

9    discussion, they did.    And so I think this discussion would fall within that as well.

10       Q    Even though it's discussions not related to the Gohmert v. Pence litigation?

11       A    Correct.    I think that I need to at least allow them, in the first instance, to

12    make that determination.    Neither the incumbent, nor the -- nor the former President

13    have told me that I can speak on this topic.

14       Q    Okay.    Can you just tell us perhaps yes or no whether your conversation

15    with Jeff Clark involved the possibility of Mr. Clark becoming Acting Attorney General?

16       A    No.

17       Q    Did your conversation with Mr. Clark involve the possibility of having the

18    Justice Department send letters to State officials in Georgia and other States asking that

19    they have a special session of their State legislatures?

20       A    No.

21    Mr. ███████    Does anybody else want to ask --

22    Mr. ███████    Yeah.

23       BY MR ████████

24       Q    Just briefly, Mr. Jacob, to follow on the Clark issue.    Are you aware that the

25    White House has written to Mr. Clark -- excuse me.    Not the White House.

1          Mr ███████  Justice Department.

2                      BY MR. ██████████

3          Q      Justice Department, indicating that it would not be appropriate for him to

4    assert an executive privilege over anything having to do with his -- the subject matters

5    ████████  just referenced, his involvement in any election of 2020-related matters?

6          A      I'm not.

7          Q      Okay.    Would that affect your personal determination as to protecting or

8    not a claim of executive privilege?

9          A      So, to be clear, on all of these things, I've worked at OLC, and I've worked at

10   two White Houses.

11         Q      Uh-huh.

12         A      And the executive branch can't function if individuals who are in the

13   executive branch make these determinations for themselves.    So, here, there are

14   interests of the former President.    There are interests of the incumbent President.

15         Q      Uh-huh.

16         A      I don't have instructions from either of them on this.    And so, if I had

17   conflicting instructions between them, I'd think that I would need to have a final

18   resolution of that conflict by someone else in order for me to be able to end -- not by

19   Congress.    Congress can't speak in its own interests.

20         Q      Yep.    Totally understand, and we're not trying to push through that.    I

21   guess, just to be clear, the record here is that both the current President and

22   representatives of the former President have agreed essentially -- and the former

23   President by inaction -- that these subject matters would not be appropriate -- these

24   subject matters meaning conversations that Mr. Clark had about the election -- would not

25   be appropriate for any assertion of executive privilege.

1      A      I -- yeah.    So this phone call was probably about 15 minutes.

2      Q      Uh-huh.

3      A      And I would be happy to talk about the contents of it if I, in fact,

4 received -- if -- if your assertion is that the former President's team has said that

5 conversations that Jeff Clark had with people are not going to have privilege invocations,

6 I'm happy to talk about it, but I need confirmation of that.

7      Q      I understand.    I can just show you the letter from Justice to Clark, and then

8 former President indicated that it would not seek to challenge or overrule or prevent such

9 testimony.

10      Mr. <u>Culvahouse.</u>    I think we'd have to go back, Mr. █████, to

11 the representatives of the former President.    And what we did, just so you have the

12 process, we shared with them the topic list.    We shared with them specific matters that

13 we had identified in the proffer that bumped up against the potential executive privilege

14 issues.    The references to Mr. Clark were specifically not culled out on that list.

15      The response we received from Justin Clark, you have.    And, to quote, it says:

16 Therefore, to the fullest extent permitted by law, President Trump instructs Mr. Jacob not

17 to provide testimony to the select committee concerning privileged communications.

18      So we have no latitude at this 10 seconds until and unless the -- either the former

19 President decides to not assert privilege with respect to Mr. Clark, or until a -- it's

20 adjudicated that the needs and requirements of the select committee overturn the

21 undifferentiated broad assertion of privilege.

22      Mr. █████      Yeah.    I understand.

23      I see Ms. Cheney is unmuted, but just to finish this, it sounds like, even if there is

24 arguably inconsistent evidence about the intentions of the former President with respect

25 to this subject matter, your position today is, absent direct communication from him,

1    you'll continue to assert the privilege?

2              Mr. <u>Culvahouse.</u>   Yes.

3              Mr. ███████   Okay.   Just --

4              Mr. <u>Culvahouse.</u>   Yes.

5                   BY MR. ██████

6         Q     Just so we can understand and assess whether we believe this falls within

7    any areas where the privilege has not been asserted, can you tell us anything about the

8    subject matter of your conversation with Mr. Clark?

9              Ms. <u>Cheney.</u>   ████, hold on one second.   I just had an additional point --

10             Mr. ██████   Yes.

11             Ms. <u>Cheney.</u>   -- as you all are considering the scope of this assertion.

12        The committee has had testimony from multiple individuals concerning their

13   participation in an Oval Office meeting with Mr. Clark about a number of topics, and so I

14   would hope that you would factor that in as you are making your judgment about the

15   instructions that you've received.

16             The <u>Witness.</u>   And, again, I don't -- I don't think that it is my place to make

17   judgments on this because, again, I just don't think that the executive branch can function

18   if the people who are working within it come to their own judgments about these.

19        If the former President's team is not invoking privilege on these subjects, I'm very

20   happy to fill you in on the phone call.

21             Mr. ██████   So I guess back to my question.

22                  BY MR. ██████

23        Q     Without getting into the substance of what each party said, just so we can

24   assess whether this falls into an area where privilege has not been asserted, can you tell

25   us anything about the subject matter you discussed with Mr. Clark?

1       A       I mean, again, I've told you the subject matters it was not about.    It was not

2   about any of the stuff that I read in the media later about the goings-on at the Justice

3   Department, and so I think that's all I can say.

4       Q       So there has been public reporting -- and this is, I believe, from

5   Maggie Haberman at The New York Times -- that President Trump was not pleased that

6   the Justice Department responded on Vice President Pence's behalf in the Gohmert

7   lawsuit.

8       Do you know whether that's accurate?

9       A       I think that Marc Short told me that that was the case, but I don't know.

10      Q       What did Mr. Short tell you?

11      A       That he had heard that -- that -- that he had heard that the -- that the fact

12  that the Justice Department was defending us was surprising to the President.

13      Q       And did he indicate that the President, in addition to being surprised, was

14  also unhappy?

15      A       Yes.

16      Q       Did he say where he heard that?

17      A       No.

18      Q       Did he tell you anything more about what the President's reaction was

19  beyond what you just told us?

20      A       No.

21      Q       Did you share that with the Vice President?

22      A       I did not.

23      Q       Do you know if Mr. Short did?

24      A       I don't.

25      Q       You made reference earlier -- we both made reference to John Eastman.

1    When, as far as you can recall, was the first time you had interaction with Dr. Eastman

2    regarding the 2020 election?

3          A    To the best of my recollection, it was at the Oval Office meeting on

4    January 4th.

5          Q    And do you know how that January 4th meeting in the Oval Office came

6    about?

7          A    So what I do know is the Vice President and Marc were down in Georgia that

8    morning at a rally for Senators Perdue and Loeffler, and I received a call, I believe

9    midmorning, and I think it was from Marc giving me a heads up that I was going to be

10   asked down for a meeting in the Oval Office.

11         Q    Do you know -- so that's sort of how you learned about it, but do you know

12   how the meeting was initiated?

13         A    No.

14               BY MR. ████:

15         Q    And I'm sorry.    When you say "Marc," you mean Marc Short, or

16   Mark Meadows?

17         A    Marc Short.

18         Q    Okay.

19               BY MR. ████:

20         Q    And then did you, in fact, attend such a meeting?

21         A    Yes.

22         Q    Okay.    Who else attended the meeting?

23         A    Marc Short and the Vice President, John Eastman, the President.    There

24   was about a 5-minute period that Mark Meadows came in on a different subject and then

25   left.

1          Q     Okay.    And Dr. Eastman was there in what capacity?

2          A     I don't believe that anybody ever stated to me what his capacity was

3    that -- while he was there.    He was represented to be an expert in all things Constitution

4    related.    In Mr. Eastman's email chain to me on the 6th, he refers to the President as his

5    client, but that's all I have to go on.

6          Q     And are you aware that Mr. Eastman has represented either -- I'm not sure if

7    you'd say the President in his capacity as a candidate for reelection or the Trump

8    campaign in court filings?

9          A     I know that he was involved in court proceedings.    Our meeting the

10   morning of the 5th was delayed because he had an argument, I believe, a Zoom argument

11   with the Georgia court that morning.    But I don't know who the filers of those lawsuits

12   were or what their capacities were.    I never looked into that.

13         Q     All right.    But I assume it's safe to say that Mr. Eastman was not

14   representing the President in his official capacity as President?    In other words, he was

15   not a government attorney?

16         A     There was no indication that he was a government attorney.    I did not

17   understand him to have a government role.

18         Q     Okay.    Do you know why other attorneys who represented the President,

19   outside counsel, were not included?

20         A     I don't.

21         Q     Okay.    So you don't know why Rudy Giuliani wasn't there?

22         A     I don't.

23         Q     Okay.    Do you know why the White House Counsel's Office wasn't

24   represented at that meeting?

25         A     I don't.    I don't.

1       Q    Did it strike you as unusual that they were not included?

2       A    Yes and no.    I mean, on my side, I clearly had a government role myself as

3  counsel to President of the Senate, advising my client on his duties.    It's less clear

4  whether the President was there as President or as in a campaign role discussing election

5  issues.    And, if he was on the campaign side of things, which, again, I can't speak to

6  definitively, but, if he was, that might be one reason why White House lawyers would not

7  have been in the room.

8       Q    But that would also be a reason why the conversation would not be covered

9  by the executive privilege, correct?

10      A    If that was determined to be the case, those would be reasonable arguments

11  to be had about whether privilege applied.

12      Q    But, based on the fact that Mr. Eastman was there as an outside counsel to

13  the President -- and I'll, you know, represent to you that he has said that he represented

14  President Trump as outside counsel and obviously representing him not as -- in his official

15  capacity as President but as a candidate, and that the White House Counsel's Office was

16  not there, is that sufficient to suggest that, in fact, the President was not there in that

17  meeting in his capacity as an official government -- as a government official, but, instead,

18  there in his capacity as a candidate?

19      A    So, again, those are factors that one would weigh on that.    I am not privy to

20  all of the things that the President might have had in mind related to these subject

21  matters and whether some of them might be related to Article II functions.

22      Q    And do I understand your position that, even -- so, if the President was

23  there, in part, as his -- in his official capacity, that the presence of Dr. Eastman, who is not

24  a government official, that does not in any way eliminate the executive privilege?

25      A    So, for example, it's widely known that Woodrow Wilson's closest adviser

1    was a guy named Colonel House, who was not a government employee, but who played a

2    prominent role in advising the President.    And I think every President would tell you that

3    they get advice from nongovernment people with respect to the performance of

4    government responsibilities.

5          So, to my mind, the correct analysis is whether or not the President was engaged

6    in Article II functions at the time.    I can't definitively answer that question, but the mere

7    fact that there was a nongovernment attorney there would not mean that the privilege

8    would be inapplicable.

9          Mr. <u>Culvahouse.</u>    And, Mr. █████ if I might interject, because, I mean, we

10   understand and -- from our very first conversations that the January 4 meeting is of

11   considerable interest to the committee --

12         Mr. ███████  Of course.

13         Mr. <u>Culvahouse.</u>    -- we have specified with great detail our understanding of who

14   was present and in what capacities, or to Mr. Clark.    You've seen the letter we've

15   received.    My letter to them specifically culled out the January 4 meeting and the

16   attendees at the January 4 meeting.    And, nonetheless, this is the response we received.

17         So I think the -- the privilege assertion on behalf of the former President was

18   made with specific knowledge of the facts and circumstances of the January 4 meeting.

19              BY MR ███████

20   Q    Can you tell us whether any papers were handed out at the meeting?

21   A    I don't recall any papers being handed out.

22   Q    Okay.    So Dr. Eastman, before the meeting on January 2nd, 2021, went on

23   Steve Bannon's podcast and discussed the role of the Vice President.

24         Mr. ███████  Is this the one we have, or --

25         Mr. ███████    No, we don't have this one.

1          Mr. ███        Okay.

2                    BY MR. ███

3          Q     And Mr. Bannon said to Mr. Eastman:    Are we to assume that this is going

4     to be a climactic battle?

5                And Mr. Eastman responded:    Well, I think a lot of that depends on the courage

6     and the spine of the individuals involved.

7                Mr. Bannon said:    When you just said the courage and the spine, are you talking

8     on the other side of the football?    Would you be -- would you be -- that to be a nice way

9     to say a guy named Mike, Vice President Mike Pence?

10               Mr. Eastman answered:    Yes.

11               First of all, were you aware of Mr. Eastman's statements to Mr. Bannon before

12    your meeting with the President at the Oval Office?

13         A     I did not make a regular practice to listen to Steve Bannon's podcasts.

14         Q     Okay.    So that's a no?

15         A     No.

16         Q     So there are two -- there are two memoranda from Dr. Eastman, which I'm

17    sure you have seen.    They've been widely reported in the media.    One is exhibit 30.

18               First of all, it says:    January 6 scenario.

19               And then the first full sentence there is:    Seven States have transmitted dual

20    slates of electors to the President of the Senate.

21               Do you think that that statement is true?

22         A     Well, the States did not transmit dual slates of electors.    There were

23    alternate slates that got submitted by groups that voted, but no State authority.

24         Q     And then, at the very bottom of the first page, he writes:    So here is the

25    scenario we propose.

1          First of all, do you know who the "we" is there?

2          A     I don't.

3          Q     Do you know whether this document ever went to the President?

4          A     I don't.

5          Q     Did you ever receive it?

6          A     I am virtually certain that I didn't receive any of these Eastman memos.

7    I've seen them in the media in recent months, but I don't have any recollection of seeing

8    any of his memos during my time in office.

9          Q     So do you have any knowledge of who did receive them at the White House,

10   if anyone?

11         A     No.

12         Q     Then the second page goes through what some have described as a six-point

13   plan.   Given our limited time here, I'm not going to read the whole thing to you.    But it

14   says:   At the end, he announces that because of the ongoing -- "he" meaning the Vice

15   President -- announces that because of the ongoing dispute in the seven States, there are

16   no electors that can be deemed validly appointed in those States.

17         And then it says:    Pence then gavels President Trump as reelected.

18         A     I'm sorry.    Could you -- which of the paragraphs are you directing me to?

19   Which point?

20         Q     Yeah.    If you look at paragraph 3, it says:    At the end, he announces that

21   because of the ongoing disputes in the seven States, there are no electors that can be

22   deemed validly appointed in those States.

23         The end of that paragraph says:    Pence then gavels President Trump as

24   reelected.

25         Can you either, you know, confirm or deny that Dr. Eastman gave that same

1    advice to the President?

2         A    I can't.

3         Q    Because of executive privilege issues?

4         A    So I'm -- what I do feel I can do because John Eastman has spoken at great

5    length publicly in numerous fora about what he asserts he did and didn't say in the

6    meeting of the 4th, I'm happy to confirm or deny accounts.

7         I don't recall Mr. Eastman running through this scenario at that meeting, saying

8    there are no electors that can be deemed validly appointed, and that means that the total

9    numbers of electors appointed will be 454.

10        I don't remember any math.

11        Q    Okay.    So, since you said you might be able to confirm or deny public

12   reports, Dr. Eastman himself said to The Washington Post in October of 2021 -- about

13   whether he advocated for Pence to reject electors, Dr. Eastman said:    That is false and

14   distorting the conversation, which depends heavily on what scenario was being discussed.

15        Do you agree with Dr. Eastman's assertion that he never advocated for Vice

16   President Pence to reject electors?

17        A    No.    Specifically in the meeting on the 5th, he advocated solely for that

18   position.

19        Q    On the 5th.    So that's the meeting without the President?

20        A    Correct.

21        Q    Okay.    And we'll get to that.

22        With regard to the meeting on the 4th, can you either confirm or deny

23   Dr. Eastman's statement when he says, "and distorting the conversation"?    So I think

24   when he says "the conversation," he means the conversation with the President.

25        So where he says it's distorting the conversation with the President to say that he

1    advocated for Pence to reject electors, do you agree or disagree with that statement by

2    Dr. Eastman?

3          A      So I think the most accurate way to -- because I think a yes-and-no question

4    is going to be difficult on this.    I think, at the meeting on the 4th, Eastman expressed the

5    view that both paths were legally viable, but that the preferred course would be a

6    procedural course where the Vice President would send it back to the States, that that

7    would be more palatable than a mere invocation of raw authority to determine

8    objections himself.

1

2      [1:18 p.m.]

3                    BY MR. ███████

4      Q      Did he start out with that position, or did he gravitate towards that position

5  over the course of the meeting?

6      A      I think that was threaded throughout, that, again, both were legally viable

7  but that the preferred course would be to send it back to the States.

8      Q      Okay.    Then exhibit 31, the next one in your binder, is the longer

9  version -- or a longer version of a memo.    Again, I'll represent to you that this is from

10  John Eastman.    I assume that -- I think you said actually earlier that you didn't see either

11  of his memos --

12     A      I don't recall seeing it.

13     Q      -- while you were in the White House.

14         Do you have any idea whether this was written before or after the one we already

15  looked at?

16     A      Since it's longer, I assume after, but I have no basis to know.

17     Q      This goes through several different scenarios.    Page 4, Roman numeral III,

18  "War Gaming the Alternatives," some of which Biden wins; some of which Trump wins.

19         Can you tell us whether Dr. Eastman went through all of these alternatives with

20  the President in the meeting on the 4th?

21     A      I don't think he said.

22     Q      Can you tell us whether he went through some of these alternatives in the

23  meeting with the President on the 4th?

24     A      Not at length.    We had a longer discussion of them on the 5th.    And I just

25  don't recall.    It's hard for me to disaggregate what he might have said in shorthand

1   during the conversation on the 4th.

2   Q   Okay.   So I'm going to share with you another description that Dr. Eastman

3   gave of his meeting that you attended with the President and the Vice President on

4   January 4th.

5   Mr. ████  Do we have this one?

6   Mr. ██████  One?

7   Mr. ████  So Boyles, yes.

8   Mr. █████  Yes.

9   Mr. ████  Okay.   So why don't we go ahead and play it.

10   And this is a podcast, I believe, where -- or a radio show, I believe, where Dr.

11   Eastman was interviewed by Peter Boyles.

12   [Audio recording played.]

13   Mr. █████  You can stop.

14   BY MR. █████

15   Q   Do you think that's an accurate description of the advice Dr. Eastman gave to

16   the President and Vice President?

17   A   Not all of it.

18   Q   Okay.   Can you tell us which parts -- and we can go sentence by sentence if

19   you want or you can just tell us which parts you take issue with.

20   A   Well, it's the part where he -- up to the point where he says, "Open

21   question," that sounds -- he might have used those words.   I don't recall whether he

22   used them specifically.

23   As I've noted before, he thought that the more prudent course was a procedural

24   send it back to the States, rather than reject electors.

25   But I do not recognize the statements that he makes thereafter where he says

1    that it would be foolish to reject the slates.    I don't recall him using that word, and I

2    would be shocked if he had.    And I don't recall any of that sequence that sort of goes

3    from that point forward.

4           Q      And what he describes there as being a foolish move, meaning the Vice

5    President unilaterally rejecting electors, is that exactly what he urged the Vice President

6    to do when he met with you on the 5th?

7           A      When he met on the 5th -- and I have contemporaneous notes of that

8    meeting that reflect this -- he came in and said, "I'm here asking you to reject the

9    electors."    That's how he opened at the meeting.

10          Q      Did he say, "I'm here on behalf of the President to ask you to reject the

11   electors"?

12          A      I don't -- I don't recall.    I don't think that he specifically said on behalf of the

13   President.

14          Q      Okay.    But I believe you had said that in at least one email around that

15   time, whether it was before or after, he stated that he was representing the President?

16          A      In an email on the 6th, he referred to the President as his client.

17          Q      And prior to that he had been -- I can represent to you he had been listed on

18   pleadings as representing the President, whether you're aware of that or not.

19          So I'm going to ask you more about the meeting on the 5th later, but I don't want

20   to forget to follow up on what you just mentioned about contemporaneous notes.

21          Are those contemporaneous notes that you have in your personal possession or

22   are those in the Archives, or where would they be?

23          A      No, they're personal notes, about three lines of notes, and I think we have

24   them.    You're welcome to them.

25          Q      Okay.    Great.    Maybe during a break we can ask you to give us to

1    them -- give them to us.

2           Mr. Culvahouse.    You have them with you, right?

3           Ms. Santella.    Uh-huh.

4           Mr. █████    Great.    So we'll get to that.    But before we do that, I want to play

5    another clip here.    And I think this is -- is this next one from the same radio show

6    interview?

7           Mr. ████████    Immediately afterwards.

8           Mr. ██████    Okay.

9           [Audio recording played.]

10                  BY MR ████████

11           Q    So we'll leave aside that Dr. Eastman got your name egregiously wrong and

12    we'll leave aside whether or not Marc Short, in fact, leaked something to The New York

13    Times.

14           But Dr. Eastman describes as a false story the reporting that he had asked the Vice

15    President to simply unilaterally declare President Trump reelected.

16           I know you said that he presented alternatives.    Is it, in fact, false to say that Dr.

17    Eastman at some point during the meeting asked the Vice President to simply unilaterally

18    declare President Trump reelected?

19           A    So I've got to disaggregate the 4th and the 5th.

20           Q    Okay.    On the 4th.

21           A    On the 4th, I think that he said that both were legally viable options.    But I

22    do think that he said that he was not saying that that was the one that the Vice President

23    should do.

24           Q    Okay.

25           A    That it would be more prudent to do the other.

1    Q    And we're going to get to more detail on the 5th, but since you brought it

2    up, what was his advice on the 5th?

3    A    He, again, came into the meeting saying, "What I'm here to ask you to do is

4    to reject the electors."

5        And aside from my contemporaneous notes from that meeting, which weren't

6    much, you have my email from January 6th where I refer to the fact that he retreated to a

7    position the evening of the 5th asking for what I would call the procedural solution of

8    send it back to the States as opposed to what he had been asking for in the earlier

9    meeting.

10    Q    So it sounds like you're saying that at the beginning of the meeting on the

11    5th, Dr. Eastman was taking an even more aggressive position regarding the role of the

12    Vice President than the position he took in the Oval Office on the 4th?

13    A    Yes.

14    Q    And do you know what caused him to take the more aggressive position on

15    the 5th?

16    A    I don't.

17    Q    At the meeting on the 4th, did the President take a position?

18    A    Again, I can't speak to the President's communications in that meeting.    I'm

19    happy to confirm or deny accounts with respect to Mr. Eastman.

20    Q    Okay.    Did you believe -- well, I'll ask it this way.

21        In light of the conversation you had had with the President and others on the 4th,

22    were you surprised by the position that Dr. Eastman took at the beginning of the meeting

23    on the 5th?

24    A    So I was at least mildly surprised because I had done a -- well, you have the

25    memorandum that I did for the Vice President analyzing what I had understood Mr.

1   Eastman's proposal, you know, the thing that he thought was the preferred course of

2   action, from the night before.    And so I was surprised that we instead had a stark ask to

3   just reject electors.

4          Mr. ████    Okay.    I'm going to get to that in a moment, but I will ask if we

5   should take a lunch break now, or does anybody want to ask a question before we get to

6   the lunch break?

7          Mr. ████.   Yeah.    Can I just quickly follow up on the January 4th meeting?

8              BY MR. ████

9      Q    Did you or the Vice President or Mr. Short make clear during that meeting

10  what the Vice President's now consistently held position was about his authority?

11     A    So the Vice President mostly asked a series of questions in that meeting of

12  Mr. Eastman.    And from my -- and, again, I mentioned this before -- from my very first

13  conversation with the Vice President on the subject, his immediate instinct was that there

14  is no way that one person could be entrusted by the Framers to exercise that authority.

15  And never once did I see him budge from that view, and the legal advice that I provided

16  him merely reinforced it.

17         So everything that he said or did during that meeting was consistent with his first

18  instincts on this question.

19     Q    Yeah.    And were you -- was your impression going into that meeting that

20  his position, the Vice President's position, was clear to Mr. Eastman and the President

21  before that meeting began on January 4th?

22     A    I mean, it was clear to me that Mr. Eastman was trying to persuade the Vice

23  President to what he understood to be a different place than where the Vice President

24  was.

25     Q    Okay.    And when you talk about the preferred course -- you a couple of

1   times have said the preferred course or the more prudent course -- was your impression

2   that Mr. Eastman thought it was preferred because it might be more palatable to the Vice

3   President or it was preferred on the merits of a constitutional analysis?

4        A     So on the -- in one of my conversations with him on the 5th, the afternoon of

5   the 5th, or maybe early evening, he acknowledged that the legal basis for the two

6   positions was the same.    You couldn't get there either way unless you -- because to get

7   to the procedural position, you had to set aside a number of the positions of the Electoral

8   Count Act, which you couldn't do unless the President basically had plenary constitutional

9   authority to resolve these things.

10       So the legal theory wasn't different.    He thought that it was more politically

11   palatable.    I don't think that he ever termed that in terms of more palatable to the Vice

12   President as opposed to -- my impression was he was thinking more acceptance of the

13   country of the action taken.

14       Q     I see.   So my question is really was he -- you described it as trying to

15   convince the Vice President, to move the Vice President.    Was this preferred course of

16   just delay, in your sense, an attempt to get something that he thought the Vice President

17   could potentially agree to as opposed to a unilateral rejection of or acceptance of

18   alternate electors?

19       A     So it's possible with respect to the 4th.

20       So on the 5th we have the meeting that starts late morning because he was

21   delayed for the Georgia proceedings, and there he makes it clear:    Reject.

22       When he comes back with the procedural theory later, at that point he's very

23   clear, "I know you are not going to just reject.    Would you consider this?"

24       Q     Yeah.    It's been described to us as a pivot, that he takes the pivots from,

25   okay, if you're not going to reject these electors, maybe you will just delay, send it back to

1    the States for some period of time.

2          It sounds like to me -- first of all, would you agree that it was a pivot?    And, if so,

3    did it occur really late on the 5th as opposed to before the meeting on the 4th?

4         A     So, yes.    I mean, there was -- before the meeting on the 4th, there was

5    nothing for him to pivot from.

6         Q     Okay.

7         A     That was the first time that I saw Mr. Eastman or heard anything from him

8    with respect to the whole thing.

9          I agree that it was a pivot, and he was quite clear in saying, "I've heard you loud

10    and clear.    You're not going to do that.    Would you now consider this?"

11         Q     I see.    And that occurred in an evening conversation on the 5th, which I

12    think███████ will get to.

13         A     Starts in the afternoon and then a couple of calls into the evening.

14        Mr███████    That's great.    Thank you.

15        Mr███████   Okay.    Take a lunch break?

16        Mr███████.   Actually, can I ask one more question about the 4th?

17        Mr.███████   Yes.

18        Mr.███████.   So after the meeting on the 4th, did anybody from the White House

19    Counsel's Office reach out and ask you your view of the legality of any of those issues?

20         The <u>Witness.</u>    So I want to be careful in general with respect to conversations

21    with the White House Counsel's Office.    I think on this one I'm, given this narrow

22    timeframe, I'm happy to say no.    But I'm also sensitive to the fact that they've robustly

23    invoked privilege with respect to my interactions with Counsel's Office.

24         So if I was concerned that an answer would start to give away substance of any of

25    that, I wouldn't be able to answer.    But the answer to that is no.

1      Mr ████    Okay.

2      Mr. ████    So then just to follow up, is also the answer no to the question of

3   whether you know what position Mr. Cipollone or Mr. Philbin took with regard to the role

4   of the Vice President?

5      The <u>Witness.</u>    If your question is what position they took with the President, I

6   was not in any of those conversations.    After the 6th, Mr. Cipollone told me what he had

7   told the President.

8      Mr. ████    And what was that?

9      The <u>Witness.</u>    Again, I can't go into the substance of the counsel's advice to the

10  President.

11     Mr. ████    Okay.    Why don't we take a break now?

12     Ms. <u>Cheney.</u>    ████?

13     Mr. ████    Yes.

14     Ms. <u>Cheney.</u>    Follow up on that for just a second.

15     Mr. ████    Okay.    So we'll stay on the record.

16  Go ahead, Ms. Cheney.

17     Ms. <u>Cheney.</u>    Mr. Jacob, did Mr. Cipollone tell you what Mr. Cipollone's view

18  was?

19     The <u>Witness.</u>    Prior to the 6th?

20     Ms. <u>Cheney.</u>    At any time.

21     The <u>Witness.</u>    I do specifically recall him -- I do specifically recall him telling me

22  after the 6th what his view was.    It is possible that he could have said something prior to

23  that, but I don't recall it.

24     Ms. <u>Cheney.</u>    And what was his view?

25     The <u>Witness.</u>    Again, it was stated in the context of what he had advised the

1    President.    So I can't speak to the substance of what he told me without a privilege

2    waiver.

3            Ms. <u>Cheney.</u>    Did Mr. Cipollone disagree with the advice you had given the Vice

4    President?

5            The <u>Witness.</u>    So, again, I've got to stand on the same privilege objection,

6    frustrating though I know that must be.

7            Ms. <u>Cheney.</u>    Thank you.

8            Mr. ███████    Okay.    Anybody else before we take a lunch break?

9            Okay.    Do you all want a half an hour or so?

10           Mr. <u>Culvahouse.</u>    So that's fine.

11           Mr. ███████    Okay.    So we're off the record.

12           [Recess.]

1

2          [2:31 p.m.]

3                    Mr. ████      And we're back on the record.

4                    Mr. ████   you have some questions?

5                    Mr. ████.   I do.   Thank you, Mr. ████

6          Mr. Jacob, we placed in front of you an exhibit.    It's numbered at the top 84, it's

7    written in, and it is a draft pleading in the Gohmert v. Pence lawsuit.    I understand that

8    you --

9                    Mr. ████   I'm sorry to interrupt.    Can you make it 85?

10                   Mr. ████   85, yes.   We can make it 85.

11                        BY MR ████

12          Q    I understand we've just placed it in front of you and you've probably only

13    had a minute or so to look at it, but I ask you to flip to page 13, which is marked by the

14    first orange tag.

15          So on that page there's a comment -- and I'll just read it, because it is a bit hard to

16    see -- but a comment to the brief or the pleading is the phrase, quote, "'Any discretion he

17    possesses under the Constitution as to the counting of votes,'" end quote, "would be, I'd

18    predict, a red flag to the Vice President, opening him and DOJ up to attacks suggesting

19    that the VP, together with DOJ, may believe the VP may well have no discretion in the

20    counting process.    That is precisely the issue that the VP wishes to avoid until that

21    question comes into focus on January the 6th.

22          So my question is this.    In the interactions with the Department of Justice, did

23    you or anyone else from the Vice President's office tell DOJ to keep open the issue of

24    whether the Vice President had discretion to not count votes on the January 6th joint

25    session of Congress?

1        A     So for the reasons I previously stated, I don't think I can testify to my

2   interactions with DOJ.

3        What I can tell you is that internally what we wanted, by the time this was filed, I

4   had already started thinking about the possibility of our making a public statement about

5   the Vice President's powers.     We didn't finally decide that until January 2nd.

6        But the Vice President didn't want to be forced to make his statement in court

7   pleadings as opposed to a statement to the Nation, which is what he was thinking of.

8        So I think -- again, without testifying to the content of my communications with

9   them -- that was one of our objectives here, was for the Vice President -- to preserve the

10   Vice President's ability to speak to the Nation about this.

11        Again, we also didn't know by this point the timing of when the Vice President was

12   going to say something.     We contemplated the possibility of an op-ed that might run

13   over the weekend before the vote count.     We ultimately sent it on [inaudible].

14        But we didn't want to be preempted by litigation to have to, in a terse format of

15   the litigation pleading, have that essentially be a place that we needed to make our

16   statement.

17        Q     Correct me if I'm wrong, but this comment is inconsistent with the position

18   that the Vice President ultimately took, correct?

19        A     Well, I'm not sure it's inconsistent per se.     If you read this to mean that the

20   Vice President -- if you read this to mean that -- I don't know who J.C. is.     I assume that's

21   John Coghlan.

22        But if you take this to mean that he's referring to a position that the Vice

23   President has authority to either reject electors or to declare the procedures that would

24   apply to our vote count on the 6th unconstitutional, if you read it that way, which I'm not

25   sure is the correct reading, but if you did, yes, that would be inconsistent with what we

1    did on the 6th and the statement that we put out.

2         Q     And reading it that way is completely fair.

3         Internally, separate from your discussions with DOJ, was there ever a serious

4    consideration the Vice President would have this authority to reject certain votes during

5    the joint session on the 6th?

6         A     So the Vice President's first instinct on this, as I said before, was that there

7    was no way that one person -- that the Framers couldn't have intended that one person

8    be entrusted with that kind of authority, again, particularly someone invested in the

9    outcome of the election.    And we were intensely aware as well that no Vice President in

10   the entire history of the Nation had asserted such an authority, which you would have

11   thought somebody probably would have along the way if such authority existed.

12        So that's where the Vice President started.    That's where he stayed the entire

13   way.    Particularly once we got to the meeting with Mr. Eastman, we -- I felt by the time I

14   had advised the Vice President, even by December 8th, you know, as I talked about, I

15   gathered what my staff had given me to that point in time.    I came to my own view of

16   things.    I put that in a memo.    But I still hadn't read every single page of the

17   congressional reporters.    I had by this point in time.

18        So I had run down every legal trail that existed, every law review article, every bit

19   of legislative history, everything on the resolution of the 1876 disputes.    If it existed, I

20   had read it, because it was too important.    We had to get this right, and it had to be

21   airtight.

22        So I was -- coming out of the meeting with Mr. Eastman on the 4th, and then even

23   into the 5th, one of my roles was to make sure that for those who were asserting that we

24   did have such authority, that they could never say that we had failed to look into

25   something.

1          So we never -- I mean, we were firmly of the view that the Vice President didn't

2     have that authority.    When you use the vague term "considered," I viewed it as my job

3     to make sure I had looked at everything.    So I was going to look at it.    If there were

4     those who thought there was some argument for that position, I was going to look at it.

5          But I went in pretty firmly of the view that I was going to come out with on those

6     things and, in fact, there were no materials, new materials that were actually presented

7     to me by Mr. Eastman.    Everything was things that I was already aware of and had

8     determined could not lead one to that conclusion.

9          Q      Okay.

10         A      So that's a long answer, but it's because of that term "considered."    So I

11     was open to receiving anything that anybody wanted to give me that might bear on that

12     question.    I think that's what a good lawyer does, you continue to look at anything that

13     there is.    But I also correctly was of the view that I had already looked at everything and

14     that we knew where we were -- where we stood.

15          Mr. ███████  I appreciate that.    Thank you, Mr. Jacob.

16                 BY MR. ███████

17          Q      So along those lines, if you could look at exhibit 29.    The first one

18     chronologically, this is on the second page, email from John Eastman -- I'm sorry, an email

19     to John Eastman from you, Monday, January 4th, 7:37 p.m., although I don't put too

20     much stock in the time stamp based on the discussion we've already had.

21          You wrote to Mr. Eastman, "Could you send me any written materials on electoral

22     vote counting issues that you would like us to digest?"

23          A little bit of back and forth, ultimately resulting in you the next day sending to

24     Lindsay -- is it "Pickell"?

25          A      "Pickle."

1       Q       Pickell, Lindsay Pickell.    I'm sure there's some joke there about a difficult

2    situation, but I won't make it.

3            So you wrote to Lindsay Pickell, "As you suspected."    What did you mean by, "As

4    you suspected"?

5       A       That the Tribe article -- so Mr. Eastman, in my view, overread the Tribe

6    article in terms of what Tribe actually said in the article he was referring to, but we

7    had -- we were pretty sure we had looked at every law review article that existed on the

8    subject of the Electoral Count Act.

9            Tribe's article, as I recall, was not specifically on that subject.    I think it was a

10    broader piece that addressed that as one of the things that it talked about as it went

11    along.

12           So when Mr. Eastman had mentioned in the January 4th meeting that Tribe agrees

13    with him, Tribe was taking this position, I thought, "Well, I know I've seen a Tribe article.

14    That's not my memory of what the Tribe article says."

15           But I checked in with Lindsay because, as I noted, back in October I would have

16    them collect all the law review articles, and so she had sort of the repository of them, and

17    had her verify that the one that he sent me was the one that we had already read and

18    taken a look at a long time ago, so --

19       Q       And, in your view, did not fully support the proposition for which he was

20    using it?

21       A       Correct.

22       Q       So I'm going to turn now to the next day, January 5th.

23           We've got some emails in here that can help refresh your recollection about your

24    communications back and forth with Dr. Eastman and what time.    I'm happy to walk you

25    through them, but it may be faster if I just let you tell us the story of what happened on

1    January 5th as it pertains to the Vice President's role in the 2020 election.

2    A    Sure.    So at the end of the meeting on the 4th, it had been left that I would,

3    as I've indicated, I would meet with Mr. Eastman, I would receive whatever materials it

4    was that he wanted us to look at that he thought supported his view.

5    This sort of serves two functions.    One, it freed the Vice President up to just

6    focus on getting his statement done, because he was working on it up at the residence

7    that morning; and it enabled me to make sure that there were no, sort of what I would

8    call procedural faults on our part, that there was nothing we had ever failed to look at.

9    No one was ever going to say that the Vice President only reached this conclusion

10    because we just didn't take the time to look.

11    So I think we were originally supposed to meet first thing in the morning, but he

12    had an argument in court in Georgia that went long.

13    So my recollection is that he got over at about 11 o'clock.    We met in Marc

14    Short's office.    The meeting --

15    Q    Which office, in the West Wing or in the Old Executive Office Building.

16    A    Marc's office in the West Wing was about the size of the inside of this U right

17    here [indicating].

18    [Laughter.]

19    So in the Old Executive Office Building.    And it was me, Marc, and Eastman.

20    And he came in and said that the request that he was there to make of us is that we

21    reject the electors.

22    He acknowledged that there had been discussions of other possibilities the day

23    before, but that's what he was here to talk about today.

24    Q    Okay.    I'm just going to interrupt you briefly.

25    So you've given us handwritten notes.    I'd like to have this marked as exhibit 86.

1    And feel free to refer to that.

2         A    I'm not sure I actually have a copy myself.

3         Q    Okay.

4         A    But, yes, you'll see what I -- I didn't write down a lot because there wasn't a

5    lot that he said that was new to me.

6         Ah, I do have a copy.

7         So, yes, the first thing that I wrote was, "Requesting VP reject."    That was the

8    context.

9         Q    And that meant Dr. Eastman was requesting that the Vice President reject

10   the Biden electors from certain contested States.    Is that right?

11        A    Yes, from a set of between five and seven contested States.    New Mexico

12   and Nevada, as I understood it, were sort of on the bubble in his thinking as to whether

13   they were disputed or not.    But the other five, Georgia, Arizona, Michigan, Wisconsin,

14   Pennsylvania, were all in the clearly disputed bucket.    And then there were two that

15   were of a more uncertain status, as I understood it.

16        Q    And I think you answered this earlier, but he -- is it correct that Dr. Eastman

17   did not expressly state whether the President had asked him to make this request?

18        A    I don't recall him saying that.

19        Q    Okay.    But you were aware that he was a representative of the President in

20   some capacity, weren't you?

21        Let me rephrase that.

22        As you sit here today, knowing everything you know, is it fair to say that he was

23   there in some capacity representing the President of the United States?

24        A    He represented to me on the 6th that the President was his client, and there

25   was nothing inconsistent about the interactions I had with him on the 5th or the 4th with

1    that representation.    So I don't know it to be true, but I assumed it to be true for

2    purposes of my interactions with him.

3        Q    And what was your reaction when he requested that the Vice President

4    reject electors from certain States?

5        A    So I was surprised because it was one of the things that I felt he had been

6    pinned down on the day before, was that he was not saying that that's what we should

7    do, but now that's what we were being asked to do.

8        But it also, to some extent, simplified things for me because the complications of

9    the procedural case and having to go through all the different sections of the Electoral

10   Count Act that were at issue with that became somewhat less pertinent to the discussion.

11       So from his perspective, his objective was to persuade me.    I sort of viewed it as

12   my challenge to use Socratic questioning during the course of the thing to see if I could

13   persuade him that there's just no way that a small mind -- a small government

14   conservative would ever adopt the position that he was taking.    So that was my basic

15   reaction.

16       And we then had a very long discussion that covered the entire history of

17   constitutional provisions.    We discussed examples, like the Adams example and the

18   Jefferson example, both of which were brought to prominence by Bruce Ackerman, a law

19   review article that we were well aware of.

20       And I essentially got Mr. Eastman to -- or Dr. Eastman, I guess -- to acknowledge

21   that neither of those served as examples for the proposition that he was trying to support

22   of a Vice Presidential assertion of authority to decide disputes because no dispute was

23   raised in either case during the joint session.

24       And, moreover, there was no dispute as to the outcomes in those States.    In the

25   Jefferson example, everybody knew that Jefferson won Georgia, there was no question

1    about that, nor was any question raised about it in the Congressional Record for the

2    count.

3         There is a newspaper article from a few days after the count where one of the

4    tellers allegedly told someone that there was an irregularity with the certificate for

5    Georgia where a page was missing.    No question as to the authenticity of the page that

6    was received.    They had simply failed to attach a page that should have been there.

7         It was a technical defect.    No question about the outcome.    And Jefferson had

8    not called it to the attention of the larger body, according to the newspaper article,

9    despite the fact that the teller had expected him to.

10        That was hardly an example of a Vice President asserting authority to decide

11   disputes over electoral certificates.    And that was really the example Mr. Eastman kind

12   of pinned most of his hopes on, I suppose, in terms of a historical example of Vice

13   Presidential authority.

14        So we also walked through the history of all of the different disputes that had

15   arisen in Congress up to the Electoral Count Act.    He acknowledged -- by this point, I had

16   determined the Nixon example was not a counter example, and he agreed with me that,

17   indeed, since the Electoral Count Act had gone into effect, there were no instances of

18   departing from the Electoral Count Act.

19        And we sort of summed it up at the end saying that, so what we have here is an

20   admittedly not well-drafted sentence in the Constitution that simply does not provide for

21   the possibility of objections or how to resolve them.    It's just not in the constitutional

22   sentence.

23        The constitutional sentence refers to two activities.    The Vice President or the

24   President of the Senate shall open the certificates, and switches to the passive voice, and

25   they shall be counted.    Doesn't even specify who does the counting.

1    So there's nothing about objections.    There's nothing about resolution of

2 objections.

3    So you start with that.    And his premise was, well, the Vice President is the one

4 who does the counting because nobody else is mentioned and the Vice President opens

5 the certificate.

6    The constitutional provision doesn't say that, but that's his premise.    And his best

7 argument for that is actually a piece of paper that was attached to a copy of the

8 Constitution that was sent out to the different States.

9    They realized, wait a second, there was something that we forgot about here,

10 which is we won't have a sitting Vice President come the first count for George

11 Washington's election as President.

12    And so they recommended that a Senator be appointed to the role of presiding

13 over that session and serve as President of the Senate, even though they wouldn't have

14 one, and that he would do the counting.

15    So that was his best example, was that the Framers did seem to think that the Vice

16 President would have a real role in counting.    That's a far cry from resolving objections

17 or even thinking that there would be objections.

18    So he acknowledged that there was an ambiguous provision with 100 percent

19 consistent historical practice since the time of the Founding that the Vice President did

20 not have -- did not ever assert or exercise authority to do what he was suggesting we

21 should do.

22    And the 130 years of practice of following the Electoral Count Act every single

23 time.    We went through examples like Al Gore.

24    "Are you really saying, John, that Al Gore could have just declared himself the

25 winner of Florida and moved along?"

1    "Well, no, no, there wasn't enough evidence for that."

2    So it was a very contingent position in Mr. Eastman's mind about all of the

3    underlying unconstitutional things that he thought were happening in the States this time

4    around, and it wasn't clear how he drew the line that that worked.

5    But he acknowledged by the end that, first of all, no reasonable person would

6    actually want that clause read that way because if indeed it did mean that the Vice

7    President had such authority, you could never have a party switch thereafter.    You

8    would just have the same party win continuously if indeed a Vice President had the

9    authority to just declare the winner of every State.

10    He acknowledged that he didn't think Kamala Harris should have that authority in

11    2024; he didn't think Al Gore should have had it in 2000; and he acknowledged that no

12    small government conservative should think that that was the case.

13    And I said, "If this case got to the Supreme Court, we'd lose 9-0, wouldn't we, if we

14    actually took your position and it got up there?"    And he started out at 7 to 2.

15    And I said, "Who are the two?"

16    And he said, "Well, I think maybe Clarence Thomas."

17    And I said, "Really?    Clarence Thomas?"

18    And so we went through a few Thomas opinions and, finally, he acknowledged,

19    "Yeah, all right, it would be 9-0."    Except that his fallback --

20    Q    Did he say who the other one was?

21    A    I don't recall.    I don't recall.

22    But he ultimately acknowledged that none of them would actually back this

23    position when you took into account the fact that what you have is a mildly ambiguous

24    phrase, a nonsensical result that has all kinds of terrible policy implications, and uniform

25    historical practice against it.    It just didn't work.

1       So I kind of wound up, "Can't we just acknowledge that this is a really bad idea?"

2       And he didn't quite say yes, but, he said, "Well, all right.   I get everything you're

3  saying."   He said, "They're going to be really disappointed."

4       I don't know who the "they" is.   You can -- I know what your follow-up question

5  is going to be.   He said, "They're going to be really disappointed."

6      Q     My follow-up question is, who's the "they"?

7      [Laughter.]

8      A     I don't know.   I don't know.

9       He said, "They're going to be really disappointed that I wasn't able to persuade

10  you."   And he left.

11       I will say the one other thing that we had a lot of discussion on was the political

12  question doctrine and -- because once he acknowledged that they would lose in the

13  Court, he said, "Well, but I think that, you know, it's a political question and they

14  shouldn't get involved at all."

15       And a lot of our discussion was my view, A, that they would because they would

16  recognize if it wasn't them who was going to step in on a question that -- it's a pretty

17  easily presented question, right?   Here we have a statute, and the question is, is the

18  statute consistent with the text of the Constitution?

19       His view was that the Vice -- that the constitutional text has the Vice President

20  having the sole authority to do the counting, and that with that comes the authority to

21  resolve objections, and, therefore, anything in the Electoral Count Act to the contrary is

22  unconstitutional.

23       And indeed, if that's what the constitutional clause actually said, you couldn't have

24  a statute that was -- that contradicted that authority or removed it from the authority of

25  the Vice President.   But that's where he was.

1    But I thought the question of the statute and the Constitution, are they

2    consistent?    That is an easy question for the Supreme Court to weigh in on and to decide

3    that question, and that although I understood the sort of belt-and-suspenders position

4    that this kind of conflict between the branches is the kind of thing that the Court has

5    invoked political question on at times in the past, I didn't think that they would here.    I

6    certainly didn't think that the district court or the D.C. Circuit were going to.

7    And that even if they did ultimately invoke political question, where does that

8    leave us?    And that was a big question that Mr. Eastman never had an answer to:

9    What happens then?

10    Q    Meaning Vice President Pence would pound the gavel and say, "Trump

11    wins," and then the question of whether it would be accepted by the American people or

12    what would be left?

13    A    Yes.    So you'll have an enraged House of Representatives at least and

14    probably an enraged Senate, because they had expressed no interest in not following the

15    Electoral Count Act.    I mean, among other things, we had all of these Senators who said

16    that they wanted to follow the Electoral Count Act and make objections.    That's not

17    provided for in the Constitution either.

18    But if we were to do what Mr. Eastman suggested, it would mean that none of

19    those debates happened in Congress.    None of those Senators would get to make their

20    objections.    We would be asserting we have the unilateral authority to do all of that.

21    And so you would essentially have a standoff between the Vice President and

22    Congress, a bunch of State legislatures, pretty much all of which had said we have no

23    interest in revisiting what we think was indeed the outcome of the election in our States.

24    We gathered together in my office a list of statements of Republican legislative

25    leaders in all the different States that were at issue where they had said, "The people

1   have spoken.   We're not going to do anything to overturn that."

2          So you then send it back out to them?   You'll have litigation flying all around, an

3   enraged House and Senate, legislatures that aren't interested in actually doing what Mr.

4   Eastman wants them to do.   You'd have total constitutional chaos and with no real exit

5   strategy to happen.

6          Q    I want to make sure I understand what Mr. Eastman was requesting, though,

7   because your note says -- your handwritten notes say, "Requesting VP reject."

8          But as we went through the, what I'll call the longer version of the Eastman

9   memo, in that there were several different scenarios.

10         So the Vice President could reject the slates that were certified by the governors

11  of those States and instead choose the Trump electors.   He could reject the ones from

12  the governors and say there are no electors for those States and, therefore, it's, you

13  know, a majority of the votes cast.   There was another scenario where they said nobody

14  gets to 270 so it goes to the House.   Then there's also this idea of you reject the electors

15  and send it back to the States.

16         At the beginning of the meeting on the 5th, what was your understanding of what

17  he was suggesting would be done if the Vice President rejected the electors from certain

18  States?

19         A    So, as you know, there were a number of different procedural mechanisms

20  that were proposed both by Mr. Eastman and by other people at other times, so it's hard

21  for me to have a completely clear memory as to which procedure was the one at issue at

22  which time.

23         Here, with respect to the rejecting of the electors, it was -- to the best of my

24  recollection, there were -- the end game that he was hoping would happen in

25  Washington, if we actually rejected, would be, one, if we rejected the one slates and the

1    other slates are in and just Trump wins by virtue of counting alternate -- the alternate

2    electors; or you reduce the number of electors that are in the overall formula of the

3    electoral college in a way that gets you to a Trump victory; or you reduce them to a point

4    where it then gets thrown to the House of Representatives and the House of

5    Representatives has to vote by State.

6          So it wasn't clear to me -- or at least I don't recall at this specific point in time

7    which of those end games, and it may even have been any of those end games were sort

8    of okay by them.

9          But the specific trigger for all of them was that we would affirmatively reject the

10   Biden electors from the five to seven States and then go down one of those other

11   waterfalls.

12          Q    But not send it back to the States?

13          A    Not in this meeting.

14          Q    Not in the beginning or not ever during that meeting?

15          A    So I think I had raised the fact that, you know, "Yesterday you were pointing

16   out the fact that you thought it was a more prudent course to go that way," and had

17   mentioned that I looked at all these States and they don't have any interest in this.

18          So to the extent that you are saying that in a political question situation, where we

19   have a standoff here, so the House as it's constituted at that time is not going to get you

20   to the result that you want in terms of accepting his solution of the rejections, you do

21   have the new House voting by State delegation if you go down that waterfall to get to a

22   majority of the States, but you cannot get any solution under the Electoral Count Act.

23          So you have to step out of that for purposes of going down the alternate elector

24   slate.    So it has to be a Vice Presidential determination itself on that point.    If you kick

25   it to any process involving the House, the House rejects them.    And that's one of the

1    things that he walked through.

2        Q      In this meeting, was it just the two of you?

3        A      So Marc Short was in and out of the meeting, so he was present for periods

4    of time.     And then there was a period of maybe 5 to 10 minutes where Eric Herschmann

5    came in.

6            And Eric Herschmann's -- Eric Herschmann came in.    I think he knew that

7    Eastman was there, and he wanted to impress upon him that whatever materials he was

8    giving to the Members who were going to do objections needed to be rock solid stuff,

9    that it couldn't be puff stuff that he felt had been filed in certain States.

10           People were going to be getting up and making actual objections in front of the

11   public, and he wanted to impress upon Mr. Eastman that the stuff that he gave them

12   needed to be real good stuff.

13       Q      So that's sort of a separate topic.    So it's not the role of the Vice President.

14   That sounds like it goes to the evidence that Members of Congress could rely on in their

15   own objections?

16       A      Yes.

17       Q      Okay.

18       A      Yeah.

19       Q      Did Mr. --

20       A      Herschmann was not part of our discussion on this, and we kind of broke

21   away from discussing the reject the electors ask for the period of time that Mr.

22   Herschmann was in the room.

23       Q      Okay.    So did Mr. Herschmann, either during that meeting or at any other

24   time in your presence, express a view on what the role of the Vice President was in the

25   joint session of Congress?

1          A     Not to my recollection.

2          Q     Okay.    So did you have more than one meeting with Dr. Eastman on the

3    5th?

4          A     So one in-person meeting, which went for about an hour and a half, and

5    then there were some phone calls later in the day.

6          Q     Phone calls later.    And did those phone calls involve the President?

7          A     So one did, and that -- I would roughly place it around 4:30 to 5 o'clock, but

8    I'm not positive about that.

9          Q     So I'm going to ask you in just a second to go through as much as you can

10   recall about your various conversations with Dr. Eastman throughout the day.

11         But just focusing still on that in-person meeting, did you know Dr. Eastman before

12   January 4th?

13         A     I knew of him.

14         Q     Okay.

15         A     I'm not sure that I ever met him.    He used to debate my friend, Jim Ho,

16   regularly about whether birthright citizenship could be repealed by statute as opposed to

17   by constitutional amendment, and that's mostly what I knew him from.

18         Q     Okay.    Speaking of that, do you know how he came to President Trump's

19   attention?

20         A     I have no idea.

21         Q     Okay.    You said earlier you went to University of Chicago Law School.    I

22   believe Dr. Eastman also went to the University of Chicago Law School.

23         Did that come up at any point during your meeting on the 4th?

24         A     Not that I recall.

25         Q     Did -- I'm sorry.    The meeting on the 5th.    That's what I meant to ask

1    about.

2          A      So it might have come up.    It certainly -- on one of the phone calls later in

3    the day when they had -- I think he used the word "pivot" before, once they pivoted away

4    from reject the electors and back to send it back to the States in some form, he had said

5    when addressing the viability of his legal theory as to why that worked, he said, "You

6    know, just between us University of Chicago chickens, you and I will understand this is the

7    same basic legal theory underneath it.    It's just more palatable in terms of the actual

8    claim being made to the public as to what the Vice President's authorities are."

9          Q      But at that point had he already admitted that the legal underpinnings for

10   what I'll call the more aggressive position were flawed?

11         A      So as I said, at the very end of our session he sort of all but admitted --

12         Q      Okay.

13         A      -- that it didn't work.

14                So he certainly knew we weren't going to do that and that we thought that the

15   position was -- wouldn't be accepted by any member of the Supreme Court, by any judge,

16   by any of the Framers, et cetera.

17                He had acknowledged that he would lose 9-0 at the Supreme Court.    He didn't

18   quite get to saying yes when I had asked him, "John, isn't this just a terrible idea?"    But it

19   was a near concession on that.

20         Q      So when he said that comment over the phone about just between us

21   University of Chicago type chickens, or whatever he said, did you understand him to be

22   suggesting that even the fallback legal position was a flawed legal theory, but that the

23   Vice President should pursue it anyway?

24         A      That it was an uphill climb on the underlying legal opinions position

25   certainly, flawed in the sense that he had ambiguous constitutional text, no history, no

1  practice, and probably no judge who would support his position if asked to look at it on

2  the merits.    What he had was political questions sitting behind that that maybe no judge

3  will actually agree to look at.

4         Q     So no judge -- he admitted no judge would agree with him.    It sounds like

5  what he was banking on is maybe the judges wouldn't actually decide it because they'd

6  consider it to be a political question.    Is that right?

7         A     That is what he was banking on, yes.

8         Q     Did you get the sense that he knew that his position was legally wrong?

9         A     Yes.    I think at the end of the day he knew that -- when you look at just the

10  text of the Constitution, if that's all that you had, his theory is not totally insane, insofar

11  as Congress has in the Electoral Count Act given itself the capacity to decide objections.

12         That's not in the Constitution.    If you look at the text of the Constitution, it says

13  you open certificates and they shall be counted.    And yet Congress came up with this

14  mechanism in 1887 that says not regularly given objections can be made, and they can be

15  debated, and you can reject electors on that basis.

16         If you accept the premise that anything can be done in Washington with respect

17  to rejecting electors, it's not crazy on the basis of just that piece of constitutional text.    It

18  doesn't say what the Vice President's role, doesn't say what Congress' role is.

19         So it's really the accumulated weight of history, the accumulated weight of

20  practice, and then common sense that if this was the rule, the Republic couldn't stand.

21  Those are what lead you to the conclusion this has to be wrong.

22         And based on my conversation with him on the 5th, although he wouldn't -- again,

23  he acknowledged 9-0 loss in the Supreme Court.    He verbally acknowledged that.    He

24  never verbally acknowledged that the theory was essentially legally bankrupt at the end

25  of the day.

1        Again, I can't say it's without basis because you have an ambiguous sentence in

2    the Constitution and you have a practice in Washington of considering objections and

3    Congress debating.

4        Now, Congress has never actually rejected based on any of those debates, but

5    they've asserted that they have an authority to do so even though that's not in the

6    constitutional text.    You could say that's less of a bad idea than the Vice President doing

7    it unilaterally, and I'd agree.

8        So he certainly acknowledged that this is not an argument that he would credit if

9    Democrats were making it.

1

2    [3:10 p.m.]

3                BY MR. █████████

4       Q    And so, as someone interrupted you, can you just walk through your

5    interactions with Dr. Eastman after that in-person meeting on the 5th?

6       A    Yeah.   So I left that meeting with some hope that we had put the issue to

7    bed, because they had made the request, and he understood that he presented no new

8    information to us and that, based -- on the basis of the information, but I felt that he had

9    an understanding that the legal theory didn't really work at the end of the day.

10         Later that afternoon, Marc and the Vice President and I were in Marc's office.

11    The Vice President had gotten a haircut in the barber shop at the EOB, so he had come

12    over for that.   While he was getting his haircut, I was putting in edits to the statement.

13    I was sitting in a chair in the barber shop, and, again, we printed out right after

14    that -- right after the barber shop thing, on paper, and Marc and he and I sat down to go

15    over it.

16         And, while we were doing that, we got word that the President had called over to,

17    I guess, the West Wing office.   And did we want to have to run it through over here?

18    And we said, okay, we'll take the call.

19         The Vice President put it on speakerphone, mentioned that Marc and I were

20    there.   And then, on the other side of the call, there was the President, John Eastman,

21    and one other lawyer, who I'm not sure who it was.   I did speak to that other lawyer

22    later that evening, but I just don't recall with certainty.

23         And so this -- I can't speak to the President's communications on this call, but

24    Mr. Eastman's message was essentially:   We get it; you're not going to reject.   But can

25    you consider this other theory, the procedural send it back to the States path?

1         I guess you asked an open-ended question about the interaction.    So we didn't

2    have a lot of time, the Vice President -- we were trying to get the statement done.    The

3    Vice President had a dinner up at the residence that he needed to get off to.    So the Vice

4    President ended the call fairly quickly saying essentially:    I don't see it, but my counsel

5    will hear out whatever Mr. Eastman has to say.

6         And so I then had one, possibly two, phone calls with Eastman later that evening,

7    had one phone call with the other lawyer that evening.

8    Q    This is an outside counsel to President Trump?

9    A    Another nongovernment lawyer, yes.

10    Q    Okay.    If we mentioned some names, would that help refresh your

11    recollection at all?

12    A    So my -- I can give you my -- well, yes.    I'm not going to know for sure no

13    matter what names you tell me, but I can tell you which ones are familiar to me.

14    Q    Okay.    Yeah.    So is it male or female?

15    A    Male.

16    Q    Okay.    And I assume, if it was Rudy Giuliani, you would remember that?

17    A    I would.    I've never spoken to Rudy Giuliani.

18    Q    Okay.    Was it Boris Epstein?

19    A    No.    I knew Boris, and I did -- had not spoken to him.

20    Q    Mark Martin, former North Carolina Supreme Court justice?

21    A    No.

22    Q    Kurt Olson?

23    A    I think it could have been him, but I'm not certain.

24    Q    Okay.    Not to confuse you, but there is also a Bill --

25    A    Bill Olson.    Yeah.    And I knew both of those names were names that had

1  been floated to me as being involved in these conversations, so could well have been

2  Kurt Olson, but I'm not sure.    It could have been Bill Olson.    I think there is a 90 percent

3  certainty it was one of those two, but even as to that I can't be totally sure.

4       Q     Okay.

5       A     The conversation was not all that long, and certainly was not -- it was not a

6  substantive conversation.    Whoever that person was, they didn't know any of the

7  underlying legal materials.

8       Q     So is there anything else about any of those conversations with Dr. Eastman

9  throughout the day that you can recall?

10      A     So, on the subsequent calls, sort of the post pivot calls, we had a more

11 detailed discussion about the fact that the proposal would violate several provisions of

12 the Electoral Count Act.

13      Q     So, when you say the "pivot," is that the President's pivot or just John

14 Eastman's pivot?

15      A     So, on the -- again, I can't testify to the President's communications, and I

16 don't know that I'd be able to identify a Presidential pivot.    But Mr. Eastman pivoted

17 from where he had been at the meeting that morning, which was reject the electors.

18           In the conversation in the Oval Office on the 4th, I had raised the fact that, when

19 he -- that his preferred course had issues with the Electoral Count Act, which he had

20 acknowledged was the case, that there would be an inconsistency with the Electoral

21 Count Act, but we hadn't had an in-depth discussion about that there.

22           But we did have an in-depth discussion about that in the subsequent phone calls

23 as I walked him through provision after provision on the recess and on the fact that

24 Senators are supposed to -- you know, Congressmen and Senators are supposed to get to

25 object and debate.

1    And he acknowledged, one after another, that those provisions would -- in order

2    for us to send it back to the States, we couldn't do those things as well.    We can't do a

3    10-day, send it back to the States, and honor an Electoral Count Act provision that says

4    you can't recess for more than one day and, once you get to the 5th, you have to stay

5    continuously in session.

6        So he essentially had two arguments in response to that.    One was, between us

7    Chicago chickens, the underlying theory remains the same, and so, if the Vice President

8    has the authority to unilaterally reject, certainly he has the authority to make a

9    procedural call like this about how the vote count is going to proceed.

10        And his other argument was -- he invoked Lincoln and Lincoln's suspension of the

11    writ of habeas corpus and Lincoln's explanation thereafter that:    What was I supposed

12    to do?    Let every law in the Union go into, you know, disrepair and disregard in order to

13    uphold -- you know, that this one -- all the laws but one, right, that this one law be

14    upheld?

15        And he was casting the Electoral Count Act in that light.    What, are you going to

16    hold up the Electoral Count Act and allow -- you know, follow the statutorily required

17    procedures even though what that means is the Constitution will have been shredded

18    across all these different States, and there -- there was a lot of holes as to exactly what

19    the underlying Republic is falling apart was supposed to be.

20        But that was his other argument, was that there was this sort of -- so much

21    unconstitutional stuff happening, exceptions to needing to follow statutes, and that, if the

22    only way to stop all that unconstitutional stuff from happening was to set aside the

23    Electoral Count Act, then you set aside the Electoral Count Act.

24        I think the last -- I think he also mentioned that they were trying to get letters

25    from State legislators saying that they would -- this was to address this sort of -- one of

1    the practical objections I raised, which was that none of the legislatures were actually

2    interested in doing what he was hoping they would do anyway.

3          And he said:    Well, stay tuned.    We're going to try to get some letters.

4          And I think he sent me a letter later that evening that actually was not the

5    majority even of the -- I think it was a Pennsylvania legislator letter that was not a

6    majority of either house of the Pennsylvania Legislature.

7          Q    Okay.    If you look at exhibit 38, this looks like it's a memo from you to the

8    Vice President.    It's been produced by the National Archives.

9          Is it correct that this is produced because it involves advice to the Vice President in

10   his capacity as President of the Senate and that that's why the former President's counsel

11   allowed it to be produced?

12         A    I don't think that's their rationale --

13         Q    Okay.

14         A    -- because, if that was their rationale, they would not have invoked privilege

15   on my memo of December 8th.    I think that the -- that they made a decision that

16   Mr. Eastman had spoken so much and so publicly that anything Eastman related, they

17   weren't going to invoke privilege on.    That was my impression.

18         Q    Okay.    Would you be willing to answer questions about anything Eastman

19   related on the same theory?

20         A    I mean, as I said, I think -- the only things that I am a direct witness to are the

21   meeting on the 4th --

22         Q    Uh-huh.

23         A    -- where I think I had already done that with respect to answering your

24   confirm-or-deny questions.    If you have more of them, I'm happy to -- to do that.

25         I've spoken fully about my conversation with him on the 5th.    I've told you the

1    contents of his conversation on the telephone call that the President was on on the 5th.

2    And I told you what I remember about the other phone calls on the 5th.    Other than

3    that, there is just my email interaction.

4         Q    Did anybody from the White House Counsel's Office review this memo?

5         A    Not to my knowledge.

6         Q    Okay.    Did you discuss the contents of this memo with anybody in the

7    White House Counsel's Office?

8         A    Not before I -- not before the 6th.    It's possible that I would have spoken

9    about it with them after, but I don't recall.

10        Q    You don't recall?

11        A    I don't recall.

12        Q    Okay.    I know I -- we asked you earlier about your conversations with

13   Pat Cipollone, where you said the only conversation you had with Mr. Cipollone about the

14   Vice President's role in the joint session of Congress was one where he related what he

15   had said to the President, and you consider that covered by executive privilege.    But did

16   you have conversations with anybody else in the White House Counsel's Office about the

17   role of the Vice President in a joint session of Congress?

18        A    So, after January 6th -- after January 6th, I might have spoken to a number of

19   people in the White House Counsel's Office conversationally --

20        Q    Uh-huh.

21        A    -- about it, because -- and events that transpired, and people came by to give

22   me their thoughts on what we had done.    So it's possible I could have spoken to any

23   number of people beforehand.

24             I want to be clear that, prior to the 6th, I don't remember Mr. Cipollone expressing

25   his view on it to me prior to that point in time, but he might have.    And there were two

1      times that I had to interact with he and Pat Philbin just about the Gohmert lawsuit, which

2      covered some similar subject-matter area.     I don't recall them expressing merits views

3      or us discussing merits views during those, but -- but it might be the case.     And I do

4      know that, after one of the meetings on Gohmert, I provided Pat Cipollone all the Law

5      Review articles that we had on the subject.

6              Q      And did he express a view on the role of Vice President in the joint session of

7      Congress then?

8              A      Not that I recall.

9              Q      Okay.     And did Mr. Philbin ever express to you a view of the role of Vice

10     President in joint session of Congress?

11             A      Not before the 6th.

12             Q      What about after the 6th?

13             A      So I don't think that there is any way that this privilege -- communication

14     would be privileged, but he called me to let me know that he thought that what the Vice

15     President had done had been heroic and patriotic and would be remembered well in

16     history.

17             Q      And did he, either implicitly or explicitly, suggest that he thought that your

18     legal conclusion about the role of the Vice President was correct?

19             A      I think implicit in that statement is that he would have come to the same

20     judgment, but we didn't -- we didn't discuss the underlying legal principle.

21             Q      Did you discuss John Eastman's theory at all with Mr. Philbin?

22             A      Not that I recall.

23             Q      Okay.     So, going through this exhibit 38, first paragraph says:     Professor

24     Eastman proposes that, while presiding over the counting of electoral votes at the joint

25     session of Congress on January 6th, the Vice President could -- and then three steps here.

1     The third is:    At the end of the joint session, direct that the electoral certificates for

2     these States will not be counted until each State's legislature certifies which of the

3     competing slates of electors for the State is true and correct.

4          I should note this memo is dated January 5th.

5          So you discussed the pivot by at least Dr. Eastman, if not also his client.    Where

6     in the course of that pivot were things when you wrote this?

7          A     So I think that this memo -- and this is -- I'll say, prior to getting documents

8     to refresh my recollection, I thought that this memo might have been written the evening

9     of the 5th.    Based on the time stamps that I saw with the emails that go along with this, I

10    think that this may have been written probably through the evening of the 4th after I met

11    with Mr. Eastman, and then, that morning, sent off to the Vice President, who was up at

12    the residence before Mr. Eastman arrived for the meeting.

13         So -- and one of the reasons I think that is that Professor Eastman does not

14    recommend -- we had talked before as to the term "should."    I think that does not

15    recommend had been an important concession that the Vice President had gotten sort of

16    during the meeting on the 4th from Mr. Eastman, that that was not the course that he

17    was recommending.

18         So then, from the 4th, we have a pivot into the morning of the 5th, where he

19    says -- comes in and says, "No, we want you to reject," and then sort of a pivot back to

20    send it back to the States.

21         Q     Under the heading "Legal Analysis" on the first page, you wrote:    Professor

22    Eastman acknowledges that his proposal violates several provisions of statutory law.

23    And then you've got several bullets there.

24         Can you describe -- you don't have to describe what's in your memo because that

25    speaks for itself.    But, to the extent you can -- and I know it may be somewhat

1   redundant of what you've already told us -- can you describe your recollection of in what

2   way Dr. Eastman acknowledged that his proposal violated several provisions statutory

3   law?

4           A      Well, and I've already largely discussed this, but, to do what he was

5   suggesting, A, the 10-day adjournment would violate a provision of the Electoral Count

6   Act.    Not allowing the Senators to object and instead to report to him -- have a

7   procedure where the State legislatures would decide those instead was inconsistent.

8           He would not have us calling for objections, which would trigger that, but the

9   Electoral Count Act says:    You shall call for objections.    Again, this had been one of

10  the -- the "shalls" were important to us, which was one of the reasons we had made sure

11  that the transcript or the scripts for January 6th had the call for objections because that

12  was one of the things that the statute specifically required.

13          So the memo lays out the four ways in which the proposal would violate

14  provisions of the Electoral Count Act, and he acknowledged as much in our conversations.

15          Now, most of that acknowledgement sort of on a point-by- point basis was in the

16  conversations the afternoon of the 5th.    We didn't get into all of the details on that in

17  the meeting on the 4th.

18          Q      Okay.    So then the last paragraph of the memo says:    Conclusion.    If the

19  Vice President implemented Professor Eastman's proposal, he would likely lose in court.

20          And that's something you've already discussed with us, that even Dr. Eastman

21  acknowledged that, if the court were to decide, rather than deeming it a political

22  question doctrine, that basically every judge would rule against the Vice President.    Is

23  that correct?

24          A      Yes.

25          Q      And then you wrote:    In a best case scenario in which the courts refused to

1    get involved, the Vice President would likely find himself in an isolated standoff against

2    both Houses of Congress, as well as most or all of the applicable State legislatures with no

3    neutral arbiter available to break the impasse.

4         Can you just describe what you meant by that?

5         A    Yes.    So -- and I've read with interest more recent media reports of the sort

6    of actual plans as to what leadership in the House was planning to do if the Vice President

7    went along with the proposal made by Mr. Eastman and purported to send it back to the

8    States, which, interestingly, didn't seem to involve litigation, but at least the media

9    reports I've seen indicate that they were intending to try to sort of overrule through

10   procedures within Congress.

11        I thought -- and Mr. Eastman agreed -- that, in all likelihood, Doug Letter and the

12   House litigators would immediately be running across the street to the D.C. District Court

13   if the Vice President -- again, to get the vision of the Vice President standing up there, he

14   says:    I hereby declare us to be in recess.    The States will decide these issues.

15        So some form of pandemonium is going to break out within the joint session at

16   that point.    I assumed that litigation would be filed across the street.

17        This is the best-case scenario.    So the court declines to rule.    They go up to the

18   D.C. Circuit, and they decline to rule.    The Supreme Court refused to take the case.

19   Now we have a Senate that doesn't agree with our position.    We have a House that

20   doesn't agree with our position.    It's not entirely clear how they move ahead with the

21   work.

22        I suppose you can do something like sub in a willing Senator for the role of

23   President of the Senate, try to declare that the Vice President no longer can serve as

24   President of the Senate.    It's not provided for in the Constitution.    We're sort of in a

25   constitutional no man's land at this point.    That's happening back in D.C.

1      Meanwhile, out in the State legislatures, all these leaders who have said they have

2  no interest in reexamining this issue, that they have looked into it to their satisfaction,

3  there had been hearings in Michigan, there had been hearings in other States, and they're

4  unlikely to do anything with respect to the certification, so what even then happens if you

5  get to the end of that 10-day period, nothing comes back?

6      So you're really in a constitutional jump-fall situation at that point.    And, I mean,

7  honestly, I -- my concern was that, at this point, you have the issue being decided on the

8  streets, that people are going to be so hypercharged.    The political mechanisms that we

9  have are unable to come to a resolution.    The courts have stayed out of it.    So there is

10  no statement of law there.    You've got the President and the Vice President, in theory

11  here -- they were never aligned on this subject, but if you had the Vice President sitting

12  up here and saying, "I do have the authority to do this," an aligned executive branch

13  against the legislative branch, with the judicial branch standing out of it, sort of a

14  nightmare scenario.    That's really not clear where it all lands.

15      Q      Okay.    I'm going to -- one more question, actually, before I ask others.

16      Did John Eastman ever admit, as far as you know, in front of the President that his

17  proposal would violate the Electoral Count Act?

18      A      I believe he did on the 4th.

19      Q      Okay.    And can you tell us what the President's reaction was?

20      A      I can't.

21      Q      Okay.

22          BY MR. ████████

23      Q      I just want to quickly go back to the Peril -- the reference on the 5th to the

24  Lincoln suspension of the writ of habeas corpus that -- and whether or not that brought

25  to mind Attorney General Barr's statements earlier that, upon investigation there, the

1    Department of Justice had not found evidence of systemic fraud sufficient to undermine

2    the results of any State.

3         Did you, for instance, Mr. Jacob, when this sort of crisis of the Civil War and the

4    Lincoln -- predicate for Lincoln's suspension of the writ respond either in your own head

5    or directly to Mr. Eastman that there is no similar factual predicate; in fact, the Attorney

6    General has stated publicly, no evidence of widespread election fraud?

7         A    So I viewed it as counterproductive to try to debate Mr. Eastman about what

8    was going on in individual States.    He had views about the voting machines and

9    mathematical tabulations.    He injected some of those into our conversation on the 5th,

10   and I frankly didn't have sufficient in-depth knowledge of any one of those individual

11   cases to explain to him all the reasons he was wrong about --

12        Q    Uh-huh.

13        A    -- any given one of them.

14        Q    Yep.

15        A    And I didn't particularly view it as necessary for purposes of refuting the

16   legal position that he was taking.

17        Q    Okay.    So you didn't engage with him on the -- those facts?    When he

18   would make statements like:    There is all this evidence.    I think your statement was "so

19   much unconstitutional stuff happened" was your paraphrase of what he said.    Did you

20   engage with him on the underlying facts that would be the predicate for a move like

21   suspension of habeas corpus?

22        A    So I do -- I do recall asking him a couple times:    Well, what exactly do you

23   mean by all this unconstitutional stuff?    What are the -- but it very quickly became clear

24   that that was not -- it wasn't a productive conversation because it wasn't as though he

25   was pointing me to anything concrete to actually discuss.    They were very generalized

1    statements:    All these cases and, yeah, I get that the courts aren't -- the courts are

2    dismissing them without ever hearing the evidence.

3        But there were courts that did let them present evidence, and they didn't present

4    any, so --

5        Q    And did that inform your view at the time of these conversations with

6    Mr. Eastman, that those factual allegations had been made and rejected by courts, there

7    was no such evidence?

8        A    Again, it wasn't -- whether there was or was not a problem in some given

9    State has to be separated from the question whether the Vice President had the authority

10   unilaterally to make that decision.

11       Q    Uh-huh.

12       A    And all I was trying to get locked down with Mr. Eastman was that the Vice

13   President did not have that authority, and we're going to be following the Electoral Count

14   Act and that there was not a credible case, that the procedures that were at issue on our

15   end -- again, I think that there are -- I've mentioned all these Law Review articles.    The

16   Law Review articles raised questions about the constitutionality of different aspects of

17   the Electoral Count Act.

18       Q    Yeah.

19       A    I didn't think that the things that we were doing that day were called into

20   question by -- by that scholarship.

21       Q    Yeah.    The reference to Lincoln, again, seems like the writ -- the suspension

22   of the writ of habeas corpus was one of those times when it's okay to disregard the

23   Constitution given the magnitude of what's going on in the country.

24       It sounds to me like Eastman was saying this may be one of those times, where,

25   regardless of the Constitution, regardless of the Electoral Count Act, it's just so important

1    because of all this unconstitutional stuff happening that there is leadership or that we

2    have a similar moment.

3          Is that sort of a fair characterization of his position, that we can just ignore all this

4    law because there is a crisis right now?

5          A     It's -- what I would say is that, in his view, he thought that they were

6    comparable because, in the Lincoln example, if Lincoln hadn't suspended the writ, all the

7    laws of the Republic would have gone unenforced, at least in Maryland.     The District of

8    Columbia becomes isolated.     The war may swiftly end in the wrong direction.     And, in

9    our instance, again, although he was not able to provide compelling details, shall we say,

10   that there had been widespread violations of the Constitution -- I think that he meant

11   essentially Article II, section 1, that he felt that the procedures prescribed by State

12   legislatures had not been followed properly in all of those States and that that would then

13   justify --

14         Q     Uh-huh.

15         A     -- because, again, these were arguments in the alternative.     One was the

16   Vice President simply has this authority by virtue of the Constitution.     This is the all

17   Chicago chickens point of view.     Yeah, the underlying legal theory is the same, but this

18   may be more palatable because it's modest.     But, when you try and substantiate the

19   legal theory, it all comes back to the same basic assertion the Vice President has inherent

20   authority.

21         The Lincoln example was not premised on that, but --

22         Q     Okay.

23         A     -- rather, was premised on this is what I think he kept calling a minor

24   procedural statute, and, when weighed against all of this unconstitutional stuff --

25         Q     Okay.

1       A     -- it must yield.

2       Q     Fair to say you never saw evidence of all that unconstitutional stuff that

3   would bring us anywhere close to a perilous situation of the suspension of the writ of

4   habeas corpus?

5       A     So I don't know that any amount of actually unconstitutional things

6   happening in the States could justify a Vice President asserting a role to reject electors.   I

7   don't think so.

8       Q     Thank you.

9       Mr. ████     Do any members have any questions?    No?    Okay.

10      Mr ████      Just one.

11           BY MR. ████

12      Q     So you mentioned that, during the January 5th discussion with --

13      Mr. Culvahouse.    You've got --

14      Mr. ████   Oh, sorry.

15      Mr. ████   Ms. Cheney?

16      Ms. Cheney.    Go ahead, ████ .    I'll ask when you're done.

17           BY MR. ████ :

18      Q     During the January 5th discussions with Dr. Eastman, you mentioned he

19   recognized that his theory would clearly lose in the Supreme Court, nine to zero probably.

20   Did he suggest what would happen then if it went through, was litigated up to the

21   Supreme Court?    Did he recognize that the President should then accept the Supreme

22   Court's ruling, or did he -- or did he suggest that the -- that President Trump should still

23   retain his view even in the face of a Supreme Court ruling?

24      A     That never came up.    Sort of whether, if you did lose 9-0, should the

25   President then -- you know, John Roberts has made his decision.    Now let him enforce it.

1      There was no discussion like that.

2              Q      Okay.

3              Mr. ██████   Ms. Cheney?

4              Ms. <u>Cheney.</u>   Thank you.

5              Mr. Jacob, we've seen evidence in our investigation of contemporaneous

6      communications with White House staff suggesting that members of the White House

7      Counsel's Office might resign if the President were to take John Eastman's advice.   Are

8      you aware of any of those discussions?

9              The <u>Witness.</u>   I'm not.

10             Ms. <u>Cheney.</u>   Are you aware of any discussion that would resemble concern

11     about the unraveling of the Republic, as you've laid it out, were the President to go down

12     this path?

13             The <u>Witness.</u>   I'm not.   I mean, I'm not aware of any resignations that did

14     happen after the path that was followed, so -- anyway, but I don't know.

15             Ms. <u>Cheney.</u>   No.   But I was talking about prior to the President making his

16     decision, when it became clear that John Eastman was making a recommendation.

17             The <u>Witness.</u>   Right.   I'm saying, if those resignation threats were made, they

18     weren't followed through on after the fact to my awareness, but --

19             Ms. <u>Cheney.</u>   But are you aware of concern among the White House counsel or

20     consideration of resignation on the part of members of the White House Counsel's

21     Office?

22             The <u>Witness.</u>   I'm not.

23             Ms. <u>Cheney.</u>   Thank you.

24                 BY MR. ██████

25             Q      Okay.   Mr. Jacob, if you could turn to exhibit 68 in your binder.   And this is

1    a document that was produced to us by the National Archives.    Do you recognize that

2    document?

3        A    I think this is the -- an intermediary draft of my draft op-ed.

4        Q    Okay.    When did you draft that?

5        A    So I began drafting it while I was in the secure location at the Capitol on

6    January 6th where I just drafted, I think, a paragraph -- a thought paragraph that I sent

7    myself.

8            And then this draft, I think -- I think I recall asking Lindsay Pickell to pull

9    together -- and this would have been on the 7th -- to pull together some of the underlying

10   rules of professional conduct.    I think my initial paragraph had cited some broad

11   principles of ethical responsibility that governed lawyers, and I had asked her to expand

12   upon that.

13           And I think I had mentioned -- I'm not sure how much of the remarks that had

14   been made at the Save America rally, I had been aware of on the 6th.    But, by the 7th, I

15   certainly was aware of them.    So I asked her to pull some things like that.

16           So I think this is Lindsay's draft with some guidance from me, and this would have

17   been probably a January 7th or January 8th work product.

18       Q    And why did you write this document?

19       A    So I was deeply offended for my profession.

20       Q    Offended by what?

21       A    I felt that the -- the quality of the advice that I had seen given was given to

22   the President of the United States.    And, again, I caveat that with the fact that I only saw

23   certain slivers of what advice was actually delivered to the President.    So I don't know

24   the full extent of the advice, but what I saw was, in my view, so far beneath professional

25   standards.

1           Not so much in the conclusions, although I vociferously disagreed with the

2    conclusions, but, rather, in the failure to acknowledge the many serious practical and

3    legal problems that you have to get through to get to that conclusion, and that, when

4    advice of that quality -- of that poor quality is given to somebody like the President, it

5    makes the job of every government lawyer who is trying to do their job that much harder.

6           It is not easy to tell the President of the United States, the Vice President of the

7    United States, the Attorney General, whoever they may be:    I'm sorry, the answer is just

8    no; you can't do that.

9           But there are times that that has to be your answer.    But, when somebody else is

10   willing to step in and say, "Yes, you can," and to invoke their professional credentials in

11   support of that conclusion and back that up with very little, it really makes our job harder

12   and brings the profession into disrepute.

13          So I was, I'd say, pretty livid on January 6th about that.    I started the drafting

14   process then, and ultimately I'd like to not to publish anything at all for a variety of

15   reasons, but what was published in The Post was the last draft reflecting all of my

16   thoughts on that day.

17   Q       Okay.    So, on this draft here at exhibit 68, in the -- there -- I'd be interested

18   in asking you every -- about every sentence in this, but we don't have enough time, so I'll

19   ask you about a few.

20          In the third paragraph, last sentence of that paragraph says:    Yet the egregious

21   misrepresentations and outright lies of the President's outside counsel deceived nearly

22   half the country, nudging an unsettled Nation closer to the brink until an angry mob tore

23   down the barricades and busted through the windows of our hallowed Capitol.

24          What were the outright lies of the President's outside counsel?

25   A       So I'm pretty sure that this is a Lindsay Pickell sentence rather than my

1    sentence, but particular statements that I was outraged about had been the "trial by

2    combat" statement by Rudy Giuliani; assertions by, I think, both Mr. Giuliani and

3    Mr. Eastman that the Vice President had these powers, that it's just as simple as that.    If

4    we're to -- he said:    If we're going to have a Republic, then Vice President must have

5    authority to do something like that.

6          And so I was concerned about those.    I don't think -- again, I don't think "outright

7    lies" is my phrasing, but those were all statements I considered to be inaccurate and

8    beneath professional standards advice.

9          Q    The next sentence says:    President's outside counsel blatantly lied about

10   the Vice President's power, indulging in the delusion that the Vice President had the

11   ability to either unilaterally decide the election or delay counting of votes.

12         Do you remember if you wrote that sentence?

13         A    Again, I'm pretty sure that that's a Lindsay sentence.

14         Q    The suggestion there, though, by "blatantly lied" is that the outside counsel

15   knew that the advice they were giving was wrong.    Is your view that any of the outside

16   counsel knew that the advice they were giving the President was wrong?

17         A    So what I'll say is the only one that I interacted with was John Eastman, and

18   what John Eastman knew and acknowledged was that he never would have supported

19   this argument if advanced by the Democratic Party.    And so he never acknowledged that

20   it was incorrect.    As I talked before, by the end of our conversation, he sort of all but

21   acknowledged that there was simply no there there on what he was advancing.

22         Q    Okay.    The next sentence is:    One of the President's attorneys suggested

23   that, if a State submits one certified slate of electors and the President's outside counsel

24   submits a second uncertified slate, the Vice President could then choose which competing

25   slate of electors to accept.

1          Who is the President's attorney reference there?

2          A      Again, I'm pretty sure this is a Lindsay sentence, but it -- I presume that it's

3    John Eastman.

4          Q      Okay.    But then the next paragraph starts with:    Another attorney said

5    publicly that the Vice President can delay counting electoral votes because Federal law

6    requires a final determination in accordance with State law to ascertain legitimate slate of

7    electors despite knowing no such requirement exists.

8          Do you know who the attorney referred to there is?

9          A      Well, that also could be John Eastman, and the -- it could be that the other is

10   a reference to Jenna Ellis, because we had received a memo that Ms. Ellis had written

11   that had a similar implication.    But I'm not sure -- I'm not sure exactly how well these

12   descriptions exactly align with the respective positions of the two of them.

13         Q      Okay.    And then the next paragraph starts out --

14         Mr. <u>Culvahouse.</u>    Mr. █████, if you'd just wait a minute.

15         Isn't this a best statement of where you came out?

16         The <u>Witness.</u>    Yeah.    I mean, my -- as I said before, my op-ed is -- represents my

17   best thought product on -- on the matter.

18         Mr. █████    Okay.    I understand.

19              BY MR. █████

20         Q      The next paragraph starts with:    The lies stretch beyond the Vice

21   President's role and counting electoral votes to the election itself.

22         And then it goes on -- it says:    The President's attorneys made demonstrably

23   false statements about voter fraud, and then goes on to list the examples.

24         Do you remember if you wrote that paragraph?

25         A      Again, I think there is a paragraph that I had written the day before that I

1  had given Lindsay, and I gave her a few thoughts as well as a couple of asks, particularly

2  on the rules of professional conduct.    But I'm pretty sure that all of the wording on this

3  is what is -- reflects Lindsay's writing in the first instance.

4       Q     Do you agree with the statements that she wrote?

5       A     So I had my entire legal staff watch the -- whatever it was, mid-November

6  press conference where -- that was supposed to be the -- the big reveal on here is all of

7  the evidence of voter fraud that we have been referring to fraud this time, and I do

8  believe that demonstrably false statements were made, A, during that press conference,

9  and, B, in some of the litigation filings thereafter.

10       Mr. ██████   Okay.   I'm going to pause to see if anybody else has any questions

11  before I move on.

12            BY MS. ██████

13       Q     I have one point of clarification.   On the press conference that you're

14  referring to in mid-November, do you recall who the speakers were at that conference?

15       A     Sidney Powell, Rudy Giuliani.   I think Jenna Ellis may have spoken there.

16  She certainly was on the stage.   I don't remember who else may have been there.

17       Ms ██████   Thank you.

18       Mr. ██████   Okay.   Anybody else?

19            BY MR. ██████

20       Q     Okay.   If you can look at exhibit 44, an email message from John Eastman

21  to you, January 6th.   The time stamp says 2:32 a.m.

22       He writes:   Greg, good talk earlier tonight.   So this is technically, I guess, the

23  morning of the 6th, but I'm construing it to mean a talk in the evening of the 5th.

24       He writes:   Major new development attached.   This is huge as it now looks like

25  Pennsylvania Legislature will vote to recertify its electors if Vice President Pence

1    implements the plan we discussed.

2         And then exhibit 45 is a letter from -- on the letterhead of Senate of Pennsylvania

3    signed by several members of the Pennsylvania Senate.

4         So, when he wrote, "This is huge as it now looks like the Pennsylvania Legislature

5    will vote to recertify its electors if Vice President Pence implements the plan we

6    discussed," so what's your understanding of what "the plan we discussed" was, given that

7    we've gone through a few different possible formulations of it?

8         A    So any reference to the State legislature has to be the fallback plan that they

9    had pivoted to the afternoon of the 5th.

10        Q    And did the letter from the Pennsylvania State senators change your opinion

11   at all?

12        A    No.

13        Q    Why?

14        A    Two reasons.    One, it was irrelevant to the underlying legal analysis.    You

15   know, if the State legislature had been willing to certify a new slate, it wouldn't have

16   changed the fact that the Electoral Count Act procedures wouldn't have allowed it, and

17   then I didn't think that those procedures at that time were unconstitutional.

18        Furthermore, as a practical matter, I believe I had one of my staff count up the

19   signatories, and we determined that this did not represent a majority even of the senate

20   in Pennsylvania.    And so it certainly was not the legislature speaking, and we didn't even

21   think the Pennsylvania Senate was speaking.

22        Q    Okay.    If you could look at exhibit 80, this is a memo dated December 8th,

23   2020.    On the front page, it says:    Contact Jason Miller.

24        Do you recognize this document?

25        A    I might have seen it before.    I don't recall.

1        Q        Okay.    Do you know who wrote it?

2        A        I assume Jason Miller since that's the name on the cover.

3        Q        Well, it was -- he was also -- he was, I guess, a press person for the

4    campaign, right?    So it's possible that he's listed as a contact, not necessarily the author.

5        A        That's possible.

6        Q        Okay.

7        A        So I don't know.

8        Q        Okay.    Do you know how, if at all, this document was used?

9        A        No.

10        Q        Okay.    Okay.    If you look at exhibit 6, this is a document that was

11    produced to us, I believe, by the Archives, dated December 16th, 2020.    Title is

12    "Presidential Findings to Preserve, Collect, and Analyze National Security Information

13    Regarding the 2020 General Election."

14            Do you recall ever seeing this document before?

15        A        I certainly don't recall seeing this at the time in the White House.    I might

16    have seen this in a media story in the last week or two, but I'm not even sure.

17        Q        Okay.    If you look at the last page, the photocopy of a Post-It note says:

18    From the VP to Pat C.    I'm assuming, since you just said you don't recall seeing this

19    document, that that is not your handwriting?

20        A        It is not.

21        Q        Okay.    Any idea whose handwriting that is?

22        A        No.

23        Q        Okay.    Were you involved in any discussions within the White House about

24    the possibility of the Federal Government seizing voting machines from the States?

25        A        No.

1        Q      Okay.    Were you involved in any discussions about the possibility of the

2    appointment of a special counsel to investigate allegations of election fraud or election

3    interference?

4        A      No.

5        Q      Can you look at exhibit 7.    This one is titled "Draft Executive Order, Election

6    Integrity for November of 2020."

7               Does this document look familiar to you at all?

8        A      No.

9        Q      Okay.    If you look at exhibit 17, this is an email from Jenna Ellis to

10   Mark Meadows, dated December 31st, 2020.    This says:    Attached below.

11              Mr. Meadows then forwards it to Marc Short, who in turn forwards it to you.

12   And it appears that the attachment is what's exhibit 18 in your binder, and that's a

13   December 31st, 2020, memo from Jenna Ellis to President Trump.

14              Have you seen this before?

15       A      Yes.

16       Q      And do you remember how this came to your attention?    Was it just from

17   being forwarded to you from Marc Short?

18       A      Yes.

19       Q      Okay.    Before you got that email, did you have any knowledge of

20   Jenna Ellis' role?

21       A      I had seen her on the stage at the -- at the press conference I referred to in

22   November with Sidney Powell and Rudy Giuliani.    And, other than that, there had

23   been -- and it could have been before or after this -- I don't recall -- but there was a

24   campaign surrogate call that somebody gave me the number to call in to where she told

25   the campaign surrogates that the Vice President had the authority to do this.

1          That and this memo were the only interactions I ever had.   And never any direct

2   interactions, but those were my only sources of knowledge about Ms. Ellis.

3          Q      Okay.   So this memo, in the second paragraph, says:   On January 6th, the

4   Vice President should therefore not open any of the votes from these six States and

5   instead direct a question to the legislatures of each of those States and ask them to

6   confirm which of the two slates of electors have, in fact, been chosen in the manner the

7   legislature as provided for under Article II, section 1.2, of the U.S. Constitution.

8          So it sounds like this is a memo you received before your interactions with

9   Dr. Eastman.   Is that correct?

10         A      Yes.

11         Q      So is this the first time that somebody suggested basically to you -- I realize

12   this not written directly to you -- but had suggested to you that the Vice President could

13   reject or not open the votes from certain States?

14         A      This is the first time that I remember seeing that.

15         Q      Okay.   What was your reaction?

16         A      I think I was at the White House at night.   This may have been New Year's

17   Day or something.   Yeah.   So I was working that night.   This came in, and my

18   recollection is that I called in and said:   Well, for starters --

19         Q      Called who?

20         A      Marc.   And said --

21         Q      Marc Short?

22         A      Marc Short, yeah.   And said:   For starters, this says the Vice President

23   should therefore not open any of the votes from these six States, and the Constitution,

24   while generally not the best written sentence in the world, is absolutely clear the Vice

25   President shall open the certificates.   So you don't really need to go too much further

1    than that in this analysis.

2        Q      Did you discuss this memo with the Vice President?

3        A      Not to my recollection.    It could have come up as part of a broader

4    conversation as these issues percolated over the next few days, but I don't recall

5    discussing it.

6        Q      Do you recall discussing it with anybody in addition to Marc Short?

7        A      No.    Well, my staff.

8        Q      Okay.    So Jonathan Karl wrote in The Atlantic an article called "The Man

9    Who Made January 6th Possible," and he discusses a text message from Johnny McEntee

10   to Marc Short.    I don't think we have a copy of it, so I can just read a bit of it to you.

11       Quote:    Jefferson used his position as VP to win.    The Constitution sets precise

12   requirements for the form in which the States are to submit their electoral votes.    In

13   1801, the ballots of all States were in perfect conformity except Georgia's.    Georgia's

14   submission dramatically failed to conform to the requirements.    VP Jefferson presided

15   over the counting of the ballots even as he was one of the candidates.    Had the defect

16   ballots been rejected, Jefferson would have most likely lost the election.    Senate tellers

17   told Jefferson in a loud voice that there was a problem with the Georgia ballots.    Rather

18   than investigating, Jefferson ignored the problems and announced himself the winner.

19   This proves that the VP has a substantial discretion to address issues within the electoral

20   process, end quote.

21       Was that text ever brought to your attention?

22       A      Yes.

23       Q      Okay.    How?

24       A      My -- I think that what you just read to me was forwarded to me or handed

25   to me perhaps in paper by Marc Short.

1      Q      Okay.   And what did Marc Short say about it?

2      A      I think he gave it to me and said:   I know you've already run me through

3    this Jefferson example, but can you -- can you do it again?

4      Q      Okay.   And what did you say?

5      A      I reminded him that it was undisputed and completely clear that Jefferson

6    had won Georgia.   The results had been announced in Georgia.   No one had contested

7    it.   There was no dispute or debate during the vote count.   There is nothing in the

8    Congressional Record about any of this.   It all comes from a newspaper article a few

9    days after the vote count where one of the tellers evidently said something to a

10   journalist, which then resulted in this story about the teller having said something in a

11   loud voice, Jefferson having looked at it, noticed there was a page missing, and expressing

12   some surprise, and then nonetheless announcing the State for Jefferson.

13         But, again, nobody in Congress, including the teller, who supposedly was

14   shocked -- shocked -- that Jefferson didn't do it, didn't raise the fact of a problem, say

15   anything about it, and it got counted in.

16         And so Ackerman had gone back to the archives and looked at the original

17   certificate from Georgia and, based on his review, determined that there was, in fact, a

18   technical defect with the certificate, but, at most, this was a technicality, and the

19   question was:   What do you do if there is some small technical defect in a certificate and

20   everybody agrees Jefferson had won Georgia?

21         But no question was raised at the time, and it certainly, therefore, was not an

22   example of Jefferson exerting Vice Presidential authority to resolve objections to disputed

23   electors.

24     Q      Okay.   If you look at exhibit 19, it's a handwritten note that says:   This is

25   probably our only realistic option because it would give Pence an out, dash, Johnny.

1          Do you know who wrote that?

2          A     I don't.

3          Q     Okay.    Do you know -- how many Johnnies do you know who worked at the

4     White House at the time?

5          A     I'm not sure that I ever actually met Johnny McEntee --

6          Q     Okay.

7          A     -- but I know that Johnny McEntee worked there.

8          Q     And so you've not seen this note before other than in preparation for this

9     deposition?

10         A     Not -- not that I recall.

11         Q     Okay.    And, if you look at tab 20 or exhibit 20, set of bullets:    Pence can let

12    the States decide.

13         Other than preparing for this deposition, had you ever seen that document

14    before?

15         A     I don't think so.

16         Q     Both exhibit 19 and exhibit 20, you can see, have a sort of faint tear in them.

17    Do you know whether President Trump had a practice of tearing up papers after

18    they were given to him?

19         A     I've read media accounts this week, but I have no personal knowledge.

1

2       [4:09 p.m.]

3              Mr ███████   Okay.   This exhibit 20, the third bullet -- well, the second bullet

4       says, "There is a middle path that is way out for everybody."

5              The third bullet says, "On January 6th, the VP could only accept half the electoral

6       votes from the disputed States, instead of all."

7              Were you aware of the proposal that the Vice President reject half of the electoral

8       votes from the disputed States?

9              The <u>Witness.</u>   No.

10             Mr███████ Okay.   Is there any legal basis for the Vice President to have done

11      that?

12             The <u>Witness.</u>   No.

13             Mr ███████ Does anybody else have a question before I move on?

14             Do you want to take a break or keep going?

15             The <u>Witness.</u>   I'm fine.

16             Mr. ██████  Okay.

17                    BY MR. ████████

18             Q      To your knowledge, did Vice President Pence have a conversation with

19      former Vice President Dan Quayle regarding the role of the Vice President in the joint

20      session of Congress?

21             A      I have no personal knowledge of that conversation.   I've read the

22      Costa-Woodward book.

23             Q      Okay.   But it has not been relayed to you by the Vice President or Marc

24      Short or anybody else?

25             A      It was not at the time, no.

1  Q Okay. Was it later?

2  A So I've read the Washington Post account of Dan Quayle's remarks about

3 that comment, which are not consistent with the Woodward-Costa account. And so

4 that's all I know about the contents.

5  Q Okay. Did you have any communications with former Judge Mike Luttig

6 regarding the role of the Vice President in the joint session of Congress?

7  A No.

8  Q To your knowledge, did any representatives of Vice President Pence have

9 any such communications with Judge Luttig?

10  A I believe Richard Cullen did.

11  Q Okay. And how do you know that?

12  A I believe that Marc Short had told me that Mr. Eastman had clerked for

13 Judge Luttig, and I think it may have been Richard's idea.

14  We had been talking for a while about trying to find a respected conservative

15 scholar or conservative jurist who could put something out publicly about this, and I think

16 Richard knew Judge Luttig through Virginia connections. And so he -- and I wasn't

17 directly involved in this -- but offered to reach out to Judge Luttig.

18  Q Okay. Do you know when that was?

19  A It may have been on the 5th itself.

20  Q Okay. So if you look at exhibit 35, this is a September 21st, 2021, tweet

21 from @judgeluttig.

22  He wrote, "I was honored to advise Vice President Pence that he had no choice on

23 January 6th, 2021, but to accept and count the electoral college votes as they had been

24 cast and properly certified by the States."

25  But if Judge Luttig didn't get involved until around January 5th, hadn't Vice

1    President Pence already really made up his mind at that point?

2        A    Yes.

3        Q    Okay.   So is it your understanding that Judge Luttig was giving advice to

4    Vice President Pence or was it -- would it be better to say that he was offering a view that

5    the Vice President could rely on for a position the Vice President had already decided

6    upon?

7        A    I think the latter is correct.   I'm not aware of an actual conversation

8    between Judge Luttig and the Vice President until after the events of January 6th.   I

9    know the Vice President called him thereafter and thanked him for putting out the

10   statement.

11       I think Judge Luttig is referring to the fact that the -- I don't know if his advice was

12   put out as a press release or a tweet or what, but that the Vice President had found it

13   helpful and referred to it in his statement that he issued on the 6th.

14       Mr ███      Does anybody else have any questions before I move on?

15           BY MR. ██████

16       Q    I just wanted to ask a little bit more about Richard Cullen.   So he's an

17   outside counsel but has been reported to have been a lawyer for the Vice President

18   during his time as Vice President.

19       Can you just tell us a little bit more about the role that he played as the Vice

20   President's outside counsel versus the role that you played as lawyer for the Office of the

21   Vice President?

22       A    So Richard was private outside counsel to the Vice President, had

23   represented him during the Mueller investigation.   And the Vice President, I think,

24   would occasionally bounce ideas off of Richard on things because they had developed a

25   relationship during that time.

1         So my role is to provide all of the government side legal advice that the Vice

2    President needed on any issue pertaining to the Vice Presidency or his role as President of

3    the Senate.

4         Richard would be sort of an outside, respected counselor that the Vice President

5    could ask a question of if he felt like he wanted -- needed -- just wanted some additional

6    advice on something.

7         Q    Yeah.    Do you know if Richard Cullen was involved in any way in advising

8    the Vice President about the core issues we've been discussing here, his authority under

9    the 12th Amendment or the Electoral Count Act?

10        A    Richard, to my knowledge, did not have any central role in that.    There

11   must have been some discussion around the time of the 5th for him to reach out to Judge

12   Luttig.    And based on my conversations with Richard since then, I know that he agreed

13   with the advice we provided.

14        Q    Okay.    But was he involved in any particular conversations, meetings where

15   you and he and the Vice President were all together talking about these issues?

16        A    I don't believe that we were ever all in the same call, no.

17        Q    Okay.    We have developed other evidence that the outreach to Judge Luttig

18   was meant more for an external audience than an internal; that this was an attempt to

19   kind of validate the advice that you had given in the Vice President's position for a public

20   audience in part because of Luttig's connection to Eastman.

21        Is that consistent with your understanding of why Judge Luttig got involved in this,

22   these matters and this issue?

23        A    Yes.

24        Q    Okay.    In other words, he wasn't -- the Vice President wasn't vacillating in

25   any way.    He had made up his mind.    Luttig was sort of -- John's -- let's go back to

1    John's questions -- speaking more broadly to sort of validate what the Vice President was

2    purporting to do?

3        A    Yes.   We already had our statement drafted by the time this came out.

4        Q    Yeah.

5        A    It was still undergoing further changes, and we -- I recall the Vice President

6    saying, "Hey, that's really useful.   Shouldn't we incorporate something from Judge

7    Luttig's statement into there?"   But --

8        Q    The only thing that was changing was the wording, not the bottom-line

9    position?

10       A    Correct.   The conclusion was already -- had long been settled.

11       M█████████     Okay.   Got it.   Thank you.

12            BY MR.██████

13       Q    And then when you referred to the Vice President's statement or Dear

14   Colleague letter, however you want to describe it, can you explain how that came about?

15       A    So I remember during -- like I said, the Vice President was on vacation

16   between at least December 23rd, roughly, through New Year's Day, I think.   During that

17   time, as some of these issues started to -- pertaining to the Vice President -- we saw more

18   chatter on blogs and media accounts.   There was the Operation Pence memo.

19            Marc and I had a couple of conversations about whether there should be some

20   kind of public statement.   We had talked about the possibility of finding a conservative

21   scholar to put something out.   We talked about the possibility of me putting something

22   out.

23            When we met -- when the Vice President got back, we all met on January 2nd.   I

24   think I had already jotted down a few ideas just as a thought piece on some things that

25   we might say if we issued a statement.   It was -- I think the original idea had been maybe

1    we would do an op-ed.    Eventually we decided that day --

2         Q     Which day?

3         A     January 2nd.    We had a long meeting the afternoon of January 2nd up at

4    the residence, and we determined then that we were going to issue a statement and that

5    it wasn't going to be an op-ed.    It was going to be sort of a letter from -- I think the Dear

6    Colleague letter that we ultimately came about doing.    And the Vice President gave

7    several elements that he wanted to make sure was included in that and then kind of gave

8    me the pen to put a draft together.

9         Q     So why, as of January 2nd, did that seem necessary given it sounds like

10   Eastman, as far as you know, hadn't really popped his head up?    You've got the Jenna

11   Ellis memo that we've already talked about.

12        But at that point on January 2nd, was there a lot of pressure on the Vice

13   President, either internally within the White House or coming from outside, to take a

14   more active role on January 6th?

15        A     So I can't speak to internal pressures at that time.    It was really in the

16   following days that I -- you know, Mr. Eastman was introduced to me and we began that

17   sequence.

18        I think that there was a lot of discussion of this issue in some media articles and

19   other things that we were aware of, and that, in light of all of that, I very distinctly

20   remember the Vice President on the 2nd talking about this as something that he wanted

21   to be a moment of civic education and that he wanted his statement to walk people

22   through, not as a rebuttal to some specific instance of pressure that he mentioned at that

23   point in time, but rather for anybody who had doubts about the way that this process was

24   supposed to work, let's take them through all of this history.

25        Particularly since, you know, we decided that the Electoral Count Act was going to

1    be followed and we wanted to give a history of how we had come to having an Electoral

2    Count Act.    Why do we have that?    Why has it been followed for the last 130 years?

3          And so those were all elements that we wanted to have in there.    But it was -- it

4    was an external statement.    It wasn't supposed to be a memo to forces within the

5    building or anything like that.

6          Q     Okay.    So on January 2nd, as I understand, Vice President Pence met with

7    some congressional Republicans.

8          Did you attend that meeting?

9          A     What was the date of this?

10         Q     January 2nd, I believe.

11         A     No, I did not.

12         Q     Do you know who, which Republican Members of Congress attended?

13         A     I don't.    I'm not aware of the meeting.

14         Q     Did the Vice President have a position on whether Members of Congress

15    should object to electors in the contested States?

16         A     He did not express any position on that prior to the announcements going

17    out that there were going to be objections.

18         Once those statements went out, consistent with our position of our own view of

19    that day, I think that there was a view that it would be good to channel all of this energy

20    that existed out in the -- among many of the Republican faithful into this Electoral Count

21    Act process that had been invoked every time a Republican President had won in the last

22    20 years.

23         So this was not something new, we had done it before, channeling into that, a

24    process provided for by law and just go by the book.

25         Q     That goes more to the question of who should decide, the Vice President

1    versus the Members of Congress.    But in addition to that, did the Vice President

2    encourage Members of Congress to, in fact, vote against certification of any of the

3    electors?

4         A    I'm not aware of any encouragement by the Vice President.

5         Q    Did the President?

6         A    I'm not -- again, I'm not aware of it.

7         Q    Do you know who Phill Kline is?

8         A    The name is vaguely familiar, but no.

9         Q    So you don't recall having any interactions with Phill Kline during any of this

10   time period?

11        A    If you showed me a picture or gave me some context, I might be able to

12   remember something, but I don't.

13        Q    He's a former attorney general of the State of Kansas and is one of the

14   people who was urging State legislators to reconsider the slate of electors that their

15   States had sent.

16        A    No.    I think I would have remembered a conversation with a State AG.

17        Q    Former State AG, he was not a State AG at the time.

18        A    Or even a former State AG, I probably would have remembered that.

19        Q    On January 4th, Vice President Pence went to Milner, Georgia, for a

20   campaign rally for the Senate runoff.

21             Did you go with him on that trip?

22        A    No.

23        Q    Were you working on the Dear Colleague letter at that time?

24        A    Yes.

25        Q    And was the Vice President also working on the Dear Colleague letter at the

1   time?

2       A     He was probably working on his speech that he was giving in Georgia, so --

3       Q     Probably not on the way back, though?

4       A     I don't know.

5       Q     Okay.

6             Okay.     If you can look at exhibit 36.

7             And this is a tweet from Donald Trump dated January 5th.     And he wrote, "The

8   Vice President has the power to reject fraudulently chosen electors."

9             Do you remember if you saw that on January 5th?

10      A     I think I did.    I don't have a Twitter feed, and I try to stay as far away from

11  Twitter as I can.    When tweets make media stories, that's when I see them, and I think

12  this one made media stories, so --

13      Q     Do you remember having a reaction to it?

14      A     My rough recollection is that this occurred sometime on the afternoon of

15  the 5th, maybe mid-afternoon on the 5th, after my meeting with Mr. Eastman.     I could

16  be wrong about that.

17            But I think I was disappointed because this was my first clear signal that my hopes

18  that I might have even persuaded Mr. Eastman that this position to reject fraudulently

19  chosen electors is unworkable.

20      Q     So I don't see a time on here, but I can represent to you that the tweet was

21  at 11:06.    Was that while you were meeting with Dr. Eastman?

22      A     It probably was.    So I probably didn't become aware of it until after the

23  meeting.

24      Q     Okay.    Let's discuss January 5th a little bit more here.

25            There was a meeting between the President and Vice President on January 5th.

1    The book "Betrayal" describes it as having been a lunch.

2            So first of all, does that sound correct?    Do you know whether the President and

3    Vice President had lunch together on the 5th?

4            A     So I'm not certain, but my recollection is that they typically would have had

5    lunch that day.    I think the Vice President was up at the residence working on the

6    statement while I was meeting with Mr. Eastman and that he cancelled the lunch so that

7    he had more time to work on the statement and that we had a Coronavirus Task Force

8    meeting scheduled for maybe 2, 2:30 that afternoon, and that that had to be significantly

9    delayed because the Vice President got called down to the Oval to talk with the President.

10           Q     Just one-on-one?

11           A     I don't know who else might have been in that meeting.    And it was the

12   Vice President's pretty solid practice not to talk about his conversations with the

13   President, so I don't know exactly what was said at that meeting.

14           Q     Okay.    The exchange between the two was reported in the book "Peril."    I

15   will just read you what that book says.

16           It says, "Trump said, 'If these people say you have the power, wouldn't you want

17   to'?

18           "Pence:    'I wouldn't want any one person to have that authority.'

19           "Trump:    'But wouldn't it be almost cool to have that power?'

20           "Pence:    'No.    I've done everything I could and then some to find a way around

21   this.    It's simply not possible.'

22           "Trump:    'No, no, no.    You don't understand, Mike.    You can do this.    I don't

23   want to be your friend anymore if you don't do this.'"

24           Has anybody said anything to you about that meeting that would allow you to

25   either confirm or deny this report from the book "Peril"?

1      A      So I have knowledge of what the President said at that meeting.    The things

2   that the Vice President is reported to have said at that meeting are consistent with

3   everything that the Vice President had been saying essentially from the beginning.    But

4   he did not tell me what he or the Vice President -- he or the President said during that

5   meeting.

6      Q      Did you see the Vice President right after the meeting?

7      A      Yes.

8      Q      And what was his demeanor?

9      A      Well, he was a little flustered because we had the whole Coronavirus Task

10   Force waiting downstairs in the Situation Room and he had had to push back from in

11   order to do that.    So we very quickly needed to circle up and get down to the task force

12   meeting so that he could run that.    Otherwise, I would just say he just struck me as

13   determined.

14      Q      And by that, did you infer that he was determined in his position regarding

15   the matter that he had just discussed with the President or just determined to get to the

16   Coronavirus Task Force meeting, or what do you mean by that?

17      A      No.    As he came in, he just struck me as -- he wasn't chatty.    He wasn't

18   jovial about things.    He just was determined, among those, that we needed to get to the

19   task force meeting.    But just his general demeanor was one of closed lipped and we're

20   going to move forward.

21      Q      Did you get the sense that he had just come from an unpleasant meeting?

22      A      I can't say.

23         BY ████████████:

24      Q      Does he get chatty and jovial ever, the Vice President?

25      A      Yes.

1      Q      Is that right?

2      A      Yes.     The Vice President is caricatured in the press, but in reality is a very

3    warm, engaging person in many different ways, with an incredible memory for movies,

4    loves throwing out movie quotes and making you try to guess them, things like that.

5      Q      Interesting.     So fair to say that his demeanor coming out of this

6    conversation with the President was quite different than his typical jovial demeanor?

7      A      Yeah.    I mean, the circumstances were such that he was now something

8    like 30, 35 minutes late for a task force meeting where he had Cabinet Secretaries and,

9    you know, who knows who else sort of waiting for him down there.     He hated to

10    inconvenience people.     But he was not in a jovial mood.

1

2          BY MR. ▮▮▮▮

3     Q     He didn't come out of it quoting "Fletch" or anything like that?

4     A     No.

5     Q     Okay.    And then did he meet with the President again following the

6  Coronavirus Task Force meeting?

7     A     I don't believe so, but I'm not sure.    My recollection is that right after the

8  task force meeting he needed to get over to the EEOB for the haircut.    But I ran up to my

9  office, got my computer, went down, sat in there as we went over things from the

10 statement, had made adjustments to it, and then did edits in Marc's office.

11    Q     And that's when the Vice President came in and you had a phone call with

12 the President?

13    A     Yes, while we -- we had the printouts with blue pen marks in them all over

14 the place there, and at some point during that editing session, the call from the President

15 came.

16    Q     So this call between the President and the Vice President while you and

17 Marc Short were in the room with the Vice President has been reported in the book

18 "Peril" which said that the President was furious.

19          First of all, do you agree with that characterization of the President as having been

20 furious?

21    A     I mean, I can't speak to the President's communications on the call.

22    Q     Can you confirm or deny whether the President told the Vice President that

23 he didn't want to be his friend anymore if he certified the election?

24    A     I can't.

25    Q     Because of executive privilege?

1          A     Correct, because of executive privilege.

2          Mr. █████     But can you characterize demeanor in any way?   I understand

3   that you're unable to talk about specific words conveyed, but the President's demeanor

4   as was apparent to you listening to that phone call.

5          The Witness.   I mean, it was a phone call.   And, honestly, the lawyers did most

6   of the talking, and most of that Mr. Eastman.

7          Mr █████   I'll pause.

8          Does anybody else have questions on that before I move on?

9                 BY MR █████

10         Q     Okay.   If you can look at exhibit 41, January 5th, 2020, "Statement from

11   President Donald J. Trump."

12         It says, "The New York Times report regarding comments Vice President Pence

13   supposedly made to me today is fake news.   He never said that.   The Vice President

14   and I are in total agreement that the Vice President has the power to act?"

15         First of all, did this come out after the phone call that we just discussed?

16         A     I believe so.   I think a few hours later.

17         Q     Okay.   And what was your reaction?

18         A     A little shocked, a little disappointed.

19         Q     Why were you shocked and disappointed?

20         A     Because whoever drafted the statement, it was not accurate.

21         Q     And what was not accurate about it?

22         A     Well, the Vice President was not in agreement that the Vice President had

23   the power to take the actions that were being asked of him that day.

24         Q     Okay.   And those actions, are those the ones described in the last two

25   sentences of the statement?   "He can decertify the results or send them back to the

1    States for change and certification.    He can also decertify the illegal and corrupt results

2    and send them to the House of Representatives for the one vote for one State

3    tabulation."

4         Are those the actions that the Vice President had said he cannot take?

5         A    So, roughly, yes.

6         Q    Okay.    Why only roughly?

7         A    Because as we talked about before with the -- I've got to turn that off.

8         When you asked me about reject the electors, where does it go from there, as I

9    said, there were a couple of different waterfalls that could go down.

10        Here the President's statement says he can decertify, reject, or send them back to

11   the States, which was the procedural option, and there were a few different variations of

12   how send it back to the States might work that had been talked about at different times.

13        And then there's the second statement, he can also decertify and send to the

14   House of Representatives.    That's really one of the waterfalls that just comes from reject

15   the votes.

16        I actually don't think legally you ever get to it going to the House if they haven't

17   completed the certification work there.    But if he's affirmatively rejecting and that is

18   being accepted then as the result, I suppose it could then get to a House of

19   Representatives tabulation.

20        So this is listed sort of as three distinct options, but really it's two buckets, each of

21   which has a few different waterfalls of what might happen after you do it.

22        There were a few different ways to send it back to the States that had been

23   proposed, and there were a few different waterfalls as to what they thought might

24   happen if you reject it, some of which was -- some of which had it being decided in the

25   House, some of which had it just being decided as a victory for Trump outright.

1       Q      Did you discuss that statement with the Vice President?

2       A      It's possible that it came up the next morning at the residence.     So this was

3   pretty late on the 5th.     And I -- it's even possible that it came up in my phone call with

4   the Vice -- I had a couple of phone calls with the Vice President on the 5th as I was -- he

5   was inquiring, "Where's my statement?    I've done my dinner.    I need to start working

6   on it."

7           But I was letting him know that there were just a couple of things that were -- I

8   was having a hard time following a couple of the blue lines from the draft and I just

9   wanted to make sure I had it right before I sent it to him.     And it's possible that this

10  could have come up then.

11      Q      Do you remember whether he had a reaction to it?

12      A      I don't remember the Vice President's reaction to it or if he gave a reaction

13  to it.

14      Q      Do you remember anybody's reaction to it?

15      A      I remember Marc's.

16      Q      Marc Short?

17      A      Yes.

18      Q      What was his reaction?

19      A      Marc was pretty upset that they had put this out, that it hadn't been run by

20  us, that we would have told them this is not accurate.

21      Q      Did you discuss it with anybody else that you can recall?

22      A      No.

23      Q      All right.    If you would look at exhibit 46 --

24      Mr. █████    Before you leave that.

25      Mr. █████    Yeah, yeah.

1                       BY MR. ████████

2        Q     Did Marc say what he was going to do, if anything, in the wake of that

3   statement coming out directly contrary to your discussions with Mr. Eastman and your

4   plan for the next day?

5        A     I don't recall whether he said he was going to raise the process foul with the

6   press office, whether he said he was going to call The New York Times.    I just don't --I

7   don't remember.

8        Q     Do you know if he did call anyone when he saw this and disagreed with it?

9        A     I don't.

10       Q     Okay.    Was there any discussion with you about whether to issue your own

11  statement or to say something that night to rebut that statement that the President had

12  put out?

13       A     Not that I remember.    It wouldn't have been -- the statement that we

14  released the next day just wasn't quite ready.    The Vice President really wanted to -- I

15  mean, the Vice President had said, "This may be the most important thing I ever say."

16  And so --

17       Q     "This" meaning the statement?

18       A     The statement.    And he really wanted to make sure that it was just so.

19  And he was going to be spending time that night and into the morning getting it.

20         So that was not ready to release that evening.

21       Q     Yeah.

22       A     There could have been discussion about putting out some other kind of

23  release, but I don't recall that.

24       Q     And the statement on which you were working and he was working was to

25  be released in a matter of hours, the very next day?

1          A      Correct.

2          Q      And is it fair to say the statement would be the best substantive response to

3     that statement, the January 5th statement that the President made?

4          A      Yes.

5          Mr. ██████      Yeah.   Okay.

6                 BY MR. ████████

7          Q      If you look at exhibit 46.    It's a tweet from @realDonaldTrump.    "If Vice

8     President @Mike_Pence comes through for us, we will win the presidency.    Many States

9     want to decertify the mistake they made in certifying incorrect and even fraudulent

10    numbers in a process not approved by their State Legislatures, which it must be.    Mike

11    can send it back, exclamation point."    And that was at 6 o'clock a.m., January 6th.

12                What was -- do you remember seeing this tweet?

13         A      Not specifically.    Again, I don't -- didn't keep a Twitter feed.    I'm sure it

14    came to my attention that morning.

15         Q      Okay.    Do you remember if you discussed it with the Vice President?

16         A      I don't.    When we met up at the residence that morning, we were really

17    just trying to get the statement finalized.    This could have come up as part of the

18    generalized conversation on that, but I don't recall it specifically.

19         Q      Okay.    If you look at exhibit 47.    This is another tweet.    This one was

20    January 6th at 8:17 a.m.

21                He wrote, "States want to correct their votes, which they now know were based

22    on irregularities and fraud, plus corrupt process never received legislative approval.    All

23    Mike Pence has to do is send them back to the States, and we win.    Do it, Mike, this is a

24    time for extreme courage."

25                Do you remember seeing that tweet?

1          A      I don't specifically.     I'm sure it came to my attention at some point that day.

2          Q      Do you remember discussing it with the Vice President?

3          A      Not specifically.

4          Q      And was this tweet consistent with what you understood the President's

5    position to be regarding the Vice President's role?

6          A      Again, I can't speak to what the President's position was.     The President

7    issued a series of tweets which I think speak for themselves.

8          Q      If you look at exhibit 48.     This is a Presidential call log.

9          If you look at the top of the second page, outgoing 9:02 a.m., White House

10   switchboard office.     "POTUS instructed operator to call back with the Vice President?"

11         Then two entries later, "Operator informed POTUS that a message was left for the

12   Vice President."

13         Were you with the Vice President at that time?

14         A      I don't recall what time we got to the residence that morning.     I'd be

15   surprised if it was that early, but we might have.

16         Q      Okay.    Do you know why the Vice President didn't take the call at that

17   time?

18         A      I don't know why he was unavailable for the call.

19         Q      Okay.    To your knowledge, he wasn't declining to take the call, was he?

20         A      I wasn't at the residence.    I have no idea.

21         Q      Okay.    If you'll look at exhibit 49, an email January 6th, 12:50 a.m., from

22   Maria Ryan at Giuliani Partners to Molly Michael.

23         And Molly Michael was the executive assistant to the President, correct?

24         A      She was.

25         Q      And it says, "Per Rudy please print for POTUS to share with VP at breakfast

1    meeting."

2         Did the President and Vice President have any breakfast meeting on the 6th?

3         A    Not to my knowledge.

4         Q    I mean -- and you were at the Vice President's residence that morning, so I

5    assume you would know.

6         A    Not for breakfast.

7         Q    Yeah.

8         A    But, I mean, I roughly remember that it was probably around 9 o'clock that

9    we were going up to the residence.    And I don't -- I'd be very surprised if there was a

10   breakfast meeting that I had not heard about then.

11        Q    Okay.    And then Molly Michael sent it on to Marc Short.

12        Do you know whether this document was ever shared with the Vice President?

13   And it looks like the next exhibit, exhibit 50, is what was being forwarded.

14        Mr. ███████    Is that correct?

15        Ms. ██████    Yeah, that's correct.

16        The Witness.    Yes, I think Marc shared a copy of this with me at some point on

17   the morning of the 6th, Marc Short did.    I don't recall it being discussed with the Vice

18   President.

19             BY MR. ███████

20        Q    Okay.    Did it change your opinion regarding what the Vice President had to

21   do that day?

22        A    No, again, for two reasons.    One, what any of the State legislatures said

23   they did or did not want to do had no impact on the legal analysis of what the Vice

24   President's authorities were.

25        And, second, as a practical matter, this one, even more obviously than the

1   Pennsylvania Legislature, has tons of blank signature lines on it, indicating this is not even

2   one house of the Arizona Legislature speaking.

3        Q      Okay.   So when you got to the Vice President's residence on the morning of

4   the 6th, what was his demeanor?

5        A      I would say he was mostly -- he was warm with the staff and appreciative of

6   all the work that we had done to get things ready and sort of ready to face whatever the

7   day might bring.

8        Q      And did you work with him on the statement further?

9        A      At that point there were no substantive changes or rearrangements.    It was

10  really a matter -- I think he wanted to make sure that we were okay with the changes that

11  he had made the night before and that morning and that we didn't have any negative

12  reactions to those.   Otherwise, it was a matter of proofing it and getting it out.

13       Q      Okay.   If you'll look at exhibit 51, "Daily Diary of President Donald J.

14  Trump."

15           On the third page, the top entry is 11:17 a.m., the President talked on a phone call

16  to an unidentified person.

17           Do you know whether that was -- does that sound like around the time that the

18  President and Vice President talked that day?

19       A      So there was a time while we were up there that the Vice President left the

20  room to take a call from the President.   That could have been at 11:17, but I don't know

21  for sure.

22       Q      When the President -- when the Vice President came back, did he tell you

23  anything about his call with the President?

24       A      The Vice President's rule was never to divulge the contents of his

25  conversations with the President.

1      Q    What was the Vice President's demeanor when he came back from the call

2 with the President?

3      A    Grim.

4      Q    Okay.   Can you elaborate on that at all?

5      A    Not really.

6      Q    Okay.   Do you have any idea why he appeared grim?

7      A    No.   I mean, it was going to be a long day.   We were all watching on

8 our -- our communication staff was sending around tweets and media stories that were

9 breaking over the course of that morning, and there were a number of statements being

10 made about the election, the Vice President's authorities, et cetera.   And so it was a

11 fairly uncomfortable environment kind of overall.

12            BY MR. ██████

13      Q    What, if any, expectation did you have about protest activity?   Had you

14 received any information before you arrived at the Vice President's house or while you

15 were there about the prospect of large crowds in Washington potentially affecting the

16 joint session?

17      A    So there were quite a few times around that period of time where there

18 were protests of some kind that resulted in things issuing at the White House.

19        There probably was something that issued that morning about there being a rally

20 near the White House and to avoid certain street closures and that sort of thing.

21        Nobody had any expectation that the kind of activity that ended up following that

22 day was going to happen.

23      Q    Nobody -- when you say "nobody," you mean nobody within your direct

24 circle with the Vice President?

25      A    There was no discussion anywhere within the Vice President's circle of the

1    possibility of violence in the Capitol, for example.

2          Q      Okay.    We've developed a lot of evidence of specific threats of violence

3    that were circulating before January 6th, lots of law enforcement preparation for such

4    violence.

5          Did any of that reach you or, to your knowledge, the Vice President?

6          A      It didn't reach me, and I wouldn't be able to speak to what might have been

7    in any briefings the Vice President got.

8          Q      Did Tim Giebels or anyone from the Secret Service give you -- again when I

9    say "you," I mean you, Mr. Short, and the Vice President -- when you were together any

10   information about expectations of protest activity or possible violence?

11         A      So, again, I don't remember any specific briefing to me.    There might have

12   been for Marc or the Vice President.    I just don't know.

13         Q      Did you ever see any reports, any intelligence about the expectations of the

14   crowd, the kinds of groups or organizations that might be present, anything along those

15   lines?

16         A      I knew there was going to be a crowd.    But beyond that, I didn't have a

17   whole lot of knowledge.

18         Q      Did you, Mr. Jacob, believe that the crowd would be at the Ellipse, at the

19   Capitol, both?    Did you have any sense as to where the crowd would be physically

20   located?

21         A      So I thought it was -- I did not -- I did not expect a large crowd at the Capitol.

22   I thought that there was going to be a rally somewhere on The Mall, closer down towards

23   the White House.    But I had a lot of different things on my plate and wasn't paying

24   attention so much to rally announcements.

25         Q      Yeah.    And I understand that your role for the Vice President was not

1   security, it was on the legal issues, the important legal issues that you were facing.     But

2   it sounds like that morning you had no specific idea, no warning about crowds at the

3   Capitol or any potential violence.     Is that right?

4          A     Correct.

5          Mr. ████.   I think ████ will walk you through what happened at the

6   Capitol.

7          Mr. ████   Go ahead.

8          Ms. ████     Just real quickly.

9          Earlier ████ put in front of you a tweet that the President issued on

10  January 5th in which he said, "The Vice President has the power to reject fraudulently

11  chosen electors."     And then later that evening a statement issued by President Trump

12  that said, "The Vice President and I are in total agreement that the Vice President has the

13  power to act."

14          In recalling the circumstances of the conversation that took place at the residence

15  that you did not hear between the Vice President and the President, was it your

16  impression that the contents of that call were consistent with these public statements

17  that the President had made?

18          The Witness.   I think I lost the train of your question there.

19          Ms. ████     Sure.   Was it your impression that the call that the Vice President

20  and the President had on the morning of January 6th was consistent, that the President's

21  statements on that call were consistent with his public statements the previous day?

22          The Witness.   I didn't know what the contents of the conversation were.     And

23  the Vice President has a rule, never divulge the contents of his one-on-one conversations

24  with the President.

25          BY MR. ████

1          Q      Last thing.    Did you park at the White House and then ride up to the

2    residence with the Secret Service vehicles, or did you go straight to the residence from

3    home that morning of the 6th?

4          A      No.    I parked at the White House, and all of us then went up together, not

5    the Vice President.    Obviously, the Vice President was already at the residence.    But

6    Chris Hodgson, Devin O'Malley, I think Marc as well, although I'm not positive about that,

7    all went up together.

8          Q      In the same vehicle driven by the Secret Service?

9          A      Yes.

10         Q      Got it.    And, again, was there a reason for that, instead of going straight to

11    the residence versus riding up together?    Why was that the plan as opposed to

12    going -- meeting at the residence?

13         A      Well, it's easier for us to gather at the White House.    We all needed to get

14    home that night when the vote count was done, and so having -- the idea being we would

15    go from the Capitol back to the White House, pick up our cars -- which did eventually

16    happen at 4:30 in the morning -- and then go home.

17         So logistically -- I mean, there were times, like for the meeting on January 2nd,

18    which was on a weekend, we each individually drove up to the residence.    But normally

19    for a function like that, we would meet back at the White House and then drive up there

20    together.

21         Mr. ███████    Got it.    Thank you.

22         Mr. ███████    Okay.

23         Ms. Cheney, do you have anything at this time?

24         Ms. Cheney.    I don't.    No, I don't.    Thank you.

25         Mr. ███████    Okay.    We've been going for a while.    Do you want to take a

1   break?

2        The <u>Witness.</u>   Bathroom break.

3        Mr. ████   Yeah, 10-minute break.

4        [Recess.]

5        Mr. ████   Okay.   We'll go back on the record.

6             BY MR. ████

7        Q    So tell us, please, just kind of walk us through what happened after you left

8   the Vice President's residence and you go up to the Capitol.   Tell us how things played

9   out.

10        A    So the whole trip up I was proofing and proofing the statement to make sure

11   that there were no periods or commas in the wrong places, that it was formatted

12   correctly.

13        And then I think just as we were pulling up to the Capitol, I sent it off to our

14   communications director, Devin O'Malley, so that he could then make sure that it got

15   distributed properly.

16        So I didn't get to pay as much attention to who was lining or not lining the streets

17   or anything like that on the way up.

18        As we got there, we collected on the Senate side, our staff, along with -- I mean,

19   the whole Senate needed to process across the Capitol to the House Chamber for the

20   count.   And so -- and we got up there relatively shortly before the count, so we had to

21   pretty quickly move into that.

22        And I think the Vice President was asking, even as he headed into the House

23   Chamber on the other side, "Have you got the statement out?   Is it out?"   He wanted

24   to make sure that was out before they started.

25        So we hit Arizona in the count.   Everything was proceeding according to plan at

1    that point.    And when things broke, we had to head back over to the Senate side so the

2    Senate could begin its debate.    I did not have floor privileges, so I had to be in the Vice

3    President's staff office, which is in the back corner of the building, sort of overlooking the

4    Supreme Court.

5            As the debate proceeded, we started noticing that there were people starting to

6    stream around the back side of the building, seemingly unopposed.    They were taking

7    down barriers and that sort of thing.    I was advising people to --

8            Q    When you say "the back side," which side are you referring to?

9            A    The back side of the Capitol, so the Supreme Court side of the Capitol.    If

10   you think of the -- I don't technically know which side of the Capitol is the front, but I

11   think of the side that faces the Lincoln Memorial and the Washington Monument as the

12   front.    So we're on the back side facing the Supreme Court in the back corner.

13           But what we saw on the back side was nothing like video footage of what I have

14   since seen of what was transpiring on sort of the front side of the Capitol in terms of the

15   magnitude of the crowd.    I think we did see some people sort of moving barriers out of

16   the way, but there was no active resistance or tussle or anything like that that we saw on

17   the back side.

18           I went down to get a cup of coffee.    I had started -- once we got the statement

19   out, I think I received an email from Mr. Eastman shortly after the vote count, and I had

20   started drafting a response to Mr. Eastman that sort of memorialized the various points

21   that I had been making the day before.

22           I don't know my way around the Senate very well.    So one of our legislative

23   affairs guy and then our communications guy, Devin O'Malley, so the three of us went

24   down to get a cup of coffee, and there's a self-serve coffee kiosk down on the first floor of

25   the Senate on that side.    And as we were getting coffee, suddenly there was a loud

1    banging sound that started.    We sort of wandered out of the coffee kiosk.

2          "What in the world is that?"    I think I now know, based on videos that I've seen,

3    that that was the police riot shield that folks had stolen and were banging on the window

4    right there.

5          Glass then shattered.    And I said, "All right, everybody upstairs," because there

6    was no security that I could see down there, and the glass had shattered just down the

7    hallway from where we are, probably 60 feet away.

8          So I quickly hightailed it upstairs to the Vice President's staff office.    The younger

9    guys who didn't have young kids at home evidently decided, "Oh, glass shatter, we should

10   go check that out."    So they had evidently gone towards the window, seen a 2 by 4 come

11   flying through the window, and then saw people start clamoring through.    I think a

12   security person had showed up by that point.

13         They then followed me up to the staff office.    Two or three minutes after I got

14   into the staff office, I think it was Capitol security came in and said, "We can't secure this

15   area.    We need you all to get onto the Senate floor."

16         And I had been drafting this email to Mr. Eastman.    I didn't know where I was

17   headed at that point.    I didn't know if I was going to be able to continue to maintain cell

18   contact and that sort of thing with wherever it was that things might go.

19         So I wanted to very quickly finish that off and send it.    So I finished it with the last

20   line and sent it off without editing the email.

21         We then -- I guess by that point the Vice President had been pulled off of the floor

22   and into his personal office behind the Senate floor.    And so although the Capitol

23   security wanted to get us onto the Senate floor, that presented a small problem because

24   the Secret Service that had pulled the Vice President off that floor was not real

25   enthusiastic with opening the doors right there because his office door is right on the

1    other side of those.

2            So there was sort of a standoff between the Secret Service on that side and the

3    Capitol security on our side trying to get us through the door so we could get onto the

4    Senate floor.

5            Finally, I just decided to stay with the military aide who had the nuclear football.

6    I figured she was going to get through the door.

7            And so they did ultimately decide to open the doors.    They moved us all onto the

8    Senate floor.    The military quickly noticed that the Vice President wasn't there.    She

9    needed to be with the Vice President.    I also needed to be with the Vice President

10   because I'm one of the three or so designated people on the staff that if ever he needs to

11   be moved to a secure location, I'm supposed to be with him.    So I went to her to just

12   outside the Vice President's office.

13           I think that they -- I saw Tim go in, come back out.    Finally, he went back in and, I

14   think I understand, advised the Vice President that this time we are moving, we need to.

15   I think they had been trying to figure out whether they had a clear route to get us to

16   wherever it was that they wanted to move us to.

17           So at that point the Vice President and Mrs. Pence and Charlotte and several of us

18   on the staff went down the stairs to the secure location.    There were a few twists and

19   turns that we had to go through.

20           Most of us loaded into cars once we got into the secure location.    That's what

21   they asked us to do.    The Vice President wouldn't get in his car.

22           And once I got out of the car to figure out what was going on with that, I

23   understood that he was concerned that -- although Tim was assuring him that they would

24   not take off without his permission, Tim wasn't the one behind the wheel.

25           And he did not want to -- he was determined that unless there was imminent

1    danger to bodily safety that he was not going to abandon the Capitol and let the rioters

2    have a victory of having made the Vice President flee or made it difficult to restart the

3    process later that day.

4          We were down in there for several hours.    The Vice President put out --

5          Q    Okay.    So I'll just interrupt you there.

6          At approximately 2:13, rioters broke into the Capitol and proceedings ceased

7    immediately on the Senate floor.

8          We understand it was about 2:22 that the Vice President was evacuated to a

9    secure location, as you call it.

10        At 2:24, the President issued a tweet that's at exhibit 55.    That's 2:24 p.m.    He

11    wrote, "Mike Pence didn't have the courage to do what should have been done to protect

12    our country and our Constitution, giving States a chance to certify a corrected set of facts,

13    not the fraudulent or inaccurate ones which they were asked to previously certify.    USA

14    demands the truth, exclamation point."

15        Do you remember when you were learned about that tweet?

16        A    It was -- I don't specifically remember the first time that I saw it.    It was

17    probably while I was down in the secure location.

18        Q    And how did it come to your attention?

19        A    It was probably shown to me either by Marc or Devin.

20        Q    Okay.    And what was your reaction?

21        A    I was offended for the Vice President because I thought the Vice President

22    was, in fact, showing incredible courage with the way that he was responding to what had

23    happened by making sure that we stayed.

24        I mean, by the time -- I'm sure I didn't see this at 2:24.    So by that point the Vice

25    President had already made it clear we were staying unless, again, imminent threat to

1    life, and that he was going to do whatever he could to make sure that we completed the

2    vote count that day.

1

2      [5:23 p.m.]

3                         BY MR. █████:

4      Q      Were you with the Vice President when this tweet was first shown to him?

5      A      Almost certainly not.

6      Q      Okay.    Did you hear anything about what his reaction was when he learned

7      about the tweet?

8      A      I don't recall.

9      Mr█████ Do you want to ask --

10     Mr.█████ Yeah.    Before you get into the phone calls and the things that

11     occurred in the secure location, just a couple things.

12                        BY MR. █████

13     Q      Was the timing of the release of the statement in any way related to the

14     President's address on the Ellipse?

15     A      Of this statement?

16     Q      Of -- not -- I'm sorry.    Not the tweet, but your statement --

17     Mr. Culvahouse.    Your colleague letter.

18                        BY MR. █████

19     Q      Your Dear Colleague -- the Dear Colleague letter.

20     A      So the statement was still being finalized by the time the President started

21     speaking at the Ellipse.    I wasn't following that myself in real time, but I think the

22     Congresspeople were.    And I think the Vice President directed that, once he started

23     talking, he didn't want to interrupt the middle of the President's speech with a news item.

24     That would be disrespectful to do that.

25             So I think we were going to try to wait until after the President got done speaking

1    and then issue it.

2         Q    Right.    So the intention was to release the statement upon the completion

3    of the President's remarks at the Ellipse?

4         A    I -- yeah, I believe.    There were two things.    It had to be done.    I think, by

5    the time it was done and finalized, he was speaking.    And then the directive was wait

6    until he gets done before we actually release it.    Whether that was ultimately possible

7    or not -- we had to get it done before the vote count --

8         Q    Yeah.

9         A    -- started, and I know that he was running a bit long, so I know we had some

10   concern.    We were going to have to issue it before the vote count no matter what, and I

11   just don't recall how those timings ended up lining up, but those were the directions.

12        Q    Yeah.    Well, the statement was actually issued just before 1, when the vote

13   counting began, but before the President's speech ended.

14        A    So that's why.

15        Q    Okay.    During the -- what you've described as between going to get a cup of

16   coffee and going to the secure location, were you constantly aware of noise, disruption,

17   rioters essentially in your midst, or was it simply that one time when you heard glass

18   breaking?

19        A    So the one other time was that, as we were -- so, like I said, I was there as

20   they broke the window, came upstairs.

21        Q    Uh-huh.

22        A    And then, as we were being moved from the staff office to -- on towards the

23   Senate floor, you could hear in the background commotion that seemed to be inside the

24   building and that seemed to be echoing up from the stairwells.

25        Q    Uh-huh.

1     A     But it was hard to directionally ascertain exactly where that was coming

2     from.    But there was noise in the background that clearly was not sort of the orderly

3     process of the Senate staff --

4     Q     Yeah.

5     A     -- conducting their business.    There may have been some of that sound as

6     well as we were going down the stairs to the secure location.    I don't recall specifically

7     on that.

8     Q     Yeah.    We've seen some video of essentially the Vice President and his

9     family kind of exiting the office area, going down some stairs just sort of immediately

10    adjacent to that.

11    Were you with the party -- with the Vice President specifically -- as you came out

12    of the office next to the Senate Chamber and went down those stairs?

13    A     Yes.

14    Q     Okay.    And could you hear at that moment rioters or the sound of

15    commotion in the immediate area?

16    A     That's what I don't specifically remember.    So the -- the Secret Service

17    agents and whatever other law enforcement may have been involved were saying, move,

18    move, so that they themselves were making a fair bit of noise.

19    Q     Uh-huh.

20    A     I think that there was probably that sound of commotion still going in the

21    background, but I can't in my mind disaggregate the sounds that's happening at that

22    point.

23    Q     Okay.    At any point, Mr. Jacob, during this entire period of time, from your

24    arrival at the Capitol to when you arrived at the secure location, were you -- did you have

25    to -- access to television footage or media reporting of the violence that was occurring

1   outside and then ultimately inside the Capitol?

2       A   So we didn't have any television down in the secure location.

3       Q   Okay.

4       A   We had our Blackberries.   We were able to pull up -- I think the reception

5   wasn't such that you could easily run video of things, but I was seeing pictures of things.

6       Q   Uh-huh.

7       A   Once we got back up to the staff office, we had the televisions, but they

8   were usually just trained on the Senate floor.   So it wasn't really until the next day that I

9   saw most of the real footage, but probably saw some of it in the staff office that evening.

10       Q   Okay.   But that evening, not until after you were brought back up from the

11   secure location and you were preparing to resume the session -- joint session?

12       A   Correct.   I -- I didn't have access to video footage while I was down in the

13   secure location.

14       Q   Or before?   Before you were relocated to the secure location?

15       A   Yeah.   Before we were relocated, I saw out the windows some people

16   streaming around the back of the building, but the screens were just all on the Arizona

17   debate.   I don't think anybody knew that there was anything much else to watch.

18       Q   And, best as you could tell, does that go for the Vice President as well, that

19   he was not able to see news footage of the things that were occurring in real time outside

20   or inside of the Capitol?

21       A   I don't -- I don't know for sure.   I don't recall -- I mean, he was on the

22   Senate floor, got pulled into his private Senate office --

23       Q   Uh-huh.

24       A   -- and then down to the secure location.   And I --

25       Q   Yeah.

1      A      I don't believe there were any televisions down in the secure location.

2   Whether anybody else had better reception to be able to pull up media videos, I don't

3   know.

4      Q      Okay.    You've referenced Tim a few times.    Is that Tim Giebels, the head

5   of the Vice President's Secret Service detail?

6      A      Yes.

7      Q      Do you remember him conveying any information to you or the Vice

8   President about the extent of disruption, violence, riot-type activity at the Capitol?

9             And I'm talking about before or as you were moving to the secure location.    We'll

10  get to information that occurred later.    I'm talking about as a predicate for moving down

11  to the secure location.

12     A      So I don't remember a discussion about the extent of it.    I remember a

13  discussion that they had determined that we needed to move, that they could not secure

14  the location that he was in, which had a lot of glass --

15     Q      Uh-huh.

16     A      -- and that they thought they had a clear path to get us where they wanted

17  to go, but they didn't know how long that path was going to be clear, so we really needed

18  to move.

19     Q      Was it your understanding that rioters were inside the Capitol at that point?

20     A      Oh, I knew that because I had been down there as they broke the window.

21     Q      I see.    Okay.    Did you ever observe any of them yourself, any of the rioters

22  themselves during the -- downstairs when you were getting coffee or inside the building

23  or as you were moving?

24     A      I did not.    Devin and Ben, who were with me, had walked towards the

25  windows instead of away from them.

1      Q    Yeah.

2      A    They saw the two-by-four come through the window and then people start

3  to clammer through, and then they came up.    So --

4      Q    Yeah.

5      A    -- they reported that to me, so I knew that there were people inside the

6  building.    Plus, you could hear them as we were moved out of the Senate staff office.

7      Q    Was it frightening?

8      A    I had a lot of adrenaline.   That's for sure.   I didn't feel like I had any reason

9  to believe that people were armed, and so I didn't feel an imminent threat of bodily

10  harm.    But, you know, the circumstances were not ideal, for sure.

11      Q    Yeah.    Do you know whether or not the Vice President was -- was

12  frightened, was afraid for his and his family's safety?

13      A    He didn't discuss that with me.   He was angry about what had happened

14  and very determined to make sure that what had happened did not manage to disrupt

15  the workings of the government.

16      Q    Yeah.   Separate the anger from the determination to resume.   What

17  manifestation of anger did you see or hear?

18      A    I'm not sure that I can separate them.

19      Q    Uh-huh.

20      A    They kind of went hand-in-hand from the things that -- that we discussed in

21  terms of just anger and dismay that this had happened to the Capitol --

22      Q    Yeah.

23      A    -- and the determination to ensure that no victory would be won by the folks

24  who had perpetrated this by forcing us to abandon the proceedings that day.   And, you

25  know, initial reports that we were getting from security was that it was going to take like

1   2 or 3 days for them to be able to clear the Capitol, because -- not because they thought

2   that it would take that long to find all the people, but somebody can like leave behind a

3   bomb or something like that.    And so they just needed to do a lot of in-depth work over

4   the amount of space, and they were -- again, my understanding is that all of leadership

5   was determined, but the Vice President was wanting to ensure that that's the case.

6       Q   Anything in particular that you remember him saying that would manifest

7   anger, frustration, fear?   Anything along those lines?

8       A   Nothing specific, no.

9       Q   Okay.

10       Mr. ███████   I think ██████ is going to walk you through some phone calls

11   and things that occurred at the secure location.    So I'll turn it back to you, ███, unless,

12   again, Ms. Cheney has some questions.

13       Ms. Cheney.   Thanks.   I do have questions.   Thank you, Mr. Jacob.

14       I just wanted to check.   So, as you described it, you first became aware of sort of

15   the protesters, rioters outside, and then went downstairs to get coffee.

16       During this period of time, were you texting or calling, communicating with

17   anybody back at the White House?

18       The Witness.   No.

19       Ms. Cheney.   During the period of time from when you -- that whole period of

20   time until you were evacuated with the Vice President, did you text or call with anyone?

21       The Witness.   I'm sorry.   Can you state that question one more time?

22       Ms. Cheney.   So yeah.   You said that you -- at the beginning of the process,

23   before you went down for coffee, when you first saw that there were people sort of

24   pushing barricades over outside, I believe is how you described it, I'm just wondering if,

25   beginning at that period until the moment you were evacuated with the Vice President,

1   did you place any calls or texts or emails to anyone?

2          The <u>Witness.</u>   So I texted my wife as I was being moved onto the Senate floor.   I

3   texted my pastor.    And he had actually met with me -- by coincidence, a tour that I had

4   set up for him of the East Wing ended up being the morning of January 5th, when I then

5   ended up needing to meet with Mr. Eastman, so he had been aware of some of the

6   tensions.

7          I had -- had texted him and my wife to let them know that I thought that things

8   were going to be okay, but that we were being moved onto the Senate floor.

9          Aside from that, I don't -- you know, I -- as I mentioned, I emailed Mr. Eastman as I

10  left the Vice President's staff office and was moved towards the floor.    And, over the

11  course of the next few hours, I had a couple of email exchanges with Mr. Eastman.

12         We were continuously getting streams of media reports from our communications

13  staff back at the White House, but I didn't, during the time leading up to going down to

14  the secure location, have any communications directly with anybody at the White House

15  that I'm -- that I can recall.

16         Ms. <u>Cheney.</u>    In terms of the communications that were coming in from the

17  communications staff, did those come directly to you?    How did you get the information

18  from the communications staff?

19         The <u>Witness.</u>   Yeah.    They sent out a blast email to all of us that were up there.

20  So Marc would get it.    Chris Hodgson would get it.    Devin would get it.    So there had

21  been a lot of tweets of little snippets of the remarks that were occurring out at the rally.

22         I remember in particular remarking on the "trial by combat" remark, Don Jr. saying

23  something like today you can be a hero, or you can be a zero, and, if you're going to be a

24  zero, we're coming for you.

25         So there were a lot of remarks of that tenor that we were discussing with some

1    concern -- not with concern that sort of the unthinkable things that ended up unfolding

2    would unfold, but dismay that those kinds of comments were being given to the crowd

3    out there.

4         Ms. <u>Cheney.</u>   Can you tell us the times -- and obviously not asking at all -- and,

5    you know, I was there myself.   I know that it was very emotional in some regards with

6    respect to family members.    But could you let us know that -- the time of the texts that

7    you sent to your wife and to your pastor?    That would be very helpful for us.

8         The <u>Witness.</u>   Sure.   They were from the Senate floor.   I don't recall off the top

9    of my head, but I can go back through my texts and find that out for you and pass that

10   information along.

11        Mr. █████   We appreciate that.

12        Ms. <u>Cheney.</u>   Okay.   Thank you very much.    Appreciate it.

13              BY MR █████

14   Q     Were you with the Vice President when he had a call with Congressman

15   McCarthy?

16   A     So I believe that Congressman McCarthy and the Vice President and maybe

17   others as well were on phone calls while I was down in the secure location.    I did not

18   participate in those calls myself.    So there was a long series of calls that the Vice

19   President was involved in.

20        So I would have been in the secure location with him, but not probably right next

21   to him during those calls.

22   Q     So you couldn't hear his end of the conversation?

23   A     No.

24   Q     Okay.    Did anybody report to you on what was said between the Vice

25   President and Kevin McCarthy?

1       A       I don't -- I don't recall a specific Vice President-McCarthy interaction being

2   reported to me.

3       Q       Okay.    And then there was a call with I guess the floor leaders -- McCarthy,

4   Pelosi, Schumer, and McConnell.    So I guess same with that.    You were not there in

5   earshot with the Vice President when he had that call?

6       A       I think I was on the other end of the garage drafting my next email to

7   Mr. Eastman.

8       Q       Okay.    Same question about Vice President having a call to the Department

9   of Defense, I think with Acting Secretary Miller and General Milley.    You were not able

10  to overhear that.    Is that correct?

11      A       Correct.

12      Q       Do you know if the Vice President had calls with any other Members of

13  Congress besides those four leaders I just mentioned?

14      A       Congressman Greg Pence was with us --

15      Q       Uh-huh.

16      A       -- in the secure location.    My impression was that there were more phone

17  calls, but I don't know specifically who the phone calls would have been with.

18      Q       Do you know if the President and Vice President had any calls while the Vice

19  President was at the secure location?

20      A       They did not.

21      Q       Do you know if Marc Short had any communications with anybody at the

22  White House during that time?

23      A       I believe he did, but I don't know with whom specifically.

24      Q       If you can look at exhibit 59 --

25              Mr. Wood.    Do we need to take a break?    I think so?    All right.    We're going

1    to take a short break because we're having a technology issue.    It should just take about

2    2 minutes, so we'll go off the record.

3          [Recess.]

4                BY MR. ██████

5          Q     If you can look at exhibit 59.    That is a tweet from President Trump.    It

6    was at 2:38 p.m. on January 6th.    He wrote:    Please support our Capitol Police and law

7    enforcement.    They're truly on the side of our country.    Stay peaceful.

8          Do you remember seeing that tweet?

9          A     Yeah, I don't get Twitter feeds.    So if it was in a media story that day -- I'm

10   certainly aware of it, but I don't recall specifically seeing that.

11         Q     Do you remember if there was any discussion about the fact that the

12   President's tweet did not ask for the rioters to leave the Capitol?

13         A     I just don't remember.

14         Q     Okay.    If you can look at exhibit 60.    It's another tweet.    This one is at

15   3:13 p.m. from Donald Trump:    I'm asking for everyone at the U.S. Capitol to remain

16   peaceful.    No violence.    Remember, we are the party of law and order.    Respect the

17   law and our great men and women in blue.    Thank you.

18         So, you know, same question:    Do you remember there being any discussion in

19   general about the fact that the President, until he issued a video statement, I think, at

20   4:17, had not issued any kind of statement asking the rioters to leave the Capitol?

21         A     I just don't specifically recall.

22         Q     Okay.    If you look at exhibit 62, it says:    Joint White House switchboard

23   shift change checklist.    Towards the bottom, No. 12, it says:    Four pending POTUS calls,

24   and then two pending VPOTUS call, one Senator Josh Hawley, and the other is Senator

25   Doug Mastriano.    As you can see, actually, Josh Hawley looks like he had calls in to both

1    the President and the Vice President.

2           Do you know why Senator Josh Hawley was calling the Vice President?

3    A      No.

4    Q      Do you know whether Senator Josh Hawley ended up talking to the Vice

5    President?

6    A      No.

7    Q      Okay.    Do you know who Doug Mastriano is?

8    A      Appears to be a senator.

9    Q      I think he's a State senator from Pennsylvania.

10   Ms ████    Correct.

11   Mr. ████    Aha.

12           BY MR ████

13   Q      Do you have any idea why he was trying to call the Vice President?

14   A      No.

15   Q      And do you know whether the Vice President talked to him?

16   A      No.

17   Q      Okay.    If you take a look at exhibit 61, and at the top there is a tweet from

18   the Vice President.    This was at 3:35 p.m. on January 6th.    It says:    The violence and

19   destruction taking place at the U.S. Capitol must stop, and it must stop now.    Anyone

20   involved must respect law enforcement officers and immediately leave the building.

21           Were you involved in any discussions about the drafting or sending of that tweet?

22   A      It may have been run by me before they sent it out.    I don't recall.

23   Q      Okay.    As you notice, he's saying not only stop, but immediately leave the

24   building, which stands in sharp contrast to the President's tweets that did not say that.

25           Do you know if there was any discussion about the need for the Vice President to

1    say people had to leave because the President himself was not saying that people had to

2    leave the Capitol?

3    A    I recall that we wanted to get everybody out of the building.   I don't recall a

4    discussion of that contrast point.

5    Q    Okay.    At 4:17 on the 6th, President Trump tweeted out a video statement

6    where he said to the rioters he loves them and urged them to go home.

7    Did you have any communication with anybody at the White House, either at the

8    time or later, regarding efforts to encourage President Trump to issue a statement asking

9    the rioters to leave?

10    A    No.

11    Q    Okay.    Did you hear even after the fact about whether Ivanka Trump ever

12    had to encourage her father to issue such a statement?

13    A    I've read those media accounts.    It's possible that I had heard about that

14    from somebody inside the building, but what my source of knowledge is at this point,

15    whether it's just from reading it in the media as opposed to whether somebody told me, I

16    just don't remember.

17    Q    Now, I realize you were up at the Capitol at the time when the attack on the

18    Capitol was going on, but did you ever later have conversations with any White House

19    staff about what the President was doing during the attack on the Capitol?

20    A    Not that I recall.

21    Q    Okay.    If you look at exhibit 66, another tweet from President Trump, this

22    one dated 6:01 p.m. on the 6th:    These are the things and events that happen when a

23    sacred landslide election victory is so unceremoniously and viciously stripped away from

24    great patriots who have been badly and unfairly treated for so long.    Go home with love

25    and in peace.    Remember this day forever.

1        Do you remember seeing that tweet?

2        A        Yes.

3        Q        Okay.    What was your reaction to that tweet?

4        A        I thought it was inappropriate.

5        Q        Why?

6        A        To my mind, it was a day that should be remembered in infamy.    That

7    wasn't the tenor of this tweet.

8        Q        Did you discuss that tweet with Vice President Pence?

9        A        I don't recall a specific discussion about it.    He had a lot of work he was

10   doing that evening finishing the certification count, so we wouldn't have talked about it

11   that evening.    It would have had to come up at a later point in time.

12       Q        And you don't remember talking about it later?

13       A        Not specifically, no.

14       Q        Okay.    Do you recall whether you discussed generally with Vice President

15   Pence the President's communications on the 6th?

16       A        I just -- I don't recall specifically discussing these tweets.    I don't remember

17   a specific discussion about them.

18       Q        Even aside from the tweets, did you ever hear the Vice President, even after

19   the fact, express frustration or dismay about the fact that the President didn't do more to

20   get the rioters to leave when you and the Vice President and others were under attack?

21       A        And the reason I'm taking so long to answer is I'm trying to pinpoint whether

22   my own -- so I heard accounts of -- and I don't remember how much of that, like I said,

23   was from press stories and how much of it was from inside the building, but I had my own

24   frustrations about that.    And I can't -- and I recall discussing those frustrations with

25   various people.    I don't recall a specific discussion with the Vice President about that.

1       Q    Who do you recall having those conversations with?

2       A    My legal staff, other friends that I had inside of the building.    But, again,

3   there was so much of a flurry of activity around all of that, I just don't recall the specific

4   one-on-one conversations that I had with any of those folks.

5       Q    Did you think about resigning?

6       A    No.    I worked for the constitutionally independent officer who had 14 days

7   left on the job, and I was going to make sure that I completed that service.

8       Mr. ██████    Did you want to ask --

9       Mr. ██████    Yeah.

10       BY MR. ██████

11       Q    Mr. Jacob, the rioters were chanting "hang Mike Pence" repeatedly?    Were

12   you aware of that at any time while you were upstairs around the Senate or down in the

13   secure holding area on January 6th?

14       A    I don't believe that I was.

15       Q    That was reported widely in news reports in real time as it occurred.    Were

16   you ever notified that the crowd was specifically focusing, in part, their anger on the Vice

17   President?

18       A    So I knew that there was a lot of anger at the Vice President generally even

19   before that.    So, as I advised people to step away from windows as we saw the crowd

20   streaming around the back side, one of the things I reminded them was that, although I

21   doubted that anybody outside knew where the Vice President's staff office was, that we

22   weren't the most popular office on the block right now.

23       Q    Uh-huh.

24       A    I don't remember having an awareness of "hang Mike Pence" chants that

25   day.    It might well be that I read media reports of them at some point during that day.

1 Q Uh-huh.

2 A There was a lot of information that was coming in that day, so --

3 Q Understood. Have you ever discussed those chants with the Vice President

4 at any time, that day or afterwards?

5 A I don't think I discussed those chants specifically with him, no. I had

6 certainly conveyed my admiration for the way that he conducted himself throughout that

7 day.

8 Q Uh-huh.

9 A And that was something we specifically remarked upon as a staff later that

10 week when we presented him his Cabinet chair. But I don't think that we would

11 specifically have referred to those chants.

12 Q What do you recall him saying about his reactions, feelings, opinions about

13 what occurred at the Capitol on January 6th during any of those conversations?

14 A Again, I think that his tweet that day and remarks that he made to the

15 Nation and to the Senate when it reconvened after the day encapsulated his feelings that

16 it was a tragic day, that it was a day that was a blemish on democratic governance to have

17 the Capitol breached in that way, that it was essential for law and order that those who

18 perpetrated it to be prosecuted to the fullest extent of the law, and I believe he promised

19 from the chair they would be.

20 Q Uh-huh.

21 A And so he was angry that that had happened and determined to -- coming

22 out of the back side of that day, we had 14 days left in the administration, and we were

23 going to do whatever needed to be done to help make sure that the transition would

24 proceed smoothly through that period of time, and that -- I think his remarks to

25 the -- might have been Speaker Pelosi. It might have been another Dear Colleague type

1   letter, but the following week, where he said this is a time for healing, and we need to

2   come to a place of unity, which is founded on, first and foremost, recognizing that what

3   happened on this day is tragic, unacceptable, can't repeat, needs to be repudiated.

4       Q      Did he on January 6th or in any other subsequent conversation express

5   anger at or frustration with President Trump?

6       A      He wouldn't have shared that with me.

7       Q      You -- when I ████ asked you a series of questions about who the Vice

8   President spoke to, you didn't recall a lot of specifics except for President Trump.    I

9   believe your answer was, no, they did not talk.    Why is it that you're so sure that they

10  absolutely did not communicate on the afternoon of January 6th?

11      A      Because it was -- there was frustration at the President had not called even

12  to check in on how he was doing.

13      Q      Frustration by whom?    By the Vice President himself?

14      A      The Vice President and the Second Lady.

15      Q      Okay.    Tell us more what they said about that frustration that the President

16  hadn't reached out in the midst of this riot at the Capitol.

17      A      I don't think that I have a lot to add to that, that there had been a point at

18  which the Vice President contemplated calling the President to give him a status update,

19  and I think the decision was made the President hadn't called him, and so he wasn't going

20  to make that call.

21      Q      Was he frustrated, disappointed, angry at that lack of outreach from the

22  President?

23      A      Marc Short would be far better able to answer that question than me.

24      Q      I understand, but what's your view, Mr. Jacob, based on your observation?

25      A      I didn't have a direct observation of that.    The Vice President was frustrated

1   by the day, angry about the day in general, and I don't know that I can disaggregate --

2       Q   Uh-huh.

3       A   -- what his feelings specifically were towards the President, because, as I

4   mentioned, he had an ironclad rule about not discussing his communications with the

5   President.   And, although this would not be an instance of communication with the

6   President --

7       Q   Uh-huh.

8       A   -- I couldn't imagine a circumstance in which he would talk to staff about his

9   direct feelings about -- with -- about the President.

10       Q   It sounds like you just said he didn't call the President when that issue came

11   up because he viewed it was the President's responsibility to call him, and that had not

12   occurred.   Is that accurate?

13       A   I think that is my understanding of that sequence, yes.

14       Q   Okay.

15       Mr. ███.   That's all I have, ███

16       Mr. ███   Okay.

17           BY MR. ███

18       Q   If you can look at exhibit 69.   On the second page, the first one

19   chronologically is one that I think we've already talked about where John Eastman wrote

20   to you on the evening of January 5th about a letter from Pennsylvania legislators.

21       On January 6th -- it says 10:44, but, as we learned earlier, the time stamp is not

22   necessarily reliable.   You wrote:   Thanks, John, will call.   You asked a couple of

23   questions.   Is it unconstitutional for the ECA to direct that the Members should do

24   objections, at least in the first instance?   Would the constitutional imperative you argue

25   for not kick in only after the statutorily required mechanism has been applied and failed

1    to uphold the Constitution?

2          Dr. Eastman writes back.    Time stamp says 1:33, so I can't be certain if that's

3    accurate, but, if so, that would be, I think, sort of while the siege was going on, but before

4    the Vice President was relocated within the Capitol.

5          Dr. Eastman writes:    I'm sorry, Greg, but this is small-minded.    You're sticking

6    with minor procedural statutes while the Constitution is being shredded.    Then he gives

7    the Lincoln example that I think you talked about earlier, and then an example from the

8    Iraq war.

9          What do you think he meant, first of all, when he said you were being

10   small-minded?

11   A      That I was taking the view that the Electoral Count Act should be followed,

12   which he had repeatedly referred to it as a minor procedural statute, I think even at one

13   point questioned whether it really had status as a statute.

14         One of the arguments that is made -- obviously it was passed by Congress, but one

15   of the arguments that is made in the Law Review articles is that one Congress doesn't

16   have the authority to bind another Congress with procedures like that.

17         So he had a number of arguments about why the Electoral Count Act didn't have

18   the real full status of law in his view.

19   Q      He wrote:    You're sticking with minor procedural statutes while the

20   Constitution is being shredded.

21         What do you think he meant by the Constitution is being shredded?

22   A      I think that's what I referred to earlier as all of the unconstitutional stuff,

23   whatever he meant by that, that was happening at the State level, that he considered to

24   be violations of Article II, section 1's, admonition that a State legislature should dictate

25   how the outcome of elections be determined.

1       Q    Okay.   Then you wrote back, and the time stamp -- time stamp says 12:14,

2  but I think you said you thought this might be closer to 2:14?   Is that correct?

3       A    I know for a fact that I sent this as I was being moved out of the Vice

4  President's staff office and onto the floor of the Senate.   So, if we're going down the

5  stairs at 2:22, if that's what I -- I think that's what I recall you all said from the timeline, it's

6  at some point in the 10 minutes or so before that.

7       Q    Okay.   But part of it, you had written earlier, you said?

8       A    Yes.   I had been drafting this and had, I think, the first two paragraphs and

9  more.   Probably everything up to the last two sentences had been drafted before I went

10  down to get coffee, and I had very quickly finished it up with the statement about his

11  position being essentially entirely made up, and, thanks to your bullshit, we are now

12  under siege, quickly typed that out, and then headed out to the Senate floor.

13       Q    Okay.   And, when you wrote, "and thanks to your bullshit, we are now

14  under siege," it sounds like you are suggesting that there is some cause and effect

15  between the conduct of Dr. Eastman and the attack on the Capitol.

16       Could you explain that?

17       A    Yes.   So, in my view -- and I think I explained this more in a subsequent

18  email -- the reason that the Capitol was assaulted was that the people who were

19  breaching the Capitol believed that there was some power that was being exercised in

20  that building that day to determine the outcome of the election, that it had not yet been

21  determined, and, instead, there was some action that was supposed to take place in

22  Washington, D.C., to determine it.

23       And most of them believed it was the Vice President who had the authority to do

24  that, which is a much less complex proposition than what the Electoral Count Act says,

25  which that the House and the Senate can do it.   I think that itself is constitutionally

1    questionable when you look at the actual language of the 12th Amendment.

2    But, nonetheless, they had been told that the Vice President had the authority to

3    do this, and Mr. Eastman had, in my view, enabled that argument by lending his -- his

4    status not just as a lawyer but as an alleged constitutional expert who had weight in this

5    field to those who were making the argument.

6    And I'll say, as I noted in the later email, I never believed that Mr. Eastman

7    intended the violence to happen that resulted from it.    I don't think that was his intent,

8    but I do think it was the result of that position being continuously pushed and sold to

9    people who ended up believing that with all their hearts.

10    Q    Okay.   So, if you look at exhibit 74, the first few emails are the ones we've

11    already talked about, including the one time stamped 12:14 that you think was probably

12    closer to 2:14 and ends with "thanks to your bullshit, we are now under siege."

13    John Eastman wrote back at 2:25.    Do you think that time stamp is accurate?

14    A    It could well be.    I remember, not long after I got down to the secure

15    location, seeing that I had gotten this email from him, and then crafting the longer

16    response that I took a bit of time to complete.    So he could have dashed this off very

17    quickly between 2:14 and 2:25.

18    Q    Okay.   And he responded:   My bullshit -- seriously?   You think you can't

19    adjourn the session because the ECA says no adjournment, while the compelling evidence

20    that the election was stolen continues to build and is already overwhelming.

21    So did you understand him there to be saying essentially that the evidence of the

22    election being stolen was more important than whether or not the Vice President

23    complied with the Electoral Count Act?

24    A    Yes.   This seemed to me to be a continuation of his Lincoln

25    all-the-laws-but-one theory.

1        Q       And then he wrote:    The siege is because you and your boss did not do

2    what was necessary to allow this to be aired in a public way so the American people can

3    see for themselves what happened.

4        So it sounds like he's saying there, if you and Vice President had just followed his

5    advice, none of this would have happened.    Is that the way you interpreted it?

6        A       Yes.

7        Q       Okay.    And what was your reaction to that?

8        A       I was somewhere between aghast and livid.    As I think the concluding line

9    of my previous email indicated, I was already fairly angry at what I viewed as

10   Mr. Eastman's irresponsible advice.    And, the fact that he was now saying that somehow

11   the Vice President had caused this riot by following the legal procedures that had been in

12   place and followed for -- since time immemorial was ridiculous.

13       And, in particular, the fact that he griped that we weren't allowing airing of his

14   supposedly overwhelming evidence when, as I referred to earlier, Mr. Herschmann had

15   come into the meeting -- Mr. Eastman was supposed to be supplying whatever evidence

16   people were objecting, were supposed to be invoking on the floor, and we had, in fact,

17   been having a debate on the floor, the lawfully provided process of the Electoral Count

18   Act, when this happened.

19       So it struck me as counterfactual in every respect.

20       Q       So then you wrote a lengthy response, and this is time stamped 1:05, which

21   is obviously not possible because that would have been earlier than what he sent you.

22   Do you think it was off, again, by about 2 hours?    Do you think it was around 3:05 that

23   you probably sent that?

24       A       It could be.    I remember taking a fair bit of time and thought in writing this

25   one, so 3:05 would make a lot more sense.    That's still just, I guess, 50 minutes,

1    40 minutes -- 40 minutes after he sent his.    I'd be surprised if I managed to draft this and

2    become satisfied with it in that period of time, but -- but I might have.

3        Q    Did you draft this at the loading dock?

4        A    Yes.

5        Q    Okay.    Why did you spend so much time responding to John Eastman?

6        A    A couple of things.    One, by this point, it was clear to me that this was

7    going to be an historically important day, and I wanted to memorialize -- in fact, when I

8    first started writing the earlier email, I wanted to make sure that I memorialized exactly

9    what I thought about all of his arguments, because we had had discussions the day

10   before.

11       I knew I had written a memo to the Vice President, but not all of the things that I

12   thought about it legally had been written down somewhere, and I wanted to get that into

13   my chain with Mr. Eastman.

14       By this point, I was also, again, offended for my profession, and I wanted to

15   memorialize every aspect of exactly where I thought he had gone off the rails.

16       Q    Okay.    In the second paragraph of your response, you wrote:    But the

17   advice provided has, whether intended to or not, functioned as a serpent in the ear of the

18   President of the United States, the most powerful office in the entire world, and here we

19   are.

20       So what did you mean by that?

21       A    I mean, I think I said it about as clearly as I could.    I thought that the advice

22   given was woefully incomplete, below professional standards, and that part of the

23   function of that had been that it became the basis on which the President felt that he

24   could make the declarations that he had about the Vice President's authority, as well as

25   the basis on which other surrogates, like Rudy Giuliani on the stage, not himself a noted

1    constitutional scholar, seemed to be the basis of the things they were saying about Vice

2    Presidential authority.

3        So I was specifically here thinking about the fact that he was providing the basis

4    for the advice that the President was relying on, but, more broadly, I thought that he was

5    enabling an irresponsible argument.

6        Q    And, by the irresponsible argument, does that include both what I had

7    previously called the more aggressive position as well as sort of the fallback position that

8    he thought was more politically palatable?

9        A    Yes.    I mean, these discussions are in the context of the ECA, and the ECA is

10    violated by either option.

11        Q    Okay.    Now, he appears to draw a distinction, because, in his reply, then,

12    time stamped 6:09, whether that's accurate or not, he writes:    Greg, I appreciate

13    tamping down the rhetoric.    I will respond in kind.    With all due respect, the VP's

14    statement today claimed the most aggressive position that had been discussed and

15    rejected.

16        Then he quotes, quote, "some believe that, as Vice President, I should be able to

17    accept or reject electoral votes unilaterally," close internal quotes, but we had given a

18    much more limited option, merely to adjourn to allow the State legislatures to continue

19    their work.    I remain of the view not only would that have been the most prudent

20    course, as it would have allowed for the opportunity for this thing to be heard out, but

21    also had a fair chance of being approved or at least not enjoined by the courts.

22        So it seems like he is still continuing to push his -- at least his fallback position.

23    Was that your understanding?

24        A    So, in this email, I'm not sure he's pushing the fallback theory.

25        Q    Uh-huh.

1      A    In this email, I think he's objecting that the Vice President's statement took

2    what he thought -- only responded to the more aggressive ask from the morning of the

3    5th that we reject the electors, and he was objecting here that he actually had given a

4    different option, which was just send it back to the States.

5      I think my response acknowledges that the final proposal, which I described to as

6    having been retreated to last night, was more modest, but the legal theory is not, which is

7    a reference back to his admission to me that, just between us Chicago lawyer chickens,

8    the underlying legal theory which has to adhere in the notion that that single sentence in

9    the Constitution vests the Vice President with the unilateral authority that the Electoral

10    Count Act's procedures are inconsistent with, it's the only way you can get to those

11    arguments.    That was the basis of the theory.

12      Q    Okay.    And then your last sentence in that email is:    And it did not appear

13    that the President ever got the memo.

14      What did you mean by that?

15      A    So, if he was saying -- I mean, I -- I took him to be subtly backing away from

16    the aggressive position -- I mean, he's saying your letter only responds to that, but then

17    there is this other position there.

18      But, as I say in this, both the President had -- I mean, you've shown me the tweets

19    where the Vice President -- I mean, where the President asserts that the Vice President

20    does have the authority to reject, and then issues a statement later that evening that lays

21    out options that include -- I mean, two of the three options listed are decertify the

22    electors.    And all of those, I understood to be based in legal advice provided by

23    Mr. Eastman, that those theories were viable.

24      So, when I say it does not appear that the President ever got the memo, I'm

25    saying, if indeed you did provide such advice to the President that that was not viable, I

1    never heard it, and it's not consistent with the statements that went out asserting that

2    the Vice President does have such authority.

3        Q    Okay.    At the beginning of that email, you wrote:    Did you advise the

4    President that, in your professional judgment, the Vice President does not have the

5    power to decide things unilaterally, because that was pushed publicly repeatedly by the

6    President and by his surrogates this week and without apparent legal correction.

7        So then his response, which was -- looks like it was the next day, so on the

8    7th -- well, I mean, technically on the 7th, very early in the morning, so maybe you could

9    view it as either very late in the night on the 6th or early in the morning on the 7th, he

10   wrote:    The Senate and House have both violated the Electoral Count Act this evening.

11   They debated the Arizona objections for more than 2 hours.

12       And then the next paragraph starts:    So, now that the precedent has been sent

13   that the Electoral Count Act is not quite so sacrosanct as was previously claimed, I

14   implore you to consider one more relatively minor violation and adjourn for 10 days to

15   allow the legislatures to finish their investigations, as well as to allow a full forensic audit

16   of the massive amount of illegal activity that has occurred here.

17       So this is after the breach of the Capitol, after the President had to be relocated

18   within the Capitol, after law enforcement had to come clear out the Capitol, and appears

19   to be after Congress resumed its joint session, at which there were still objections and,

20   therefore, they had to split into separate Houses, and this went on for several hours, as

21   you said.

22       Was he continuing at that point to urge you to try to get the Vice President to

23   adjourn and send it back to certain disputed States?

24       A    So two points.    One, there actually is an intervening response of his to my

25   email with this time stamp of 4:29 p.m.    I don't think that this is his response to that

1      email.

2         Q      Okay.

3         A      There is an intervening response that he has, but then this, although the

4      time stamp here is 4:44 a.m., I think, in the printout copy that we have from the Archives,

5      has a time stamp of 11:44 p.m., which --

6         Q      On the 6th?

7         A      On the 6th, which is more consistent with my memory.     I don't -- we've

8      noticed that a few of your time stamps, for whatever reason, from Archives documents

9      come out with a different time stamp than what ours do.     So I don't know how to

10     reconcile those.     But I'm pretty sure that, in our version, it says 11:44 p.m.

11            As to the content and the timing, yes.     After all of those things had happened,

12     not as a response to this email, but having already responded to this, he then sent

13     another email sort of out of the blue asking us, because -- as I read it in context, because

14     the Vice President, when we came back into session, made a speech to the Nation and to

15     the Senators present, which isn't provided for in the Electoral Count Act, and allowed the

16     majority and the minority leader each to make statements on the floor, which isn't

17     provided for in the Electoral Count Act, that we had somehow violated the Electoral

18     Count Act and that, therefore, having acknowledged that the Electoral Count Act was not

19     something that we needed to follow, could we please just set it aside and do what he had

20     been asking for the last 12 hours and send it back to the States for the last 24 hours.

21        Q      And what was your reaction at that proposal?

22        A      I remember showing the email to a couple of people with astonishment.

23        Q      Did you show it to the Vice President?

24        A      The Vice President was doing other work that day.     I showed it to him later.

25        Q      And what was his reaction?

1      A     He said that's romper room stuff.

2      Q     And what did you understand him to mean by that?

3      A     That, after all of the events of that day, to say -- to suggest that we suspend

4   after seeing the effects that these arguments had already had in helping to cause the

5   events of that day, it was -- it was kind of crazy.

6      Q     Do you recall when that conversation was that you had with the Vice

7   President?

8      A     Probably on the 8th.    I don't think he came down to the West Wing on the

9   7th.   I think I showed it to him on the 8th.

10     Q     Do you remember who else you shared it with?

11     A     I remember showing it to Aaron Chang (ph), who was our head of Advance,

12  who had come down to the Capitol, and probably Devin O'Malley, our communications

13  director.

14     Q     Did you share it with anyone in the White House Counsel's Office?

15     A     Not to my recollection.

16     Q     Did you respond to Dr. Eastman?

17     A     I think I just left it there at that point.

18     Q     Okay.

19     Mr. ████     Does anybody have questions?

20               BY MR ████

21     Q     It's interesting, Mr. Jacob, that you put so much of the blame on

22  President Trump's lawyers as opposed to the President himself.    Is it true that the

23  President was getting advice different from Mr. Eastman's, from his own White House

24  counsel, from Mr. Cipollone, Mr. Philbin, others, who advised the President on these and

25  other issues?

1   A No one shared any such advice with me, so I can't say what the sum total of

2 the advice the President was getting.

3   Q Was it your impression that his White House counsel had a very different

4 view of the Vice President's powers, the issues with which you were involved, than

5 Mr. Eastman?

6   A I knew Pat Cipollone, and I knew Pat Philbin, and I would have been

7 surprised if they agreed with Mr. Eastman's views of the world, but I don't recall them

8 prior to this point in time expressing views to me.

1

2    [6:23 p.m.]

3               BY MR. ████████

4    Q    Yeah.    Do you have any information from any source as to whether or not

5    the President was uncertain and looking for advice or had a perspective and he was

6    looking for someone to validate that perspective on this issue of the Vice President's

7    power or his ability to overturn the results of the election?

8    A    So I just don't have very much personal line of sight into the President or his

9    thinking because --

10    Q    I'm asking for your impression.

11    A    -- because my sum total interactions with him were the January 4th meeting

12    where Mr. Eastman was present.

13    Q    Uh-huh.

14    A    And then the not very long phone call on the 5th where Mr. Eastman was

15    present.

16    So I can't derive any conclusion about anything other than the legal advice that he

17    was given by Mr. Eastman.

18    Q    Right.

19    A    And so -- and, again, you've seen my op-ed, which is about the lawyers

20    involved.    That's a world that I know.

21    Q    Uh-huh.

22    A    I've served in a number of different roles as a government lawyer, and I feel I

23    have a pretty good train on what advice needs to be -- the kind and quality of advice that

24    is demanded by an office like the President of the United States.    So I felt like I could

25    speak to that.

1      As you know from even the final version of my op-ed, I didn't feel like I had a full

2    window into the sum total of the advice that the President had received from all those

3    different lawyers, which is why, although you see the draft that Lindsay helped prepare,

4    talks about revoking their credentials, my final version says there should be an inquiry

5    into this.    Because if they left all these things out, which I never saw, that is below

6    professional standards.

7      So I spoke to what I had the capacity to speak to.

8      Q    Yeah.    You have had clients.    You have clients now.    And there are some

9    clients that say, "Hey, Greg, what should I do?    I'm uncertain."    And then there are

10    clients that keep asking lawyers the question until they get the answer that they really

11    want.

12      I'm wondering if you have any view -- I understand he wasn't your client -- but any

13    view from your conversations with his lawyers or with anyone else as to which of those

14    two categories President Trump fell into when it came to the election.

15      Mr. Culvahouse.    Mr. ███████ I've got to object to that.    I mean, we've

16    been -- my client, Mr. Jacob, has been quite forthcoming about internal White House

17    deliberations.    I've probably gone a little farther than I maybe should have let him in a

18    couple of respects.    But I think getting his impressions of the President, we've been very

19    careful not to talk about Presidential communications.

20      Mr. ███████ Yes.

21      Mr. Culvahouse.    Where the lines are between executive privilege, Presidential

22    communications doctrine, and things outside that.    I just think we're in dangerous

23    ground a little bit for Mr. Jacob.

24      Mr. ███████ I understand.

25      And to be clear, I wasn't trying to dive into communications.    I guess I was just

1    looking really for your opinion, your impressions, Mr. Jacob, separate from the

2    communications, as to whether he was a results-oriented guy fishing for an answer or

3    whether he was genuinely uncertain about what he should do.

4         The <u>Witness.</u>    I don't know.    All I know is that when lawyers give advice without

5    giving a complete picture to their client, it makes the job of someone like me a lot harder

6    because -- well, I'll just leave it at that.

7         Mr. ████.    Yeah.    And, Mr. Culvahouse, I appreciate that, and I'll also leave it

8    at that.

9         Thank you.

10        Mr. <u>Culvahouse.</u>    Okay.    Thank you.

1

2                    BY MR. █████████

3        Q     Mr. Jacob, if I could have you look at exhibit 75.    I think this is what you

4    were referring to as the intervening email.    So I think we're going a little bit out of

5    chronological order, which is my fault.

6            So is it your understanding that the one at the top here from John Eastman is that

7    intervening email that you referred to?

8        A     Yes.    And I'm pretty sure in our time stamps this is something like 6:45 p.m.

9        Q     Okay.

10       A     So confusing time stamps, but I'm pretty sure that's the case.

11       Q     Okay.    So in response to your question, which I'll repeat it so it's on the

12   record, your question to him in your email was, "Did you advise the President that in your

13   professional judgment the Vice President does not have the power to decide things

14   unilaterally?    Because that was pushed publicly, repeatedly, by the President and by his

15   surrogates this week and without apparent legal correction."

16           John Eastman writes back, "He's been so advised, as you know, because you were

17   on the phone when I did it."

18           So did you understand him to be saying that he, in fact, had advised the President

19   that the President does not have the power to decide things -- that the Vice President

20   does not have the power to decide things unilaterally?

21       A     I do not recall Mr. Eastman saying that on the phone call on the 5th, which is

22   what he must have been referring to.    That was the only phone call that he and the

23   President and I were on at the same time.

24           I wouldn't have asked the question, "Did you advise the President that in your

25   professional judgment the Vice President does not have the power to decide things

1    unilaterally?" if, with my very fresh memory of the events the day before, I thought Mr.

2    Eastman had said that on the phone.

3          I think what Mr. Eastman said on the phone on the 5th was that he recognized

4    that we did not accept that position and that there was this fallback position that we

5    could send it back to the States and that that would be the more prudent thing to do,

6    would we consider that?

7          Q      Okay.    But on the question of whether the Vice President could decide

8    things unilaterally, after saying he's been so advised he writes, "I should not discuss other

9    conversations that I may or may not have had privately on that score with someone who

10   is a client."

11         And he goes on to at least imply what those conversations were because he

12   wrote, "But you know him, once he gets something in his head, it's hard to get him to

13   change course."

14         So did you take this to mean that John Eastman, after initially having advised the

15   President that he could take the more -- the Vice President could take the more

16   aggressive position and doing things unilaterally, advised the President of his fallback

17   position but that that just wasn't sinking in with the President?

18         A      I can't speculate as to what he means about that.

19         Q      Well, what did you, at the time you read it, what did you understand him to

20   mean when he wrote, "But you know him, once he gets something in his head, it's hard to

21   get him to change course"?

22         A      So I in my email had noted the fact that the President had said the day

23   before that the Vice President does have the authority to reject electors.    And I took it

24   to be -- this to be John Eastman's explanation as to how that came to pass, that, "You

25   know him, once he gets something in his head, it is hard to get him to change course."

1        Now, I had been -- as I testified previously, in the meeting on the 4th, Mr. Eastman

2   had advised.    He may have used the term "open question" as he said in the podcast, but

3   that it was a legally supportable option and that there were arguments, legally viable

4   arguments in the literature in support of the Vice President can reject position.

5        So that is not telling the President that the Vice President does not have that

6   authority.    That was the advice that I was aware of, and I never heard that repudiated.

7        Q      Did you ever have any conversations with anybody regarding the possible

8   invocation of the 25th Amendment following January 6th?

9        A      Can you repeat the question?

10       Q      Did you have any conversations with anybody at the White House after

11  January 6th about the possible invocation of the 25th Amendment to the U.S.

12  Constitution?

13       A      I had discussions with Marc and with the Vice President about the 25th

14  Amendment.

15       Q      Can you tell us about those discussions?

16       A      So the first conversation would have been -- I think the morning of the 7th

17  we saw some media stories floating about the 25th Amendment having been raised by

18  Speaker Pelosi.

19       And I pointed Marc to the wall of my office where I have an article I wrote by the

20  name of "25" that I published in the Green Bag back in 2003 that discussed the use of the

21  25th Amendment in the shows "The 24" and the "West Wing."    And my copy on the wall

22  is signed by Martin Sheen and by Bradley Whitford, who played the Josh Lyman character.

23       So I said, "Actually, I know quite a lot about this.    So to the extent that this

24  question comes up, I should be well prepared to advise you."

25       I also had a second article that I wrote called "25 Returns" that examined the 25th

1  Amendment through the lens of the Geena Davis show "Commander in Chief."

2  So at that point I advised Marc that if questions came up, I was prepared to

3  answer them.

4  But the burning thing that happened shortly after seeing those reports was that a

5  call came in, I think from Speaker Pelosi and Senator Schumer, Leader Schumer, wanting

6  to reach the Vice President.

7  I think Marc -- I think I was there as Marc took a call maybe from their chiefs of

8  staff -- I don't think it was the Speaker and Senator Schumer who were actually on the

9  phone -- from them.

10  And then there was a later conversation with the Vice President.    I don't

11  remember if it was that evening or the evening after.

12  And then, following that, when they moved a resolution on the floor of the House

13  calling on the Vice President to invoke the 25th Amendment, I had an absolutely

14  miserable afternoon in the Vice President's office.    I had gotten my ███████████

15  the day before and gotten about 1████████████████████████████████████████████████

16  ████

17  So with no sleep whatsoever, I was from 1 o'clock until about 7 o'clock doing

18  about 18 drafts of the statement that the Vice President ultimately issued on the 25th

19  Amendment.

20  Q    Did any member of the White House staff indicate to you that they thought

21  that the 25th Amendment should be invoked?

22  A    So similarly to the way that I answered ████ before, I've got to be careful

23  because I don't want to, through negative implications, end up disclosing the

24  communications or noncommunications with folks.    But I don't recall anybody

25  expressing that to me.

1    Q    Do you know whether any members of the President's Cabinet urged the

2    Vice President to invoke the 25th Amendment?

3    A    I'm not aware of anyone doing that.

4    Q    Are you aware of any discussions about possible use of the Insurrection Act

5    in connection with January 6th -- or in connection with the 2020 election?

6    A    Are these media reports tied to Mike Flynn?    I think I might have read some

7    things about that.

8    Q    Aside from the media.

9    A    But I have no contemporaneous knowledge of implications of the

10   Insurrection Act.

11   Q    Same question regarding the use of martial law?

12   A    Correct.    I don't think I had any contemporaneous awareness of that.

13   Q    Okay.    How would you describe the relationship between the President and

14   the Vice President after January 6th?

15   A    There were several days that they did not speak.    There was a time when

16   they had a conversation.    I don't remember precisely when that was, how many days

17   after the events on the 6th that was, but -- and I think they spoke a couple of times

18   thereafter.

19   Q    Do you know whether they ever spoke about what happened on

20   January 6th?

21   A    I think that they did.    I think that that was the first conversation.

22   Q    Can you tell us what was said?

23   A    I don't know the details of it.    The Vice President wouldn't divulge those

24   communications.

25           Mr. ████    Do you have anything?

1          BY MR. ███████

2     Q     Do you know who, if anyone, had a role in brokering or setting up that initial

3   conversation after January 6th between the Vice President and the President?

4     A     I believe that Jared and Ivanka came to the Vice President and had a long

5   meeting with him and that they brokered the conversation.

6     Q     Any information about the contents of that discussion between Jared and

7   Ivanka and the Vice President on this issue of some sort of meeting with President Trump

8   after January 6th?

9     A     I was not in the room for it.    My impression was that they had been very

10  apologetic and had successfully persuaded the Vice President to meet with the President.

11    Q     Did he need to be persuaded?    Was he still angry at that point about what

12  had happened on January 6th?

13    A     So he was certainly angry about what happened on January 6th.    Exactly

14  what his feelings were towards the President, I can't directly speak to.

15        So he, at minimum, needed to be invited.    I mean, I wasn't aware of an invitation

16  from the President to come and speak to him that the Vice President refused.    So in that

17  sense I can't say whether he needed to be persuaded.    Persuade probably isn't the word

18  I should have used in that regard.

19    Q     I see.    So he -- my understanding, and, again, correct me if I'm wrong -- is

20  that he was not going to reach out to the President, but was ultimately receptive to the

21  President through Jared and Ivanka reaching out to him?

22    A     Yes.

23    Q     Okay.    Do you know whether or not he felt differently, felt better after the

24  ultimate meeting with President Trump?    I understand you can't disclose or don't know

25  about the contents.    But in terms of, again, demeanor or his reaction, what was that?

1    A    Again, I can't speak directly to exactly what he was feeling because he would

2    always remain very close to the vest about exactly what his feelings were and his

3    conversations were with the --

4    Q    Except when he was talking about movies, right?

5    A    About the President.    He was very free talking about movies.

6    Q    Okay.

7    A    I did have a strong sense that it was a net positive meeting, that it was a

8    good thing, that some air had been cleared.

9    Q    Yeah.

10   A    Probably not all air had been cleared.

11   Q    Do you have any information about the extent of their current relationship,

12   the Vice President -- former Vice President and President Trump?

13   A    I don't.

14   Q    There's media reports that they have not spoken in some months.    Do you

15   have any information about the nature or frequency of their ongoing contacts since they

16   both left the White House?

17       Mr. Culvahouse.    Let me -- how is this relevant to the committee's inquiry, this

18   last question?    I mean, this is a year-plus after the events.

19       Mr ████████    They're both witnesses in this -- important witnesses in this

20   investigation.    And I'm just trying to get -- ascertain whether or not there's any ongoing

21   communication that might affect their cooperation.

22       The Witness.    I don't know.

23       Mr. ████████    Have you talked to the former Vice President about your testimony

24   here today?    And I understand you represent him, and if it calls for privileged

25   conversations, then I don't want to invade those communications.

1    The <u>Witness.</u>   I've not spoken to him about the contents of my testimony.   I

2    didn't know what questions would be asked, so -- but he's aware that I'm here today.

3    Mr █████.   I think that's all I have.

4    Mr. █████   Okay.   Ms. Cheney, do you have anything?

5    Ms. <u>Cheney.</u>   I do.   Thanks, █████

6    Mr. Jacob, can you just go back again to -- I think █████ asked you about any

7    discussions with the Cabinet about the 25th Amendment.   Can you talk more broadly?

8    Were you contacted by Gene Scalia in general about the role of the Cabinet after

9    January 6th?

10    The <u>Witness.</u>   I was not.   I know Gene pretty well.   I've known him for a long

11    time.   But he didn't contact me about anything having to do with the 25th Amendment.

12    Ms. <u>Cheney.</u>   But did he contact you post-January 6th about the role of the

13    Cabinet or management of the White House getting to the 20th?

14    The <u>Witness.</u>   No, not -- he didn't contact me, and I'm not specifically aware of a

15    conversation with anybody else in the office.

16    Ms. <u>Cheney.</u>   Did you hear from anybody else in the Cabinet -- again, setting

17    aside the 25th Amendment -- anybody else in the Cabinet about the Vice President's role

18    between January 6th and January 20th?

19    The <u>Witness.</u>   Not that I recall.

20    Ms. <u>Cheney.</u>   How about internal discussions, given what had just happened,

21    thinking about the need for peaceful transition of power?   Were you involved in internal

22    discussions about management of the White House through the 6th to the 20th?

23    The <u>Witness.</u>   So not management of the White House.   When the 25th

24    Amendment issues got raised by the House of Representatives, we did talk about the fact

25    that things seemed to be moving smoothly in terms of being able to effect a transition of

1  power in the coming 2 weeks.   There didn't seem to be any reason to think that

2  we -- that that would not be able to be accomplished.

3      And I think the Vice President said in his statement that he was committed to

4  making sure that that would happen, and he was, you know, attentive to that.

5      Mr. Culvahouse.   Can you give us one second?

6      Mr. ███   Do you want to go off the record or --

7      Mr. Culvahouse.   No.   I just want to consult with my client.

8      [Pause.]

9      Mr. Culvahouse.   All right.   Sorry.

10     Ms. Cheney.   Then I wanted to also ask, the email, which I'm not clear on the

11  time of it -- I'm changing subjects again, going back to the email that you received from

12  Mr. Eastman basically asking one more time.   I think it's exhibit 74 for us.   The time

13  stamp is 4:44 a.m.   This is the one we talked about previously.

14     I wondered if at that time when Mr. Eastman was seeking an additional delay or

15  additional efforts on your behalf, were you aware of any other efforts that were ongoing

16  at that time to seek a delay?

17     The Witness.   No, I wasn't aware of any other asks as of that point on

18  January 6th.

19     Ms. Cheney.   All right.   Thank you.

20     Mr.███   Is there anything that we have not asked you about that we should

21  know?

22     Mr.███.   I have one question and then you can answer that one.

23     Mr.███   Do you want to do yours first?

24     The Witness.   According to ██, the answer is yes.

25     [Laughter.]

1          BY MR. █████████

2          Q     So you worked pretty intensely for a couple days leading up to January 6th

3     with John Eastman going back and forth.     Have you had a chance to watch his speech

4     that he gave on the Ellipse?

5          A     I think I've -- so I have not watched the entire thing on the Ellipse.     I know

6     I've seen at least part of his remarks and I think Mr. Giuliani's remarks.     I probably have

7     seen his entire set of remarks.

8          Q     So do you have a view as to why you think he gave those remarks or what his

9     objective was in doing that?

10         A     I don't.

11         Q     Okay.     That's fine.

12         Mr. ███████     Is there anything that we have not asked you about that you think

13     this committee should be aware of?

14         The Witness.     No, I don't think so.     I think -- I just want to say I think my legal

15     staff, who you can see threaded into some of these things, but there was a tremendous

16     amount of work that had to be done to make sure that we left no stone unturned, that

17     we reviewed everything, and that there was no procedural fault as we went into the end.

18         So I thought all of them had a number of very late nights and very early mornings

19     and did an exceptional job allowing us to come to the right legal conclusions and to serve

20     the Vice President with the advice that he needed.

21         Mr. ███████     Do you have -- Ms. Cheney, do you have something else?

22         Ms. Cheney.     I did.

23         Mr. ███████     Okay.

24         Ms. Cheney.     First of all, thank you very much, Mr. Jacob, for being here today.

25     And I am grateful, as you know we've discussed before, for your work and your

1    contribution and certainly for what the Vice President did that day.

2           And I want to move to just sort of wrap up.    In the aftermath of the 6th, I know

3    we talked about Cabinet officials, I know we talked about White House officials.    Just to

4    be absolutely clear, so you weren't contacted by anybody about the 25th Amendment?

5           The Witness.    So I had conversations with Marc Short and with the Vice President

6    about the 25th Amendment.    I remember we had a call late one evening, and I don't

7    remember if that was the 7th or the 8th.    It was probably one of those days.    And then

8    some other staffers were involved in getting the statement to final on the 11th or 12th, or

9    whatever day that was.

10          But those are the only communications I remember having about the 25th

11   Amendment.    I don't remember any contacts from outside the building about it.    I

12   don't remember any discussions with any of the President's staff about the 25th

13   Amendment.

14          There was something that came up initially because of the outreach by Speaker

15   Pelosi and Senator Schumer, and then when the House decided to move things on the

16   floor, that then resulted in the drafting of the statement.

17          Ms. Cheney.    So was the discussion focused solely on the activity in the House?

18          The Witness.    So, I mean, the legal discussion was focused about whether the

19   circumstances were ones that warranted invocation of the 25th Amendment.    What the

20   procedural structure of the 25th Amendment was where -- when you have a President

21   who is -- has his mental faculties and is able to respond to questions and

22   communications, even if the 25th Amendment were invoked, the President simply

23   declares himself fit again, that then goes to the House and the Senate to resolve.

24          And so really the structure of the 25th Amendment says, other than in the

25   instance of disability or incapacity, at the end of the day a judgment can be made by

1  Congress on this.    But that's where the decision is going to be if you don't have a clear

2  case of incapacity or disability.

3      So that was the discussion, and I was not aware of the kinds of discussions that

4  you suggest.    I was aware that the House was pushing a solution.    That was what the

5  statement was a response to.    And I don't remember -- I certainly didn't have any

6  contacts with any Cabinet members about it, and I don't recall any discussions about

7  Cabinet members or other interactions on the 25th Amendment issue.

8      Ms. <u>Cheney.</u>   Were there discussions -- did you have discussions with anyone

9  from the General Counsel's office or other officials at the Department of Defense in this

10 period?

11     The <u>Witness.</u>   When you say the General Counsel's office, do you mean the

12 White House Counsel's Office?

13     Ms. <u>Cheney.</u>   No.    I mean the Department of Defense general counsel or

14 anybody at the Department of Defense.

15     The <u>Witness.</u>   I don't believe that.    Well, we were -- not about any issues

16 pertaining to this.    I think that there were some questions about some materials to build

17 a desk that the Navy had possession of, and those were the only discussions that I recall

18 having with anybody at DOD at this time.

19     Ms. <u>Cheney.</u>   And were you involved on the 6th -- and it may be that -- well, I'll

20 ask the question.    If you can't answer it because of the setting we're in, you can let us

21 know.

22     But the planning that goes on around continuity of government, around

23 succession issues, were you involved in any of those on January 6th?

24     The <u>Witness.</u>   I don't recall having any succession discussions on January 6th.

25     Ms. <u>Cheney.</u>   At any time after the 6th?

1       The <u>Witness.</u>   Well, again, we had discussions about the 25th Amendment, which

2  is a form of succession.    I had to be outbriefed by WHMO, White House Military

3  Operations, about my role in any succession scenario that would come up as the counsel

4  to the Vice President, but there were no substantive discussions about triggering any kind

5  of succession scenario.

6       Ms. <u>Cheney.</u>   All right.   Thank you very much.

7       BY MR. █████

8    Q     Do you have any policy recommendations for the committee to consider

9  based on your vast knowledge of the Electoral Count Act, of the 12th Amendment, plus

10  just the personal experience of having gone through what happened on January 6th?

11  Any recommendations to help avoid a tragedy like that from ever happening again?

12    A     So with the Electoral Count Act, yes.

13    Q     Okay.

14    A     In my view, a lot has been said about the fact that the role of the Vice

15  President in the electoral count on January 6th is purely ministerial, and that is a correct

16  conclusion.    But if you look at the constitutional text, the role of Congress is purely

17  ministerial as well.    You open the certificates and you count them.    Those are the only

18  things provided for in the Constitution.    The Framers didn't contemplate objections on

19  the grounds that things not be regularly given, et cetera.

20       As long as you have that power provided for by statute in Washington, as we do

21  under the Electoral Count Act -- and I kind of get where Congress was coming from,

22  because what Congress learned in 1876 is that the enterprise of counting sometimes isn't

23  as simple as take what you've got and count them.    Because if you actually do have

24  submissions by two competing State authorities, you have to answer the antecedent

25  question, Which one do we count?

1          So in the event that you really do have competing submissions from two State

2   authorities, somebody has to resolve which one you're going to count.

3          But outside of that scenario and these not regularly given objections that really

4   started being abused, in my view, in 2000, and were used in 2000, 2004, 2016, now 2020,

5   so most of the last Presidential elections, I've seen talk about raising the threshold on the

6   number of objections and things like that.

7          It should just be gotten rid of.    It's not constitutional.    There is nothing in the

8   Constitution about a power of Congress to reject a sole certified slate of electors from the

9   State.

10          And as long as you have that power in Washington, when you have one party

11   control of both the Senate and the House, there's going to be pressure for Congress to do

12   what the Vice President would not, and that is a terrible idea.

13          And, you know, this flaw has been -- has really over the last 20 years come to light

14   as we've seen the sequence of not regularly given objections over time build and, finally,

15   we saw what happened in 2020.

16          But if people think that Congress has the power to redetermine the outcome of

17   the election, then there's going to be pressure on Congress to do that when the stars are

18   aligned in such a way that they think someone could do it.

19          So I've seen a lot of headlines about -- from Senator Romney, Senator

20   Collins -- about we need to clarify that the role of the Vice President is purely ministerial.

21   None of the arguments that were being advanced by Mr. Eastman were predicated on an

22   alleged ambiguity in the Electoral Count Act about whether the Vice President's role was

23   purely ministerial.    The Electoral Count Act makes that pretty clear.    That's not what

24   needs to be clarified.

25          It wouldn't hurt to have an absolutely clear statement on that effect, but anything

1   that the Vice President did that was outside of a purely ministerial function would

2   probably violate the provision of the Electoral Count Act.    So that's already provided for.

3          I think you need to seriously think about limiting the role of Congress.    You do

4   need to have some resolution to what happens when you have two State authorities

5   submit competing slates of electors.

6          Q      Does that need to be Congress or can that be the courts?

7          A      So it doesn't need to be Congress.    And it can -- it could be the courts.    But

8   there isn't -- right now the Electoral Count Act isn't set up to resolve that question.

9          I do think that having an antecedent rule set up -- the problem is that you do have

10  to have somebody decide at that point, right?    And there's no such thing as a perfect

11  solution to this because no matter who you have decide, you can come up with scenarios

12  about how you might not like the decision that that actor comes up with.

13         The courts are one possible solution.    I've seen Judge Luttig make arguments to

14  that effect in The Wall Street Journal.

15         Where there are no competing slates, I don't think that there's a role even for the

16  courts to get involve.    If you only have one State authority sign off on things, there

17  shouldn't be State actions along those lines.    And allowing even litigation to try to

18  challenge things at that point isn't really consistent with the constitutional structure.

19  Again, it's one ambiguous sentence on that front.

20         The one other thing I'll say is, because there are no rules for the joint session,

21  whatever you do with the Electoral Count Act, you need to cabin -- this is the one sense in

22  which the ministerial role of the Vice President is not completely clear, even under the

23  Electoral Count Act, which is if any of these motions or points of order or anything else

24  that could be used to try to break out of the strictures of the Electoral Count Act were in

25  order during that session -- and, again, this goes back to 1857 with Senator James Mason

1    in the chair ruling on the objection in the first instance and then saying you can feel free

2    to overrule me.

3        Well, a structure similar to that is what the parliamentarian was proposing, but

4    that means that the Vice President gets to rule in the first instance and then you have to

5    decide can the joint session actually vote as a body?    That's never happened in history.

6        And if not, the House and the Senate break apart.    Do they both need to agree to

7    overrule?    Can one be sufficient?    There's not a very satisfying answer to that.

8        The most satisfying answer is make sure that there are no substantive rulings that

9    the person sitting in the chair is available to make.    Just make sure that all of those

10   things are out of order so that no question can be put to the chair about the

11   constitutionality of the Electoral Count Act, about some alternate slate, or things like that,

12   so that everything is according to Hoyle.

13       So those are the things that I think that you should be thinking about as you look

14   at Electoral Count Act reform.

15       I do think thank God we had the Electoral Count Act because it made our lives

16   easier.    I think it was a good insight that they had that we need to have something on

17   the books, and the fact that we had something for 130 years that had been followed

18   without exception was extraordinarily helpful.    But there are some -- there's some kinks

19   that need to be worked out.

20       Mr. ████    Okay.    If nobody else has any questions, we will finish up.

21       I will just note for the record we are going to keep the deposition open, subject to

22   the call of the chair.    But it is our strong desire, as I'm sure it is yours, not to have to do

23   that.    We're just doing it in the event that we receive some documents or new

24   information that present a really compelling need for us to bring you back to ask more

25   questions.

1          But as we sit here today, we don't anticipate that happening.    And we greatly

2    appreciate all of your cooperation and the time you spent with us, and we will make

3    every effort to avoid having to call you back for any further questions.

4          So unless there's anything anybody else would like to add on the record, we'll go

5    off the record now.

6          Mr. Culvahouse.    Sure.

7          Mr. ████    We're off the record.

8          [Whereupon, at 6:59 p.m., the deposition was recessed, subject to the call of the

9    chair.]

1                           Certificate of Deponent/Interviewee

2

3

4        I have read the foregoing _____ pages, which contain the correct transcript of the

5     answers made by me to the questions therein recorded.

6

7

8

9                                _____

10                                  Witness Name

11

12

13                                _____

14                                  Date

15